```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      FT. LAUDERDALE DIVISION
 3                        Case 12-60312-CR-COHN
 4
     UNITED STATES OF AMERICA,
 5
                  Plaintiff,
 6                                           FT. LAUDERDALE, FLORIDA
         vs.
 7                                           May 9, 2013
     MACKENLEY DESIR and GENET REMBERT,
 8
                  Defendants.
 9   _____\
                           VOLUME 1
10
                      TRANSCRIPT OF MOTION HEARING
11               BEFORE THE HONORABLE JAMES I. COHN,
                    UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
     FOR THE GOVERNMENT:      FRANCIS INES VIAMONTES, A.U.S.A.
14                            VANESSA JOHANNES, A.U.S.A.
                              500 S Broward Boulevard, 7th Floor
15                            Ft. Lauderdale, Fl 33132
16   FOR DEFENDANT MACKENLEY: DERIC ZACCA, ESQ.
                              ERGIO FERNANDEZ, ESQ.
17                            CABRERA & ZACCA, L.L.P.
                              12781 Miramar Parkway, Suite 303
18                            Miramar, Fl 33021
19   FOR DEFENDANT REMBERT:   DARYL WILCOX, A.F.P.D.
                              Federal Public Defender's Office
20                            One East Broward Boulevard Suite 1100
                              Ft. Lauderdale, FL  33301
21
     REPORTED BY:             PAULINE A. STIPES, RPR-CM
22                            Official United States Court Reporter
                              Federal Courthouse
23                            299 E. Broward Boulevard
                              Ft. Lauderdale, FL  33301
24                                                954-769-5496
25
```

# TABLE OF CONTENTS

Ronnalyn Crain .......................................... 6

    Direct Examination by Ms. Viamontes  ................... 6

    Cross-Examination by Mr. Wilcox  ...................... 8

    Redirect Examination by Ms. Viamontes  .............. 21

    Recross-Examination by Mr. Wilcox  ................... 23

Cassandra Jones ......................................... 24

    Direct Examination by Ms. Viamontes  ................. 24

    Cross-Examination by Mr. Wilcox  ..................... 30

    Redirect Examination by Ms. Viamontes  .............. 36

Susan Funk-Romash ....................................... 38

    Direct Examination by Ms. Viamontes  ................. 38

    Cross-Examination by Mr. Wilcox  ..................... 46

Genet Rembert ........................................... 52

    Direct Examination by Mr. Wilcox  .................... 52

    Cross-Examination by Ms. Viamontes  ................. 68

    Redirect Examination by Mr. Wilcox  ................. 80

Susan Funk-Romash ....................................... 85

    Direct Examination by Ms. Viamontes  ................. 85

    Cross-Examination by Mr. Wilcox  ..................... 89

# EXHIBITS

| Description | Marked for Identification Page | Line | Received in Evidence Page | Line |
|---|---|---|---|---|
| Government Exhibit 1 ............................. 37 | | | | 19 |

3

 1          THE COURT:  Good morning.

 2          Okay.  The matter before the Court is United States of

 3  America versus Mackenley Desir and Genet Rembert Rembert.

 4          Mr. Desir is present, he is represented by Deric

 5  Zacca; and Ms. Rembert is present, she is represented by Daryl

 6  Wilcox, and it is my understanding that, Mr. Zacca, you are

 7  requesting that attorney Ergio Fernandez, who is a member of

 8  the Bar of the Southern District of Florida, be permitted to

 9  assist you in trying this case.

10          Is that correct?

11          MR. ZACCA:  Yes, judge, with the Court's permission

12  and the client's consent.

13          THE COURT:  Did you discuss the matter with Mr. Desir?

14          MR. ZACCA:  I did.  I discussed it with him this

15  morning.

16          THE COURT:  Mr. Desir, do you consent to Mr. Fernandez

17  trying the case with Mr. Zacca?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Mr. Fernandez, you will be assisting

20  Mr. Zacca during this case.

21          MR. FERNANDEZ:  Thank you.

22          THE COURT:  Now, representing the Government is

23  Frances Viamontes and Vanessa Johannes.

24          MS. JOHANNES:  Yes.

25          THE COURT:  We have a number of outstanding motions to

1  hear this morning.

2          I guess, probably, the first motion that we should

3  hear is Mr. Desir's motion to exclude co-defendant Rembert's

4  testimonial evidence, which is docket entry 148.

5          Let me back up for just a second.

6          I think that would be contingent on the disposition of

7  Rembert's motion to suppress statement.

8          Let's hear Rembret's motion to suppress statement and

9  then I will hear motion to exclude testimonial evidence.

10         MR. WILCOX:  Good morning.  Daryl Wilcox on behalf of

11  Genet Rembert.  I did file a motion to suppress statements

12  stemming from the arrest -- the Government has the burden to

13  prove that.

14         THE COURT:  They do.

15         MR. WILCOX:  I will ask, if there are any other

16  witnesses in the case, we invoke the Rule.

17         THE COURT:  The Court will invoke the Rule of

18  Sequestration.

19         All witnesses other than parties and case agents are

20  requested to exit the courtroom and not discuss your testimony

21  with anyone other than the attorneys outside the presence of

22  any other witness.

23         Okay.  The Government may call its first witness.

24         MS. VIAMONTES:  The Government, at this time, calls

25  FBI Agent Crain.

1        THE COURT:  Ms. Johannes, may I have the name of the

2  agent at table?

3        MS. JOHANNES:  Yes, FBI Agent Susan Funk, F-u-n-k.

4        She informed me that her name is hyphenated.

5  Funk-Romash, R-o-m-a-s-h.  It is phonetic.

6        THE COURT:  All right.

7        Ma'am, would you please remain standing and raise your

8  right hand.

9        RONNALYN CRAIN, GOVERNMENT'S WITNESS, SWORN.

10       THE COURT:  Would you please be seated.  Please state

11 your name and spell your last name for the record.

12       THE WITNESS:  Ronnalyn Crain, R-o-n-n-a-l-y-n, Crain

13 is C-r-a-i-n.

14       THE COURT:  All right.  Ms. Viamentes, you may

15 inquire.

16                    DIRECT EXAMINATION

17 BY MS. VIAMONTES:

18 Q.  Thank you, your Honor.

19       Agent Crain, would you state where you work?

20 A.  FBI.

21 Q.  What capacity?

22 A.  Special Agent.

23 Q.  Were you on duty December 14, 2012?

24 A.  Yes.

25 Q.  How were you involved in the investigation or the arrest of

1   Ms. Rembert?

2   A.   I participated in the arrest and partially in the

3   interview.

4   Q.   You weren't present when her Miranda rights were read, were

5   you?

6   A.   No, I wasn't.

7   Q.   At any time --

8         Who else was present when you were with Ms. Rembert?

9   Was Agent Funk present?

10   A.   Yes.

11   Q.   Was Detective Cassandra Jones from the Hollywood Police

12   Department?

13   A.   Yes, she was.

14   Q.   At any time, did you observe Genet Rembert along with any

15   other law enforcement officer other than Susan Funk or

16   Cassandra Jones from the Hollywood Police Department?

17   A.   No, ma'am.

18   Q.   During your interaction with Ms. Rembert and involvement

19   with her arrest and interrogation, at any time, did you witness

20   a law enforcement officer curse at Ms. Rembert?

21   A.   No.

22   Q.   Did you hear her invoke her right to counsel?

23   A.   No, ma'am.

24   Q.   At any time, did she request an attorney to be present

25   before interrogation?

1   A.   No.

2   Q.   Did you hear a law enforcement officer tell her we don't

3   play by this bullshit?

4   A.   No, ma'am.

5          MS. VIAMONTES:   No further questions of this witness,

6   your Honor.

7          THE COURT:   Mr. Wilcox, cross.

8          MR. WILCOX:   Thank you, your Honor.

9                        CROSS EXAMINATION

10  BY MR. WILCOX:

11  Q.   Good morning, Agent Crain, how are you?

12  A.   Good.

13  Q.   Were you present at the scene when Ms. Rembert was

14  arrested?

15  A.   Yes.

16  Q.   Where was that?

17  A.   Hollywood.

18  Q.   Where in Hollywood?

19  A.   I don't remember the exact address.

20  Q.   Do you have a report?

21  A.   I don't have it in front of me.

22  Q.   Did you write a report?

23  A.   I did not write the report.

24  Q.   Did you adopt?

25  A.   I probably signed off on it, looked at it, yes.

8

```
 1            MR. WILCOX:  Your Honor, I would ask the Government to

 2   disclose that report to me at this time.

 3            THE COURT:  All right.  Granted.

 4            MR. WILCOX:  Unless you are referring to this report,

 5   I may have it, judge.

 6            Are we referring to this one?

 7            MS. VIAMONTES:  I don't know which one you are

 8   referring to.  You have to ask the witness.

 9            MR. WILCOX:  Thank you.

10            THE WITNESS:  Sorry.  I need my glasses if you want me

11   to read this.

12            MR. WILCOX:  I do want you to read it.

13            THE COURT:  Where are your glasses?

14            MS. VIAMONTES:  May I approach, your Honor?

15            THE COURT:  Sure.

16            THE WITNESS:  Okay.

17   BY MR. WILCOX:

18   Q.  Is that the only report that you are aware of that you may

19   have adopted?

20   A.  There is this report and there is the actual arrest report.

21            This is the report of her being interviewed and there

22   is the arrest report where it explains how she was actually

23   arrested and transported.

24            MR. WILCOX:  Okay.  May I have a moment, your Honor?

25            THE COURT:  Yes.
```

```
 1              (Pause).
 2   BY MR. WILCOX:
 3   Q.  Ma'am, you indicated that you recall that Ms. Rembert was
 4   arrested in Hollywood, is that correct?
 5              When I asked you the question earlier, do you
 6   remember?
 7   A.  Yes, yes.
 8   Q.  Was it near the Beacon Tower Motel?
 9   A.  Yes.
10   Q.  Excuse me?
11   A.  Yes.  If you have the other report, it has the address on
12   it.
13   Q.  No, it doesn't but I will let you see it?
14   A.  Okay.
15   Q.  Does that report have the address on it?
16   A.  No, it doesn't have the arrest.
17   Q.  Do you know if there is a report that chronicled the arrest
18   that does have the address on it?
19   A.  No.  These are --
20              Looks like these are the only two reports.  She was
21   arrested in Hollywood, Florida.
22   Q.  What was she doing when she was arrested?
23   A.  She was driving in her vehicle.
24   Q.  Was someone with her?
25   A.  Yes, there was another individual with her.
```

1  Q.  Do you remember who that person was?

2  A.  Yes.

3  Q.  Who was that?

4  A.  I don't recall her name.  The case agent would recall her

5  name.

6  Q.  So, there should be --

7          So, is there a report with the other person's name

8  that was with Ms. Rembret when she was arrested?

9  A.  Is it in the report?

10  Q.  No, you can look at it.  I don't know.

11  A.  I don't recall her name.

12  Q.  Did you tell us how the traffic stop was effectuated and

13  what procedures were employed that placed Ms. Rembert in

14  custody?

15  A.  Well, I am the co-case agent and I was not directing

16  everything that happened during the arrest, so --

17  Q.  Did you witness it?

18  A.  No.  I was not the first person on the scene, so I did not

19  witness it, no.

20  Q.  When you arrived on the scene, what did you see?

21  A.  When I arrived on the scene, the Hollywood police officer

22  had already pulled her over and effected the arrest and then --

23  Q.  Go ahead, I am sorry.

24  A.  I told her that she was being arrested by the FBI for some

25  sex trafficking charges, and that the case agent would be there

1   shortly to explain why, exactly, she was being arrested and

2   that was basically it.

3   Q.  Ms. Rembert said nothing to you --

4          Do you remember what you said to her?

5   A.  At that time, she was very upset and she said, "what do you

6   mean sex trafficking charges," and she started to get very

7   upset.  I said, "calm down.  We will explain everything in a

8   few minutes;" and, then, approximately five minutes later,

9   Agent Funk showed up and then explained to her in private,

10  because it was in a public place and some other people were

11  showing up, so she pulled her to the side and told her why she

12  was under arrest.

13  Q.  Going back when you first arrived on the scene, was she

14  already handcuffed and placed in the Hollywood police car?

15  A.  No.

16  Q.  Was she already handcuffed when you arrived?

17  A.  I believe so.  I don't recall, to be honest with you.

18  Q.  Do you know how long she had been in custody by the

19  Hollywood police before you arrived?

20  A.  Approximately five minutes, I believe.

21  Q.  So, during those five minutes, you wouldn't know whether or

22  not she told the Hollywood police officer who arrested her that

23  she wanted a lawyer, you wouldn't know that?

24  A.  No.

25  Q.  You don't know whether the Hollywood police officer told

1   her we don't play that bullshit here.

2          You wouldn't know if the Hollywood police officer told

3   her that, would you?

4   A.  No.

5   Q.  Okay.  And the only thing you remember her saying --

6          Do you remember her saying anything to the person with

7   her when she was arrested?

8   A.  I don't think she was talking to the person because the

9   person --

10  Q.  Well --

11  A.  The other person -- Actually, I think her name was Ashley,

12  she -- some other officers were talking to her at a different

13  site.  She was pulled away from her.  So I don't think she

14  really had an opportunity to talk to her.  She was in a

15  different area than her.

16  Q.  Do you know whether Ms. Rembert was asked any questions at

17  the scene of arrest?

18  A.  She was asked any questions?

19  Q.  Asked any questions.  Did any law enforcement officer ask

20  her any question when she was in custody while she was at the

21  place she was arrested?

22  A.  She was asked questions about her vehicle that she was

23  driving, stuff like that, nothing about the case.

24  Q.  Do you remember what she was asked?

25  A.  Not specifically, no.

1   Q.   You told us she was arrested for sex trafficking?

2   A.   Yes, but she wasn't asked any questions regarding the sex

3   trafficking case.

4   Q.   She was arrested about what -- about what time was she

5   arrested, about 1:30?

6   A.   Honestly, I don't recall the time.

7           MR. WILCOX:  May I approach, your Honor?

8           THE COURT:  Yes, sir.

9           THE WITNESS:  Yes, the report says 1:30.

10  BY MR. WILCOX:

11  Q.   The report says 1:30?

12  A.   Yes.

13  Q.   Do you have any reason to doubt the veracity of the report?

14  A.   No.

15  Q.   This report that says 1:30, that was prepared by whom, do

16  you know?

17  A.   Agent Funk.

18  Q.   And it is drafted by Susan Funk and Ronnalyn Crain, that is

19  you?  That is you?

20  A.   That is me.

21  Q.   Your name is on the report but you didn't draft it?

22  A.   That means she wrote it and then I reviewed it.

23  Q.   It doesn't say that, does it?  It doesn't say Ms. Funk

24  wrote it and you reviewed it?  That does not say that, does it?

25  A.   No.  I am explaining what the process is.  She wrote it, I

1    reviewed it, and it is an effort.

2    Q.   I am asking if you helped her write it, did you?

3    A.   She wrote it, I reviewed it, and I signed off on it.

4    Q.   So, at 1:30 she was arrested, is that right?

5    A.   Approximately, yes.

6    Q.   Approximately 1:30.  At 2:02, she was transported to the

7    FBI office, is that right?

8    A.   Approximately.

9    Q.   Approximately 2:25, you arrived at the FBI office, is that

10   right?

11   A.   Approximately.

12   Q.   Between 1:30 and 2:25, when she arrived at the FBI Miami

13   office, who was with her during the transport?

14   A.   Transport, I believe was Agent Funk and C.J. --

15            Could I see the report, please?

16   Q.   Do you remember -- Are you having trouble recollecting?

17   A.   I didn't have a chance to review the report before today to

18   be honest with you.

19   Q.   Let me ask you a question.  If you don't remember, I will

20   show you the report?

21   A.   I don't recall.

22   Q.   Let me ask you this.

23   A.   Actually, I believe I transported her with Agent Funk.

24   Q.   Transported whom?

25   A.   Genet.

```
1  Q.  Ms. Rembert?

2  A.  Yes.

3  Q.  So your recollection is that you and Ms. Funk -- you and

4  Agent Funk-Rohash --

5  A.  Romash.

6  Q.  Transported Ms. Rembert from Hollywood to the FBI agent --

7  FBI office in Miami?

8  A.  Yes.

9  Q.  Was she questioned during the ride over there?

10  A.  No.

11  Q.  Are you certain of that?

12  A.  Yes.

13  Q.  Did you talk about anything?  Nobody said anything to her

14  during the approximately 25 minutes that she was in the car

15  between the arrest site and arriving at the FBI office, you all

16  were completely silent?

17  A.  About her charges, no.

18  Q.  What did you talk about?

19  A.  I really don't recall.

20  Q.  Did you talk about sex trafficking in general?

21  A.  No, I really don't recall.

22  Q.  Do you recall her saying -- asking you, should I have an

23  attorney?

24  A.  No.

25  Q.  You don't recall her saying, "like, I like to have my
```

1  attorney -- I would like to have an attorney with me if you

2  guys are going to interview me," you don't remember her saying

3  anything like that?

4  A.  No.

5  Q.  You don't remember what you talked about during the 25

6  minutes that you were riding from the arrest site to the FBI

7  office?

8  A.  No.  But I know we wouldn't have talked about her charges

9  because we didn't go over her Miranda rights yet.

10  Q.  Well, that is the preferred procedure, I understand that.

11       Now, you arrived at the FBI office at about 2:25, is

12  that right?

13  A.  Correct.

14  Q.  That's correct.  Okay.

15       And you took her up to an interview room?

16  A.  Yes.

17  Q.  How many officers were in the interview room?

18  A.  Agent Funk and C.J., officer from Hollywood.

19  Q.  When you say C.J., you are referring to a officer from

20  Hollywood?

21  A.  Yes.

22  Q.  Okay.  She just followed you there?

23  A.  Yes.

24  Q.  The officer from Hollywood?

25  A.  I believe so.

1  Q.  And we are talking about Cassandra Jones?

2  A.  Yes.

3  Q.  When you say C.J., you are talking about Cassandra Jones

4  from the Hollywood Police Department?

5  A.  Yes.

6  Q.  Did she ask questions?

7  A.  Who?

8  Q.  Cassandra Jones.

9  A.  Did she ask questions during the interview?

10 Q.  Right.  Did she ask Ms. Rembert any questions at any time?

11 A.  I wasn't there during the interview.

12 Q.  So you don't know?

13 A.  No.  I was there during the latter portion of the

14 interview.

15 Q.  Who was there during the initial portions of the interview?

16 A.  Agent Funk and Detective Jones.

17 Q.  Detective Jones.  Is she here today?

18 A.  Yes.

19 Q.  But you don't know whether or not Detective Jones

20 participated in an interrogation or asked Ms. Rembert any

21 questions?

22 A.  Well, during the portion that I was, during the interview,

23 she asked questions.

24      She asked a few questions during the latter part of

25 the interview which I participated in.

1  Q.  Do you remember what she asked her?

2  A.  No, I don't remember exactly what she asked.

3  Q.  Going back to the room, how big would you say the room was?

4  A.  The interrogation room?

5  Q.  Yes, ma'am.

6  A.  I'd say a little bit smaller than the area that this lady

7  is sitting in right here.

8  Q.  Would you say it is -- you can't give me an estimate of

9  terms like 8 by 10 or 12 by 16 or anything?

10  A.  I am not very good with measurements.

11  Q.  And the only person that was in the room were Ms. Rembert

12  and law enforcement officers?

13  A.  Yes.

14  Q.  Was she still handcuffed?

15  A.  I believe she was unhandcuffed for awhile, I can't recall,

16  or partially handcuffed.

17  Q.  Were you there at the beginning of the interview?

18  A.  I'm sorry?

19  Q.  Were you there when she signed the form?

20  A.  No.

21  Q.  You were not there when Ms. Rembert signed the Miranda

22  waiver form?

23  A.  No.

24  Q.  You can't testify whether or not that was explained to her?

25  A.  No.

1  Q.  You didn't witness Agent Funk reading her the Miranda

2  rights form?

3  A.  No.

4  Q.  Where were you at that time?

5          MS. VIAMONTES:  Objection, relevance.

6          THE COURT:  Sustained.

7  BY MR. WILCOX:

8  Q.  You weren't in the room?

9  A.  No, I wasn't.

10 Q.  So you can't testify what Ms. Rembert may have said to

11 Agent Funk prior to signing the form?

12 A.  No.

13 Q.  You can't testify whether or not Agent Funk may have said

14 to her, look, cooperate and tell us what is happening and you

15 probably won't even be charged.

16          You don't know whether she said that if you are not in

17 the room, right?  Right?

18 A.  Correct.

19 Q.  So she may have made mention of an attorney or may have

20 made mention she wanted to see an attorney and you may not have

21 heard it.

22          MS. VIAMONTES:  Your Honor, this calls for

23 speculation.

24          THE COURT:  Sustained.

25          MR. WILCOX:  No further questions, your Honor.

20

```
 1            THE COURT:  Any redirect?
 2            MS. VIAMONTES:  Briefly, your Honor.
 3                     REDIRECT EXAMINATION
 4   BY MS. VIAMONTES:
 5   Q.  Agent Cain, at any time, if you heard Ms. Rembert mention
 6   attorney or counsel, what would you have done?
 7   A.  I would have let her have an attorney or counsel.
 8   Q.  Would you stop the interview?
 9   A.  Yes.
10   Q.  How long have you been an FBI agent?
11   A.  17 and a half years.
12   Q.  How many interviews have you been involved in of
13   defendants?
14   A.  Hundreds.
15   Q.  Is it standard procedure to go over Miranda rights waiver
16   before getting into the facts of the case?
17   A.  Absolutely.
18   Q.  If a suspect tells you they want an attorney there, what do
19   you do?
20   A.  Let them call their attorney, stop the interview.
21   Q.  Do you then say, well --
22            Do you try to convince them to talk to you?
23            MR. WILCOX:  Objection, argumentative.
24            THE COURT:  Sustained.
25   BY MS. VIAMONTES:
```

1  Q.  Did you hear any threats being made to Ms. Rembert during

2  the interview?

3  A.  No.

4  Q.  At any time during the interview, any threats made to

5  Ms. Rembert?

6  A.  No.

7  Q.  At any time after the interview, threats made to

8  Ms. Rembert?

9  A.  No.

10  Q.  Any threats made to her if she didn't cooperate?

11  A.  No.  I don't remember.

12  Q.  Although you weren't there for the majority of the

13  interview, you never heard any such statements being made to

14  Ms. Rembert, did you?

15  A.  No.

16        MS. VIAMONTES:  Nothing further.

17        THE COURT:  All right.  Special Agent --

18        MR. WILCOX:  I have one question on recross if you

19  permit that.  I don't remember.

20        THE COURT:  No, I don't, unless there is something new

21  that came out on redirect that was not covered.

22        MR. WILCOX:  The Government asked Ms. -- Agent Crain

23  on redirect whether or not any threats were made to

24  Ms. Rembert, and I don't think I got into that on cross.  Asked

25  whether she had made any threats.

1          THE COURT:  All right.  Go ahead.

2          MR. WILCOX:  I will ask from here.

3          THE COURT:  Sure.

4                    RECROSS EXAMINATION

5   BY MR. WILCOX:

6   Q.  Agent Crain, do you remember saying to Ms. Rembert that you

7   would make sure the prosecutor knew she was cooperative?

8   A.  I'm sorry.

9   Q.  Agent Crain, do you remember saying to Ms. Rembert during

10  the interview you were going to make sure the prosecutor knew

11  she cooperated or words to that effect?

12  A.  I said that -- I did say, if she was cooperative, we would

13  make sure that the prosecutor understood -- or knew that she

14  cooperated, yes.

15  Q.  At what point in the interview was that said?

16  A.  Well, it was later in the interview.

17          We were wrapping up because she wanted to continue to

18  talk and cooperate because she was being very cooperative and

19  she wanted to keep talking and keep talking, and it was getting

20  very late, and we told her that we could continue to cooperate

21  at another time and we really -- it was late in the night, and

22  we said, don't worry, we can continue to talk at another time,

23  and I will make sure that the AUSA knows that you are

24  cooperative.

25          MR. WILCOX:  Thank you, your Honor.

1          THE COURT:  All right.  Thank you Special Agent Crain,

2  you may step down.

3          Ms. Viamontes, you may call your next witness.

4          MS. VIAMONTES:  At this time, the Government calls

5  Detective Cassandra Jones.

6          THE COURT:  Ma'am, please remain standing and raise

7  your right hand.

8          CASSANDRA JONES, GOVERNMENT'S WITNESS, SWORN.

9          THE COURT:  Would you please be seated.

10         THE WITNESS:  Thank you.

11         THE COURT:  Please give us your name and spell your

12  first and last name for the record.

13         THE WITNESS:  Detective Cassandra Jones, J-o-n-e-s.

14         THE COURT:  Your first name.

15         THE WITNESS:  C-a-s-s-a-n-d-r-a.

16         THE COURT:  Ms. Viamentes, you may inquire.

17         MS. VIAMONTES:  Thank you, your Honor.

18                        DIRECT EXAMINATION

19  Q.  Detective Jones, where do you work?

20  A.  City Hollywood Police Department.

21  Q.  What capacity?

22  A.  As detective, Vice, Intelligence Unit.

23  Q.  How long have you been working for Hollywood Police

24  Department?

25  A.  I have been employed over nine years now and detective over

1    five.

2    Q.  How long have you been on your particular spot now?

3    A.  Two and a half years now.

4    Q.  Were you working that capacity December 14, 2012?

5    A.  Yes, I was.

6    Q.  Were you involved in the arrest of Genet Rembert?

7    A.  I was.

8    Q.  Please tell the Court what you did in apprehending Genet

9    Rembert.  What was your role?

10   A.  I was conducting surveillance where she lived, her

11   residence.  I observed her and another female leave the

12   residence, conducted a traffic stop and, once the FBI, arrived

13   placed her in custody.

14   Q.  Do you remember where you were doing surveillance?

15   A.  At the Beach and Town Motel.

16   Q.  Do you know who she was with?

17   A.  A white female.  I don't recall her name.

18   Q.  Are you the officer who pulled over and conducted the

19   traffic stop?

20   A.  Yes.

21   Q.  Who was driving the vehicle?

22   A.  Ms. Rembert.

23   Q.  What did you do?

24   A.  I asked for documents for identification, vehicle

25   registration, insurance information pertaining to the traffic

1   stop and I asked her to exit the vehicle and respond to the

2   back of the vehicle to speak with her.

3   Q.  Did you inform Ms. Rembert why she was being stopped?

4   A.  They did change lanes inappropriately over a solid white

5   line.  I advised her she had a traffic infraction.  I advised

6   her FBI was enroute to where we were to speak to her reference

7   an investigation they were conducting.

8   Q.  You were aware there was a warrant --

9          MR. WILCOX:  Objection, leading.

10  MS. VIAMONTES:

11  Q.  Were you aware there was a warrant for her arrest?

12  A.  Yes.

13  Q.  At the roadside before FBI arrived, did you question

14  Ms. Rembert in any way?

15  A.  No.

16  Q.  Did you ask her any questions relating to prostitution or

17  sex trafficking?

18  A.  No.

19  Q.  Did she make any incriminating statements at the roadside

20  about prostitution or sex trafficking?

21  A.  No.

22  Q.  Before the FBI arrived, did Ms. Rembert invoke her right to

23  counsel or did she mention she wanted an attorney present?

24  A.  No.

25  Q.  Once the FBI arrived, specifically, Agent Funk arrived --

1  A.  Yes.

2  Q.  Once Agent Funk arrived, what did you do?

3  A.  I let them take over the investigation.  They spoke with

4  her.  They were going to transport her to the FBI office in

5  Miami.  I stayed on the scene to make sure the vehicle got back

6  to the residence.  We followed the white female that was with

7  Ms. Rembert back to the hotel and then I responded to the FBI

8  building.

9  Q.  The white female that was with Ms. Rembert, was she allowed

10  to take the vehicle back to the residence?

11  A.  Yes, Ms. Rembert gave permission for that.

12  Q.  At some point thereafter, did you join FBI Agent Funk at

13  the FBI office in Miami for the interrogation?

14  A.  Yes, I did.

15  Q.  Were you involved in or were you present when Ms. Funk or

16  Agent Funk went over the Miranda rights form with Ms. Rembert?

17  A.  Yes, I was.

18  Q.  Did you witness Agent Funk advise Genet Rembert that she

19  had the right to remain silent?

20  A.  Yes.

21  Q.  That she had the right to have an attorney present before

22  any questioning?

23  A.  Yes.

24  Q.  And were you there when Ms. Funk advised her that anything

25  she said could be used against her in court?

1    A.   Yes.

2    Q.   Were you present and did you witness Susan Funk tell the

3    Defendant Genet Rembert, if you could not afford a lawyer, one

4    will be appointed by the Court?

5    A.   Yes.

6    Q.   Did you, in fact, see Ms. Rembert initial each and every

7    right she was waiving or giving up?

8    A.   Yes.

9    Q.   Did you witness Agent Funk go over the right that if she

10   wished to answer questions now without a lawyer present,

11   Ms. Rembert had --

12           MR. WILCOX:   Objection to leading, your Honor.

13           THE COURT:   Sustained.

14   BY MS. VIAMONTES:

15   Q.   At any time, during the advice of rights, did Ms. Rembert

16   request an attorney?

17   A.   No.

18   Q.   At any time, did Ms. Rembert say she didn't understand her

19   rights?

20   A.   No.

21   Q.   Did you witness Agent Funk raise her voice at Ms. Rembert?

22   A.   Not at all.

23   Q.   Did you witness Agent Funk curse at Ms. Rembert?

24   A.   No.

25   Q.   At any time, did Agent Funk make Ms. Rembert any promises

1  in exchange for her cooperation?

2  A.  No.

3  Q.  At any time, did you witness Agent Funk or any other law

4  enforcement officer threaten Ms. Rembert?

5  A.  No.

6  Q.  At any time, did you hear any law enforcement officer tell

7  Ms. Rembert that we don't play by that bullshit here?

8  A.  Not at all.

9  Q.  In your career with the Hollywood Police Department, your

10  years as a detective, how many interrogations have you been

11  involved with?

12  A.  More than I could count and remember.

13  Q.  Dozens?

14  A.  Well, more than that.  Probably at least upwards of 50, 60

15  or more.

16  Q.  If a suspect requests an attorney or even mentions an

17  attorney, what do you do?

18  A.  You cease all investigation -- all questions pertaining to

19  the investigation until that person has an opportunity to see

20  an attorney.

21  Q.  If you had witnessed or heard Ms. Rembert question an

22  attorney, what would you have done?

23  A.  Stop the interview.

24  Q.  Did that happen in this case?  Was the interview stopped?

25  A.  No.

```
 1   Q.  Why not?

 2   A.  She never asked for a lawyer, never invoked that right.

 3           MS. VIAMONTES:  Nothing further.

 4           THE COURT:  Mr. Wilcox, cross.

 5                       CROSS EXAMINATION

 6   BY MR. WILCOX:

 7   Q.  Detective Johnson, good morning.

 8           Detective Jones?

 9   A.  Yes.

10   Q.  Now, did you prepare a report?

11   A.  No, I did not.

12   Q.  You did not?

13   A.  No.

14   Q.  You conducted a traffic stop?

15   A.  Correct.

16   Q.  But did not prepare a report?

17   A.  I didn't write any citations.

18   Q.  Were you with another officer?

19   A.  At the time of the traffic stop, no.

20   Q.  Could another Hollywood police officer, possibly a male,

21   arrive at the traffic stop?

22   A.  Yes.

23   Q.  Who is that?

24   A.  One of the other detectives in the VIN unit.

25   Q.  What unit?
```

1   A.   Vice, Intelligence, Narcotics Unit.

2   Q.   Another detective, male detective?

3   A.   There was a male officer, road officer, there to make sure

4   people saw we were, in fact, the police.

5   Q.   What other Hollywood police officers were there?

6   A.   That were male, like, two.

7   Q.   Were there other female police officers there, too?

8   A.   No, just me.

9   Q.   You and two other Hollywood Police Officers involved in the

10  traffic stop?

11  A.   Yes.

12  Q.   Did the male handcuff Ms. Rembert?

13  A.   I don't recall who handcuffed her.  They might have.

14  Q.   Okay.  Did you handcuff her?

15  A.   I don't recall.

16  Q.   You don't recall which person actually placed Ms. Rembert

17  in custody?

18  A.   No.

19  Q.   So you don't recall her actually being placed in custody?

20  A.   I remember her being handcuffed.  I don't remember her

21  there.  She wasn't handcuffed until FBI was on the scene.  I

22  don't recall whether they put flex cuffs on her or actually

23  handcuffs.

24  Q.   And you advised another person was in the vehicle with

25  Ms. Rembert?

1   A.   Yes, white female.

2   Q.   What kind of vehicle was it?

3   A.   I don't recall.  It was an older vehicle.

4   Q.   Do you remember who owned the vehicle?

5   A.   Yes.  It was Mackenley Desir.

6   Q.   You are certain Ms. Rembert was driving?

7   A.   Yes.

8   Q.   And how are you associating Ms. Rembert driving?

9   A.   Because I knew her identification, I knew who she was, her

10  pictures; and, when I saw her, I was the only one on the scene.

11  I approached the driver side and approached her behind the

12  wheel of the vehicle.

13  Q.   Happened in December of this year?

14  A.   Yes.

15  Q.   It couldn't have been the other person --

16  A.   Last year, sorry.

17  Q.   The other person, could you describe her?

18  A.   The white female, blond hair, she was pregnant.

19  Q.   She was not driving?

20  A.   No, she was in the passenger seat.

21  Q.   Did you witness any conversation between any other

22  Hollywood Officer and Ms. Rembert?

23  A.   No, I did not.

24  Q.   Okay.  Did you talk to Ms. Rembert at the scene?

25  A.   I did.

```
 1   Q.   What did you say to her?
 2   A.   I explained why I was pulling her over and explained to her
 3   the FBI was on the way to the location to meet with her and
 4   there was an arrest warrant for her.
 5   Q.   Is that all you said?
 6   A.   Yes.
 7   Q.   Do you know if the male officer said anything?
 8   A.   No.
 9   Q.   Do you know whether he said anything to her?  Do you know
10   whether he said anything to her?
11   A.   No officers spoke to her.  They had no reason to.
12   Q.   They may not have had a reason to, I want to know whether
13   they spoke to her?
14   A.   I did not observe any other Hollywood officer speak to her
15   on the scene.
16   Q.   And you were with her the whole time until the FBI arrived?
17   A.   Yes.
18   Q.   You participated -- you followed Ms. -- you followed the
19   pregnant white female back to the Beach and Town?
20   A.   Yes.
21   Q.   And proceeded to the FBI office?
22   A.   Correct.
23   Q.   What happened when you got to the FBI office?
24   A.   The agent brought me into the investigation report.  They
25   processed it all and asked her background information.
```

1  Q.  Would you explain that?

2  A.  Biographical information, just her name, phone number,

3  address, and that kind of stuff.

4  Q.  That was in another room?

5  A.  Correct.

6  Q.  Then she was taken to the interview room?

7  A.  Yes, correct.

8  Q.  You were present at the beginning of the interview room?

9  A.  Yes.

10  Q.  What happened at the beginning of the interview room?

11  A.  Agent Funk read her rights to Genet Rembert and advised all

12  her rights, explained it, and gave her a form that also had it

13  in writing which Genet Rembert signed, initialed each right she

14  was waiving and signed the bottom.  Agent Funk signed the form

15  and I witnessed it.

16  Q.  And you don't recall Ms. Rembert mentioning that she was on

17  her way to see her lawyer when she was arrested?

18  A.  No.

19  Q.  And you don't recall anyone saying to Ms. Rembert, look, if

20  you cooperate, we will advise the U.S. Attorney that you have

21  been cooperative?

22  A.  No.

23  Q.  Nothing like that was said in your presence?

24  A.  No, sir.

25  Q.  Where was Agent Crain during the interview?

1  A.  She wasn't in the room in the beginning of it.  At some

2  point, she did come in after it had started.

3  Q.  At the beginning of the interview, do you recall

4  Ms. Rembert being asked questions about her childhood and her

5  being raised in foster care?

6  A.  Yes.

7  Q.  What was the purpose of those questions?

8          MS. VIAMONTES:  Objection, relevance.

9          THE COURT:  What is the relevance?

10          MR. WILCOX:  Your Honor, I am trying to establish that

11  the witness was actually trying to soften Ms. Rembert up.

12          MS. VIAMONTES:  Your Honor, that doesn't go to whether

13  she intelligently or knowingly waived Miranda.  All of that

14  came after she was read Miranda and she waived.

15          THE COURT:  Overruled.

16  BY MR. WILCOX:

17  Q.  What was the purpose of the questions?

18  A.  To get to know an individual, give them a chance to explain

19  things, I guess.

20  Q.  Never attempted to show during the questioning, you never

21  attempted to suggest to her that she was a victim?

22          MS. VIAMONTES:  Judge, I object.  That doesn't go to

23  whether she voluntarily waived Miranda before that.

24          THE COURT:  Overruled.

25          THE WITNESS:  I am sorry, could you ask that again?

1  BY MR. WILCOX:

2  Q.  Well, wasn't the purpose of those questions to convince

3  Ms. Rembert that she was a victim, she was being manipulated by

4  Mr. Desir and she was being taken advantage of by Mr. Desir?

5  A.  In asking those questions, there is no intent to sway her

6  conversations or opinions one way or the other.  It is simply

7  to ask her questions about her life and tell her own story.

8  Q.  How is that relevant to her whether somebody else was

9  engaged in a sex act?

10         MS. VIAMONTES:  Judge, this is becoming argumentative.

11         THE COURT:  Well, we are getting beyond the issues

12  raised by Ms. Rembert's motion to suppress statements.

13         MR. WILCOX:  I don't have --

14         Let me talk to Ms. Rembert, your Honor.

15         THE COURT:  Okay, sure.

16         (Pause).

17         MR. WILCOX:  I don't have any further questions.

18         THE COURT:  All right.  Redirect.

19         MS. VIAMONTES:  Briefly, your Honor.

20         May I approach?

21         THE COURT:  Yes.

22                      REDIRECT EXAMINATION

23  BY MS. VIAMONTES:

24  Q.  Detective, I have given you what has been marked as

25  Government Ex. 1 for identification.  Do you recognize it?

```
 1   A.   Yes, ma'am.
 2   Q.   What is it?
 3   A.   It is the waiver of rights form the FBI uses and the same
 4   one Agent Funk gave to Ms. Rembert that she initialed, Agent
 5   Funk signed it, and I signed it as a witness.
 6   Q.   Is that a copy of the original form she signed?
 7   A.   Yes, ma'am.
 8   Q.   Is that in the same or substantially the same condition
 9   when you saw it in December 2012?
10   A.   Yes, ma'am.
11   Q.   Did you witness Ms. Rembert initial and sign that form?
12   A.   I did.
13           MS. VIAMONTES:  Your Honor, at this time, I move
14   Government 1 into evidence.
15           THE COURT:  Any objection?
16           MR. WILCOX:  No, your Honor.
17           THE COURT:  Government's 1 will be received.
18           [Government Exhibit 1 received in evidence.]
19   BY MS. VIAMONTES:
20   Q.   During your cross-examination you said you witnessed
21   Miranda rights form, this is the form?
22   A.   Correct.
23   Q.   Did you witness any hesitation on Ms. Rembert's part in
24   signing this?
25   A.   No.
```

```
 1              MS. VIAMONTES:  No further questions.
 2              THE COURT:  All right.  Thank you, Detective Jones,
 3    you may step down.
 4              Ms. Viamentes, you may call your next witness.
 5              MS. VIAMONTES:  Thank you, your Honor.
 6              At this time, the Government calls Susan Funk-Romash.
 7              THE COURT:  Please raise your right hand.
 8              SUSAN FUNK-ROMASH, GOVERNMENT'S WITNESS, SWORN.
 9              THE COURT:  Would you please be seated.
10              Please state your name and spell your last name for
11    the record.
12              THE WITNESS:  My name is Susan Funk-Romash,
13    R-o-m-a-s-h.
14              THE COURT:  All right.  Ms. Viamentes, you may
15    inquire,
16              MS. VIAMONTES:  Thank you.
17                         DIRECT EXAMINATION
18    Q.  Agent Funk, where do you work?
19    A.  FBI.
20    Q.  What capacity?
21    A.  Special Agent.
22    Q.  How long have you been a Special Agent with FBI?
23    A.  A little over three years.
24    Q.  During your training to become an FBI agent, are you taught
25    how to advise a suspect or defendant of Miranda rights?
```

1  A.  Yes.

2  Q.  Are you taught to use a standard FBI advice of rights form?

3  A.  Yes.

4  Q.  Are you informed that, if a suspect wants a lawyer, you are

5  to terminate questioning?

6  A.  Yes.

7        THE COURT:  Ma'am, you need to speak up.  I can't hear

8  you.

9        THE WITNESS:  Yes.

10  BY MS. VIAMONTES:

11  Q.  Agent Funk-Romash, you are pretty soft spoken.

12  A.  Yes.

13  Q.  The tone you used in court, is that the tone you used with

14  Ms. Rembert during interrogation?

15  A.  This is how I speak, yes.

16  Q.  Did you raise your voice with Ms. Rembert?

17  A.  No.

18        THE COURT:  Somebody has got a cell phone or some

19  electronic device on.

20        You need to power it off.

21        Apparently, it has been done, okay.  Go ahead.

22  BY MS. VIAMONTES:

23  Q.  Are you the case agent on this case?

24  A.  Yes, I am.

25  Q.  Were you advised -- were you working on December 14, 2012?

1   A.   Yes, I was.

2   Q.   On that day, were you attempting to locate Genet Rembert?

3   A.   Hollywood PD Officer Cassandra Jones was, yes.

4   Q.   Were you advised she had been located?

5   A.   Yes.

6   Q.   Did you respond to the scene where she had been stopped?

7   A.   Yes.

8   Q.   What did you see?  Please tell the Court what you saw when

9   you arrived at the scene of the traffic stop.

10  A.   Hollywood PD and FBI agents were at the scene.

11       Ms. Rembert was standing behind her car.  I believe a

12  Hollywood PD officer and FBI agent were speaking with her.

13       I don't remember if she was handcuffed at the time or

14  handcuffed when I got there.

15  Q.   When you say they were speaking with her --

16  A.   They were standing with her, near her area.

17  Q.   Could you hear any conversations between them?

18  A.   No, no, I couldn't.

19  Q.   Was the Hollywood Police Department aware this was an FBI

20  investigation?

21  A.   Yes.

22  Q.   When the FBI is in charge of the investigation, who takes

23  role in interrogating suspects?

24  A.   The FBI.

25  Q.   Shortly after you arrived on scene, was Ms. Rembert taken

1  back to FBI headquarters, FBI office in Miami?

2  A.  Yes, she was.  Myself and Agent Crain transported her.

3  Q.  During the transportation or the ride back to the FBI

4  office in Miami, did you talk with Ms. Rembert about the case

5  at all?

6  A.  No.  I showed her a copy of her arrest warrant and

7  explained what she was being arrested for, her charges.

8          Also, in the car ride we normally do some of the

9  booking paperwork so we don't have to sit at the booking room

10 and fill out all of the identifying information and things like

11 that.

12 Q.  What kind of information, booking --

13 A.  Name, address, identifying information, things of that

14 nature.

15 Q.  During the car ride and during the questions about her

16 biographical data, did Ms. Rembert imply or suggest she wanted

17 an attorney present?

18 A.  No, she did not.

19 Q.  Did she out right ask for an attorney at any point?

20 A.  No, she did not.

21 Q.  Please tell the Court what you did once you arrived at the

22 FBI office in Miami with Ms. Rembert?

23 A.  Once we arrived at the office, we had her fingerprinted and

24 photographed.  We have booking personnel there.

25          She had flex cuffs on and they were a little tight,

1    and we had to find the appropriate mechanism to remove them

2    because they weren't handcuffs, they were flex cuffs.

3            We removed them from her.  She was fingerprinted,

4    photographed and myself and Cassandra Jones interviewed her in

5    the interview room.

6    Q.  Agent Funk-Romash, before beginning the interview, did you

7    go over a Federal Bureau of Investigation advice of rights form

8    with Ms. Rembert?

9    A.  Yes, I did.

10   Q.  Agent Romash, I handed you a copy -- in fact, I handed you

11   the original of the Miranda rights waiver form you went over

12   with Ms. Rembert.

13           Do you recognize it?

14   A.  Yes, I do.

15   Q.  Does it have your signature on it?

16   A.  Yes.

17   Q.  Did Ms. Rembert sign that form, as well.

18   A.  Yes, she did.

19   Q.  Please tell the Court how you went over that form and each

20   right with Ms. Rembert.

21   A.  I asked if she could read and write English.  In the

22   corner, there are notations for that.

23   Q.  Specifically what notations?

24   A.  RWUE.

25   Q.  What does that mean?

1  A.  Read, write, understand English.

2         I asked if she was under the influence of any

3  substances.  She said no.  I read her her rights and I asked

4  her to read, initial and sign, and she consented to speak with

5  us.  She did.  I signed and Detective Jones signed, as well.

6  Q.  When you ask Ms. Rembert if she could read, what did she

7  say?

8  A.  Yes.

9  Q.  When you asked if she could write, what did she say?

10 A.  Yes.

11 Q.  When you asked if she spoke English, what did she say?

12 A.  Yes.

13 Q.  When you asked if she was under the influence of narcotic

14 or alcohol what did she say?

15 A.  No, she was not.

16 Q.  Did she appear to be under the influence of anything?

17 A.  No.

18 Q.  Did you witness Ms. Rembert read each and every right?

19 A.  Yes.

20 Q.  Did she initial -- Did she affix her initials next to each

21 and every right?

22 A.  Yes.

23 Q.  What was the first right that she initialed?

24 A.  Before we ask you any questions, you must understand your

25 rights.

1          You have the right to remain silent.

2  Q.  Did she affix her initials?

3  A.  Yes.

4  Q.  What was the next right?

5  A.  Anything you say can be used against you in court.

6  Q.  Did she affix her initials next to that?

7  A.  Yes.

8  Q.  What was the next right?

9  A.  You have a right to ask for a lawyer before we ask you any

10  questions.

11  Q.  Did she affix her initials there?

12  A.  Yes.

13  Q.  What was the next one?

14  A.  You have a right to a lawyer during questions.

15  Q.  Did she put her initials?

16  A.  Yes.

17  Q.  Any other rights?

18  A.  Yes.  If you cannot afford a lawyer, the Court will appoint

19  one if you wish.

20          If you start answering questions, you have a right to

21  stop answering at any time.

22  Q.  Did she initial every right?

23  A.  Yes.

24  Q.  Did she sign the form agreeing to speak with you?

25  A.  Yes, she did.

1  Q.  Once you signed the form and she signed the form, what did

2  you do?

3  A.  We began to ask her questions and she began to answer.

4  Q.  At any point during the questioning of Ms. Rembert, did she

5  say she wanted a lawyer present?

6  A.  No, she did not.

7  Q.  At any time, did you tell Ms. Rembert that bullshit doesn't

8  work here?

9  A.  No, I did not.

10  Q.  In reference to her asking for an attorney?

11  A.  No, I did not.

12  Q.  Did you witness any other law enforcement officer say that

13  or something similar to Ms. Rembert?

14  A.  No, I did not.

15  Q.  Did you witness any law enforcement officer make

16  Ms. Rembert promises in exchange for her cooperation?

17  A.  No.

18  Q.  Did you make her any promises in exchange for her statement

19  or cooperation?

20  A.  No.

21  Q.  Did you make any threats to Ms. Rembert to induce her into

22  speaking with you?

23  A.  No, I did not.

24  Q.  Did you witness any other law enforcement officer make any

25  threats to Ms. Rembert to induce her to speak to law

1  enforcement?

2  A.  No.

3           MS. VIAMONTES:  Thank you, your Honor.

4           No further questions.

5           THE COURT:  Cross-examination.

6                        CROSS EXAMINATION

7  BY MR. WILCOX:

8  Q.  Is it Agent Funk hyphen Rohash?

9  A.  Funk is now my middle name.  Romash is the last name.

10 Q.  Rohash?

11 A.  Romash.

12 Q.  R-o-m-a-s-h?

13 A.  Yes.

14 Q.  I am sorry.  Good morning.

15 A.  Good morning.

16 Q.  Congratulations again.

17 A.  Thank you.

18 Q.  Now, this arrest occurred December 14th of last year, is

19 that right?

20 A.  Yes.

21 Q.  And Hollywood Police Department effected the initial arrest

22 or placed her in custody initially?

23 A.  Initially, yes.

24 Q.  And you weren't present when she was initially placed in

25 custody?

1    A.  No, I was not.

2    Q.  Do you know who she was with?

3    A.  I know Detective Jones was there.  She was the person I was

4    in contact with.

5         I am not familiar with the names of other Hollywood

6    detectives.

7    Q.  How about the other person that was in the vehicle with

8    Ms. Rembert?

9    A.  Yes.

10        THE COURT:  Mr. Wilcox --

11        THE WITNESS:  Yes, there was another person in the

12   vehicle.

13        THE COURT:  I am having a problem hearing you.  Would

14   you please speak into the microphone?

15        MR. WILCOX:  This is the first time a judge has asked

16   me that.

17        THE COURT:  Well, there is always a first.

18   BY MR. WILCOX:

19   Q.  Do you know the name of the individual that was in the car

20   with Ms. Rembert?

21   A.  Yes, her name was Ashley Kruger.

22   Q.  And did you see her at the scene?

23   A.  Yes, I did.

24   Q.  Did you speak with her?

25   A.  Yes.  She was separated from Ms. Rembert and I did speak

1  with her.

2  Q.  Now, prior -- You don't know how long Ms. Rembert was in

3  the custody of the Hollywood Police -- the officers of the

4  Hollywood Police Department prior to your arrival?

5  A.  No, I do not.

6  Q.  So you don't know what may have been said between

7  Ms. Rembert and the Hollywood Police officers prior to your

8  arrival?

9  A.  No, I do not.

10  Q.  And when you arrived at the scene and spoke to Ms. Rembert,

11  you did tell her that she was being arrested in relation to a

12  sex trafficking offense?

13  A.  Yes, that is correct.

14  Q.  And her response was?

15  A.  I don't recall her response, sir.  She listened to what I

16  said.

17  Q.  She didn't say anything?

18  A.  I don't believe she said anything.

19  Q.  She did not say that she was just on her way to see a

20  lawyer?

21  A.  No.

22  Q.  But you did not read her Miranda rights at the scene?

23  A.  At the scene, no.  She was not questioned at the time.

24  Q.  She was transported to the FBI office?

25  A.  Yes.

1  Q.  And that was with you and Agent Crain?

2  A.  Yes, sir.

3  Q.  And you asked her questions while she was being transported

4  about her date of birth and what else?

5  A.  Identifying information questions on the booking processing

6  sheet, which are usually name, date of birth, address, Social

7  Security number, any markings, scars or tatoos.

8        General processing information.  Nothing related to

9  the charges.

10  Q.  No questions about sex trafficking?

11  A.  No, sir.

12  Q.  No mention how much time sex trafficking offense would

13  carry?

14  A.  No, sir.

15  Q.  There was no mention of Mr. Desir?

16  A.  There is a question whether or not she is married on the

17  booking paperwork and I believe she stated his name.

18  Q.  And there were no followup questions about that marriage or

19  any other question about Mr. Desir?

20  A.  No, sir.

21  Q.  And, during the ride from the scene of the arrest to the

22  FBI office in Miami, it is your testimony she never mentioned

23  the word lawyer or attorney?

24  A.  Yes, sir.

25  Q.  When she arrived at the --

1    When you began the interview, did anybody at any time

2 suggest, if she cooperated, that charges would not be filed

3 against her or things would go easier for her?

4 A.  No, sir.

5 Q.  Did anybody tell her that United States Attorney would be

6 advised of her cooperation?

7 A.  Later on in the interview, yes.

8 Q.  That was not prior to signing the warrant -- I am sorry,

9 not warrant, Miranda rights warning?

10 A.  No, sir.

11 Q.  Agent Funk, there were a series of questions after the

12 rights form was signed -- after Ms. Rembert signed the waiver

13 of rights form?

14 A.  Yes.

15 Q.  You asked her a series of questions about her childhood and

16 up bringing?

17 A.  We asked her questions about herself, correct.

18 Q.  Well, some of those questions were about her childhood, am

19 I correct?

20 A.  She gave up information about her childhood, sir.

21 Q.  In response to your question?

22 A.  In response to some of the questions.

23    We allowed her to tell her story.

24 Q.  Well, what question did you ask her whereby she began to

25 give you her life story?

1  A.  I don't remember the exact question, sir.

2         MR. WILCOX:  One moment.

3  BY MR. WILCOX:

4  Q.  She told you she was born in Duval, Florida?

5  A.  That is correct.

6  Q.  You didn't ask her where she was born?

7  A.  I don't recall.

8         MS. VIAMONTES:  Judge, I am going to object to further

9  questions about what came after Miranda.

10        THE COURT:  Sustained.

11        MR. WILCOX:  Your Honor --

12        Fine.  Thank you, your Honor.

13        THE COURT:  Yes.

14        MR. WILCOX:  No further questions.

15        THE COURT:  Redirect.

16        MS. VIAMONTES:  No questions, your Honor.  Thank you.

17        THE COURT:  All right.  Thank you Special Agent

18 Funk-Romash.

19        You may step down.

20        Any additional witnesses or other evidence on behalf

21 of the Government?

22        MS. VIAMONTES:  No, your Honor.

23        THE COURT:  Any evidence on behalf of Ms. Rembert?

24        MR. WILCOX:  I believe Ms. Rembert wants to testify on

25 her behalf.

1           I will state on the record that I have advised

2    Ms. Rembert she has an absolute right to testify in this

3    suppression hearing, however, I have also advised Ms. Rembert

4    that should sentencing become necessary in this case that it

5    could have adverse consequences.

6           THE COURT:  All right.  Ms. Rembert, you want to step

7    forward, please.

8           Ms. Rembert, would you remain standing and raise your

9    right hand.

10          GENET REMBERT, DEFENDANT'S WITNESS, SWORN.

11          THE COURT:  Would you please be seated.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Pull your chair up close to the microphone

14   so we can hear what you have to say.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  State your name and spell your first and

17   last name for the record.

18          THE WITNESS:  Genet Rembert.  G-e-n-e-t R-e-m-b-e-r-t.

19          THE COURT:  Mr. Wilcox, you may inquire.

20                      DIRECT EXAMINATION

21   Q.  Good morning, Ms. Rembert, how are you?

22   A.  Good morning, Mr. Wilcox.

23   Q.  How old are you?

24   A.  21.

25   Q.  What kind of work have you done?

1   A.   Prostitution.

2   Q.   Do you remember being arrested December 14th, 2012?

3   A.   Yes, sir.

4   Q.   Okay.  Could you tell us how that arrest was effected, how

5   did that arrest come about?

6   A.   Basically, what happened during that day?

7   Q.   Uh-huh.

8   A.   Um-m-m, I had to pay a down payment on a lawyer.

9   Q.   A lawyer for what?

10   A.   To start on my case.

11   Q.   What case is that?

12   A.   A case I had in the State Court.

13   Q.   For what?

14   A.   Aggravated battery.

15   Q.   Okay.  And do you remember the name of the lawyer you were

16   going to see?

17   A.   Joshua Rydell.

18   Q.   And were you driving in a car?

19   A.   No, I wasn't driving.

20   Q.   Were you traveling in a vehicle?

21   A.   Yes, I was.

22   Q.   And where -- where did you depart?

23   A.   I departed from my place at 1820 Dewey Street.

24   Q.   Was that near the Beach and Town Motel?

25   A.   Yes.

1   Q.  And is that in Hollywood?

2   A.  Yes.

3   Q.  What car were you traveling in?

4   A.  In a Toyota Corolla, 2008.

5   Q.  And who owns that Toyota Corolla?

6   A.  My husband, Mackenley Desir.

7   Q.  Is that the Defendant in this case?

8   A.  Yes.

9   Q.  Who was travel with you?

10  A.  One of my friends, Ashley Kruger.

11  Q.  Who was driving?

12  A.  Ashley Kruger.

13  Q.  How can you be so sure Ms. Kruger was driving?

14  A.  Because I don't know how to drive.

15  Q.  Have you -- when was the -- well, are you saying you don't

16  drive at all?

17  A.  No.  I don't know how to drive in traffic.  I can drive

18  down the street or probably park a car but I can't drive on a

19  highway or in traffic.  I am too scared to do it.

20  Q.  Do you have a driver's license?

21  A.  No.

22  Q.  Okay.  Let me ask you some questions about this driving.

23        When was the last time you actually drove a car for

24  like maybe a mile?

25  A.  Probably have to say maybe a month or so before they

1  even -- it would have to be before Mackenley went in, because

2  he was still teaching me how to drive.

3  Q.  And when you were driving, were you driving by yourself?

4  A.  Whenever I drive?

5  Q.  Yes.

6  A.  No, usually, there is someone with me.

7  Q.  When was the last time you operated a motor vehicle by

8  yourself?

9  A.  That was like -- had to be November, because that is when I

10 crashed the car.

11 Q.  All right.  You heard testimony that there was a traffic

12 stop, do you recall that?

13 A.  Yes, sir.

14 Q.  Okay.  Do you recall the Hollywood Police officer,

15 Cassandra Jones stopping you?

16 A.  Yes, sir.

17 Q.  How did that happen?

18 A.  Well, I was in the passenger seat and Jennell -- or Ashley

19 was in the driver seat.  She looked to the right and there was

20 a -- C.J.

21 Q.  You mean Detective Jones?

22 A.  Detective Jones.

23 Q.  Okay.

24 A.  She was in a gray SUV, something like that, probably like a

25 Dodge or something, truck.  And she had her badge like this and

1   she was pointing like this, pull over, pull over.

2          I looked at Ashley and I said do not pull over, you

3   don't know who that lady is.  She is wearing dark sunglasses,

4   tight black shirt.

5          I was laughing but it was not a joke.

6          Like who is pulling us over?

7   Q.  Do you know what road you are on?

8   A.  Federal.

9   Q.  Traveling north or south?

10  A.  Traveling north.

11  Q.  Continue, please.

12  A.  Ashley was, like, I don't know, might as well pull over.

13         So, we pulled in right next to CVS on the corner of

14  Johnson and Federal, not the CVS parking lot, but it is like a

15  bike shop.

16         Detective Jones came over to the driver's side and I

17  leaned over Jennell -- I mean Ashley and I was, like, what are

18  you pulling us over for?

19         She said you are not driving within the white lines or

20  whatnot.

21         I don't know what that means, so I am looking at

22  Ashley, like, you don't know how to drive.  We are arguing.

23  She asked for our identification.  I reached down in my purse

24  and I handed it to her.

25  Q.  What did you hand her?

1  A.  My ID.

2  Q.  A driver's license?

3  A.  No.  ID, identification card.

4  Q.  State of Florida identification card?

5  A.  Yes.

6  Q.  Continue, please.

7  A.  Ashley passed it to the officer, and she said she would be

8  right back.

9        And me and Ashley were, like, wondering whether we had

10  warrants or whatnot, or they were going to tow the car, because

11  it wasn't our car, and we know she just got a ticket.

12        So, when Detective Jones came back, she came and

13  pulled me out of the passenger side and told me to put my hands

14  on the car and she proceeded to search me, and then she put me

15  in metal handcuffs.

16  Q.  Who?

17  A.  Detective Jones.

18  Q.  Would you continue, please?

19  A.  Ah --

20  Q.  I am sorry, go ahead.

21  A.  She put me in metal handcuffs and told me to lean up on the

22  side of the car.  The first thing I ask whenever I am put in

23  handcuffs, I said, am I going to jail, and she said I don't

24  know until they get here, and I said, who gets here?  And she

25  said FBI. So, I am going off--

1    Q.  When you say going off, I don't know if the judge

2    understands what that means.  I want you to be specific what

3    you did.

4    A.  I know what I said.

5    Q.  What did you say?

6    A.  What the F you mean?  I don't do anything for the FBI to

7    even mess with me.

8    Q.  I'm sorry.  I think you said "what the F you mean," and F

9    is an abbreviation for expletive?

10   A.  Yes.

11   Q.  What the F you mean, continue.  What else did you say?

12   A.  What the F you mean?  I don't do anything that the FBI -- I

13   don't do anything for the FBI to even mess with me.

14   Q.  Something like that?

15   A.  Something like that.  More so, I am shaking my head not

16   believing it.

17          She moves me to the edge of the car and I was just

18   sitting in there and people are starting to look, and, you

19   know, gather around and what not, and the cars that we thought

20   were just like regular cars turned out to be like a whole bunch

21   of unmarked cars that pulled into the parking lot.  Some people

22   pulled into the CVS parking lot and got out of their cars and

23   had badges, and some more people came on the other side of the

24   parking lot and they have badges, too.

25          So, Detective Jones pulled Ashley out of the driver's

1  side and took her to the far side of the bike shop, like the

2  door step there.

3  Q.  Let me stop you right there.

4         When Detective Jones took Ashley to the bike shop or

5  toward the bike shop, is that what you said?

6  A.  The bike shop, the side door of the bike shop.

7  Q.  Okay.

8         Were you left alone?

9  A.  Yes.

10 Q.  Okay, continue, please.

11 A.  And that is when I started noticing, you know, all the

12 cars.

13        There was a male detective, white male, he was wearing

14 a green shirt, sandy brown hair.

15 Q.  How old was he?

16 A.  He had to be in late 40's, early 50's.

17 Q.  Do you recall his name?

18 A.  No.

19 Q.  Go ahead, continue?

20 A.  He got out of his car and took the metal handcuffs off me,

21 and put the flexy cuffs on, but he put them on extremely tight.

22        I said, you know what, I want my fucking lawyer --

23 Q.  Excuse me, just say f'in.

24 A.  I want my f'in lawyer.

25 Q.  And did he respond to that?

1  A.  We don't play that BS here.

2  Q.  I see.  What happened after that?

3  A.  I am still, like, pretty much cussing and asking --

4  Q.  Well --

5  A.  And asking him --

6  Q.  Excuse me, let me stop you.

7       You testified you said I want my f'in lawyer.

8  A.  Yes.

9  Q.  Is that the only time you said that?

10 A.  No.  That was, like, the first time I said that.

11 Q.  Okay, continue, please.

12 A.  Okay.  When he went off to the side with Detective Jones --

13 Q.  You said you were still going off?

14 A.  Yes.

15 Q.  What --

16 A.  I mean, first off, I was more shocked that the FBI wanted

17 something to do with me, and the fact I didn't know anything

18 about the whole case or what not, and I am asking him to tell

19 me, and they are telling me the FBI agent will tell me when

20 they get there, and I am, like, how the F do you not know?  You

21 are the one who is arresting me.  I don't fully understand that

22 the FBI would tell them or whatever, I was pissed off,

23 basically.

24       At the time, my phone was ringing because I was

25 directly -- I was actually scheduled to meet Joshua Rydell

1   around two -- two o'clock.

2   Q.  And he is your --

3   A.  He was Mackenley's lawyer, but we already established that

4   we were going to put him on my case.

5         I had $800 in my wallet to put a down payment on --

6   that is where we were headed.

7   Q.  Continue.

8   A.  My phone was ringing, and I have a specific ring tone for

9   Joshua Rydell, and I told Detective Jones, my lawyer is

10  calling, can I at least talk to him?

11        She is like -- they can handle that whenever the FBI

12  gets here.

13        The detective and -- At the time I only knew her as

14  the lady with the short blond hair went to the side of the male

15  detective's car and they started talking.  I wanted to see what

16  they were saying.  I tried to look through the window and read

17  their lips, but I couldn't understand what they were saying.

18        He was standing inside his car, and she was -- he was

19  leaning on the window talking down, and I am busy trying to

20  lean, you know, trying to see what was going on.

21        Hollywood officer told me, uniform officer told me to

22  turn around, like, and I, obviously, didn't turn around.  I

23  gave him a whole bunch of attitude.  Finally -- no, the lady

24  with the curly hair, blond hair.

25  Q.  Agent Crain?

1  A.  Crain, yes, she came across the parking lot from CVS, and I

2  was like, okay, you are the FBI?  And she said yes.  I said why

3  am I here?  She told me, like, she said she was not the case

4  agent.  And I said what the F is a case agent?  She said

5  everything is fine, calm down, because I was really upset.

6        So, she asked me what I wanted to do with my shoes, at

7  the time I was wearing heels, so I kicked them off.  I kicked

8  them off towards the car, and I was like I don't even want --

9  just don't f'in say anything to me until somebody is going to

10  tell me what is going on.  Susan pulled up --

11  Q.  Susan, Agent Funk-Rohash?

12  A.  Romash.

13  Q.  Romash?

14  A.  Pulled up in a blue Dodge Magnum, I think it was, and

15  pulled up on the side of the road and came towards me.

16        When she came towards me, I said are you the lady that

17  is supposed to tell me what's going on?  She said, yes, calm

18  down.  She is soft spoken.  Everybody else was showing me

19  attitude.  Because I was showing attitude, she said calm down.

20        I told her, what am I here for?  She said sex

21  trafficking, and I said what the F do you mean sex trafficking?

22  How the F can I sex traffick somebody?

23        When you tell me sex trafficking, I think you are

24  talking about locking people up in a storage cell and travel

25  with them.

1   Q.  What did she say when you said what the F is sex traffic

2   stuff?

3   A.  She told me to calm down.

4        At that time, Ashley was talking to C.J., Agent Jones,

5   because she left the car.

6   Q.  Hollywood Police detective?

7   A.  Hollywood Police Detective Jones, she left the car and she

8   walked over to Jennell.  I think it started to rain --

9   Q.  Ashley?

10  A.  I am sorry, Jennell is a name I always call her, so, Ashley

11  Kruger is the same as Jennell.

12       I have never called her Ashley before.

13  Q.  Okay.

14  A.  Is it okay if I just say Jennell?

15       THE COURT:  You are testifying.

16  BY MR. WILCOX:

17  Q.  Go ahead Ms. Rembert.

18  A.  Jennell -- it started raining, so they took Jennell over to

19  the -- what is it, carport, like, on the side of the door.  You

20  can stand under it and shade from the rain.

21       She asked me what was going on, and I yelled from the

22  car, they say F'in sex trafficking.

23       She said what?  Sex trafficking.  What do you mean?  I

24  told her to call my lawyer and let him know the FBI is here,

25  and I turned to Susan Funk and told her, I want to talk to my

```
 1  lawyer.  She said do you?  Are you sure?  You don't even know
 2  what is fully going on over here.
 3  Q.  Excuse me.  Was -- You said that, how close was Agent Funk
 4  to you?
 5  A.  Face-to-face.
 6  Q.  Face-to-face when this exchange took place?
 7  A.  Yes.
 8  Q.  Were you in a police car?
 9  A.  No, standing outside --
10  Q.  Or --
11  A.  I was standing on the bumper or what is the front part of
12  the police car.  They moved me from the Toyota to the police
13  car, because the officer wanted me to turn around and not look
14  at Detective C.J. and the other male detective talking.
15          THE COURT:  Excuse me, just a second.
16          Is that noise coming from upstairs?
17          Oh, she is, you need to stop that.
18          THE WITNESS:  Sorry.
19  BY MR. WILCOX:
20  Q.  You need to tell us what you said to Agent Funk-Romash
21  about an attorney.
22  A.  I told her I wanted to see -- talk to my lawyer, and she
23  said do you?  Do you think you really need to do that?  You
24  don't know what is really going on right now.
25  Q.  Did you respond to that comment?  Do you recall responding
```

1   to that comment?

2   A.   I don't recall.  Most of the time I was pretty much cussing

3   and going off.

4   Q.   What is the next thing that you remember?

5   A.   I yelled at Jennell to make sure that she called my lawyer

6   and to take the down payment to the lawyer as soon as possible

7   like ASAP.

8   Q.   How did she --

9   A.   They didn't let me take anything.  They made me leave my

10  wallet.  They made me take off my wig, my jewelry, all that,

11  and put it in the car, and give her the car keys; and, they

12  asked me, does she have permission to take the car?  And I said

13  she was driving, you saw us leave from the house, yes, she can

14  take the car.

15        So they let her take the car and we went and got into

16  the blue Dodge ram or whatever, and was it -- Agent Crain sat

17  in the back seat and Susan Funk-Romash, Agent Susan

18  Funk-Romash, she drove.

19        Like I said, they did the preliminary questions.

20  Q.   You say preliminary questions?

21  A.   That is what she said they are.

22  Q.   Do you remember what questions were asked?

23  A.   What my name was, where did I stay at, what my mom's name

24  was, things like that.

25        I asked her, okay, what type time am I looking at for

1  the sex trafficking stuff and can I get a bond?  And she was

2  like the most you are looking at 15 years, and the bond can run

3  anywhere from like $250,000.

4        I, once again, started cussing again, what the F you

5  mean $250,000?

6        She is, like, calm down, calm down, calm down, you

7  know relax, chill.

8        So, finally, we got to the FBI headquarters.  Like she

9  said the detective that -- the male detective put the flexy

10 cuffs on my hands so tight that you couldn't even cut them off.

11 We went through about 20, 30 minutes trying to figure out, find

12 some way to cut the flexy cuffs off.

13        Finally, they were cut off, and I asked to use the

14 bathroom.  I used the bathroom.

15        We sat down, they asked me if I was hungry, if I

16 wanted something to eat.

17        So Agent Crain told me she could get me a Coca-Cola

18 and some cookies, and I said, okay, that is fine.

19        So they got that for me and I just -- Susan Funk sat

20 down in her chair and she pulled out the sheet that she gave

21 me -- the sheet that I signed, and she slide it to me like this

22 (indicating) and I was about to reach for it; but, before I

23 reached for it, she sat there and she said, just to let you

24 know that if you ask for a lawyer and if you request a lawyer,

25 like, she looked at me like this, with the paper here, and she

1  said if you ask for a lawyer and request for a lawyer, I don't

2  remember the exact words, basically, she said that I was going

3  to jail.  But if, but if I cooperated, the thing that most

4  likely would happen is I will go get booked because they don't

5  have a FDC place in Broward County for females.  I will get

6  booked.  Once I get booked I will probably go to arraignment

7  and I will be released.  All you have to do is basically tell

8  me what you know or what happened.

9           I told her, do I need a lawyer?  No.  Okay, so I

10 initialed and signed the paper.

11          After that, they asked me questions and I answered.

12 Q.  Thank you.

13          MR. WILCOX:  No further questions at this time, your

14 Honor.

15          THE COURT:  We need to take a brief restroom break

16 before cross-examination.

17          We will take 10 minutes.

18          (Thereupon, a short recess was taken.).

19          THE COURT:  All right.  Folks, please be seated.

20          Scheduling wise, it is the Court's intention to work

21 through all these motions before lunch.

22          So, you may be taking a little later lunch than

23 perhaps you anticipated, but I think that it is best that we go

24 ahead and complete all this before we break.

25          Ms. Rembert, let me remind you that you are still

```
 1   under oath.
 2          We will continue with cross-examination by
 3   Ms. Viamentes.
 4          MS. VIAMONTES:  Thank you, your Honor.
 5                       CROSS EXAMINATION
 6   BY MS. VIAMONTES:
 7   Q.  Ms. Rembert, you read?
 8   A.  Yes.
 9   Q.  Do you write?
10   A.  Yes.
11   Q.  You speak English fluently?
12   A.  Yes.
13   Q.  Other than English, do you have any other language you are
14   fluent in?
15   A.  No.
16   Q.  What grade did you complete in school?
17   A.  10th.
18   Q.  You mentioned that you were on your way to see Josh Rydell.
19          He represents Mr. Mackenley Desir, is that true?
20   A.  Yes.
21   Q.  You were made to leave everything with Ashley?
22   A.  Yes.
23   Q.  All your belongings, you had to leave them -- you were
24   forced to leave with Ashley?
25   A.  It wasn't necessary to be forced, but where else would I
```

1   leave them?  I couldn't take them to FBI headquarters.

2   Q.  The name you use for Ashley, Jennell, that is her stage

3   name, isn't it?

4   A.  No.

5   Q.  That is the name she uses on Back Page to advertise?

6   A.  That is the only name I know her of.  I don't see how that

7   has to do with this.

8   Q.  That is the name you use, Jennell, for Ashley?

9   A.  Yes, that is her nickname.  If she uses it for her stage

10  name, that is what she does.

11  Q.  You don't know whether she uses that for her stage name or

12  on Back Page dot com?

13  A.  As far as I know, she might use a whole different name.

14  Q.  A couple weeks ago you agreed to meet with me, isn't that

15  true?

16  A.  Yes.

17  Q.  And before meeting with me, your attorney went over a

18  Kastigar letter with you, isn't that true?

19  A.  What is a Kastigar?

20  Q.  The letter where he explained to you that we were going to

21  meet, you were going to talk about the facts of the case, and

22  in that letter it states that, if later you testify, the

23  statements you made could be used against you.

24          Do you remember that?

25  A.  Yes.

1  Q.  We met for a pretty long time, isn't that true?

2        We met for a few hours, right?

3  A.  No, maybe an hour or so.

4  Q.  And you went into a lot of detail about the prostitution

5  business and your role in that prostitution business with

6  Mr. Desir, isn't that true?

7  A.  Not my role, but my role in the prostitution with myself,

8  yes.

9  Q.  At no time, during that interview or that meeting, did you

10  mention to me that any law enforcement officer refused to allow

11  you to speak with a lawyer, isn't that true?

12  A.  No, I did not.

13  Q.  You didn't mention this Hollywood detective with the sandy

14  brown hand, 40 to 50 years old, that told you this bullshit

15  doesn't play here.  Is that right?

16        MR. WILCOX:  I object, your Honor, that is negative

17  impeachment.  It has not been established that she was asked

18  that.

19        THE COURT:  Sustained.

20  BY MS. VIAMONTES:

21  Q.  All these law enforcement officers, the law enforcement

22  officer with the sandy brown hair, Detective Jones, Agent Funk,

23  all these officers that violated your rights, that made you

24  upset, didn't it?

25  A.  Yes.

1  Q.  Made you upset?

2  A.  Yes.

3  Q.  That is a pretty important thing, right, for them not to

4  allow you to talk to a lawyer?

5  A.  Yes.

6  Q.  And this isn't your first rodeo, right?  You have been

7  arrested before?

8  A.  Never interviewed.  Yes, I have been arrested before, but I

9  have never been in an interview.

10  Q.  You have been advised of your rights before?

11  A.  No.  I have never been advised of Miranda rights before,

12  never been read my rights.

13  Q.  So, although you were upset about it, and you knew it was

14  important that they violated your rights, you didn't think of

15  bringing that up, right?

16        MR. WILCOX:  Objection, same objection, negative

17  impeachment.

18        THE COURT:  Sustained.

19  BY MS. VIAMONTES:

20  Q.  So, let me get this straight.

21        The first law enforcement officer you came across that

22  violated your rights, the male detective 40 to 50 years old,

23  sandy brown hair, what is it he tells you about speaking with a

24  lawyer?

25  A.  We don't play that BS here without the BS.

1   Q.  And, then, after that, Detective Jones from the Hollywood

2   Police Department, she also refuses to allow you to speak to a

3   lawyer, is that true?

4   A.  No.

5   Q.  No?  What does she do?

6   A.  Detective Jones really didn't talk to me.

7   Q.  Okay.

8        So the next law enforcement officer that refused to

9   allow you to speak to a lawyer was Agent Crain?

10  A.  No.

11  Q.  Isn't that what you testified to on direct, that you

12  mentioned a lawyer, I want my lawyer?

13  A.  To Crain, yes.

14  Q.  And she didn't let you speak with the lawyer?

15  A.  That is the lady with the blond hair?

16  Q.  She testified here earlier today.

17  A.  Okay, Crain, yes.

18  Q.  And, in fact, you claim you are getting a phone call from

19  Josh Rydell, and you ask if you can answer and she says, no,

20  you can't answer that phone call, you can't speak with your

21  lawyer?

22  A.  Yes.

23  Q.  Is that true?

24  A.  Yes.

25  Q.  Then, lastly, you are given the Miranda rights waiver form,

```
 1  is that true?
 2  A.  Yes.
 3         MS. VIAMONTES:  May I approach, your Honor?
 4         THE COURT:  Yes.
 5  BY MS. VIAMONTES:
 6  Q.  You are pretty aware that this is a serious situation,
 7  right?  When you were at the FBI office, you were aware this is
 8  a serious case?
 9  A.  Aware and scared, yes.
10  Q.  Because you were aware and scared, you read each and every
11  one of those rights carefully, didn't you?
12  A.  No, not really.
13  Q.  You didn't read them?
14  A.  No.
15  Q.  You didn't think it was important, you didn't read them?
16  A.  I didn't know the importance of Miranda rights.
17  Q.  You do know how to read, though, right?
18  A.  Yes.
19  Q.  You put your initials next to each and every right, isn't
20  that true?
21  A.  Yes.
22  Q.  And you understood that?
23         You understood you had a right to have a lawyer?
24  A.  Yes.
25  Q.  In the car ride over to the FBI office, you weren't asked
```

1   any questions about prostitution, were you?

2   A.   Other than what my charges were, no.

3   Q.   You asked what your charges were, isn't that true?

4   A.   I am talking about charges I had in State Court.

5   Q.   Neither Agent Funk nor Agent Crain asked you specific

6   questions about sex trafficking or prostitution on the way to

7   the FBI office, isn't that true?

8   A.   No.

9   Q.   It is not true?

10  A.   No --

11  Q.   Let me rephrase that.  I am not trying to confuse you.

12  A.   Yes.

13  Q.   Did Agent Funk ask you questions about sex trafficking or

14  prostitution on the ride to the FBI office?

15  A.   No, I asked her.

16  Q.   Agent Crain, she didn't ask you any questions about

17  prostitution or sex trafficking either, correct?

18  A.   No.

19  Q.   She didn't, right?

20  A.   No.

21  Q.   So, that, after you read and sign this form, you don't ask

22  Agent Funk any questions about having a lawyer there, do you?

23  A.   Not after she told me what she told me, no.

24  Q.   It is your testimony that Agent Funk hands the form to you

25  and takes it back and says, you shouldn't ask for a lawyer?

1    A.  She didn't take it back.

2         She took this and slid it to me and she said before

3    you sign this paper, let me just let you know that if you sign

4    this paper and ask for a lawyer, pretty much you are going

5    down.

6         If you sign the paper and do as you are asked and

7    pretty much answer the questions and cooperate, that most

8    likely you will go to arraignment on Monday and you could not

9    be held at the FBI headquarters here.  They do not have an FDC

10   facility for females, so, most likely, I get booked at the main

11   jail, arraigned on my date and released.

12   Q.  And Detective Jones from the Hollywood Police Department,

13   she was present when this happened?

14   A.  Yes.

15   Q.  Can you please tell us which phone you were using when you

16   were communicating with Josh Rydell, Joshua Rydell?

17         MR. WILCOX:  Objection, your Honor, assumes a fact not

18   in evidence.  There is no evidence that she asked to

19   communicate with Josh Rydell.

20         THE COURT:  Sustained.

21   BY MS. VIAMONTES:

22   Q.  You testified that attorney Josh Rydell was calling you and

23   agents prevented you from answering his phone call, is that

24   true?

25   A.  Yes.

1  Q.  What phone number were you using or what phone did you have

2  in your possession when Mr. Rydell was trying to reach you?

3  A.  What is the question?

4  Q.  What is the phone number to the phone you were using when

5  Josh Rydell was trying to reach you?

6  A.  I don't know the phone number by heart.

7  Q.  You don't know your own phone number?

8  A.  No, I didn't, no.  I don't know how long it has been since

9  I had that phone.

10  Q.  Is that because you use many different phones?

11  A.  No, I just don't remember the phone number.

12  Q.  You consented to a search of the phone you had in your

13  possession during your arrest, isn't that true?

14  A.  Yes.  But the phone that Rydell called me on is not the

15  phone I had in my possession.

16        MS. VIAMONTES:  May I approach, your Honor?

17        THE COURT:  Yes.

18  BY MS. VIAMONTES:

19  Q.  So, it is your testimony, then, Ms. Rembert that the FBI,

20  while they arrested you, they allowed you to keep two phones in

21  your possession?

22  A.  No.  My red phone was in the car with Jennell.

23  Q.  So, how could you see the missed call coming from Attorney

24  Rydell if it is in the car with the person you call Jennell?

25  A.  I told you I have a specific ring tone for Mr. Rydell.

```
 1   Q.  The phone number assigned to the phone that you gave the
 2   FBI permission to search on the day of your arrest is on the
 3   form I placed before you, isn't that true?
 4   A.  Yes.
 5   Q.  You see the phone number there?
 6   A.  Uh-huh.
 7   Q.  What is the phone number?
 8   A.  754 -- I am not -- 754-245-7323.
 9         MS. VIAMONTES:  One second, your Honor.
10   BY MS. VIAMONTES:
11   Q.  And you signed that consent to search, correct, your phone?
12   A.  Yes.
13   Q.  Isn't it true that, in the interview, you wanted to
14   continue talking to law enforcement?
15   A.  I wanted to see what they could do for me, so, yes.
16   Q.  What sort of things did you ask them, to see what they
17   could do for you?
18   A.  Were they going to release me?  What was the process for
19   all this?  Were they going to be at court?  Were they going to
20   come get me on Monday?  Things like that.  Could they get in
21   contact with my grandfather, things like that.
22   Q.  And, it is your testimony that Agent Funk told you you
23   would be at arraignment on Monday, is that correct?
24   A.  Yes.
25   Q.  You were told -- Who were you told about the $250,000 bond?
```

1  Who told you that?

2  A.  I think it was Crain, Crain.

3  Q.  Is she also the one who told you that your punishment could

4  be 15 years?

5  A.  Yes.  Both of them told me that.

6  Q.  They told you the maximum could be 15 years?

7  A.  Yes.

8  Q.  So not one law enforcement, not two, but three law

9  enforcement officers prevented you from having a lawyer during

10  questioning, is that true, based on your testimony?

11  A.  Yes.

12  Q.  Isn't it true -- isn't it true you told Agent Funk-Romash

13  and other agents that the phone in the vehicle was actually not

14  your phone?

15  A.  They asked me about the black phone.  They did not ask me

16  about the red phone.

17       They asked me, is the black phone yours or is the blue

18  phone yours?  They didn't even mention the red phone, and I

19  told them the black phone is Ashley's, the blue phone, flip

20  phone, is mine.

21       I am not even sure the agents were aware there was a

22  red phone in the car.

23  Q.  The phone that you gave consent to search was which phone?

24  A.  The flip phone.

25  Q.  The blue phone?

1  A.  Yes, the blue flip phone.

2  Q.  And you recall making a phone call to Josh Rydell, Attorney

3  Rydell, at approximately 12:53 from that blue phone?

4  A.  No.  I called him plenty of times whatever phone was

5  available at the time.

6        I can't specifically tell you what time I called him.

7  Q.  You called him before you left your apartment that

8  afternoon?

9  A.  I called him when I left the apartment.  I called him in

10  the car when I told him I was going to be running a little

11  late.

12        I called him, yeah, pretty much -- I called him again

13  to ask for directions.

14  Q.  When you called Mr. Rydell, would you call him on his

15  office line or cell phone?

16  A.  I don't know what that number was.  His office or his cell

17  phone, I am not sure.

18  Q.  Before you were arrested, December 14, 2012, you attempted

19  to reach attorney Joshua Rydell, isn't that true?

20  A.  Yes -- Attempt, what do you mean by attempt?

21  Q.  Did you, in fact, speak with Mr. Rydell?

22  A.  Yeah, I told him that I was on my way.

23  Q.  He called you.  He returned your call moments after you

24  dialed his number, isn't that true?

25  A.  I can't really give you the whole back and forth what

1  happened with the calls.

2          MS. VIAMONTES:  Nothing further, your Honor.

3          THE COURT:  Redirect.

4                      REDIRECT EXAMINATION

5  BY MR. WILCOX:

6  Q.  Now, Ms. Rembert, did you indicate on cross-examination

7  that there were three phones in your vehicle at the time you

8  were arrested?

9  A.  Yes.

10  Q.  Okay.  Could you just explain or describe those three

11  phones and the purpose of those three phones who -- or was any

12  of them -- sorry, too many questions.

13          Let me start over.

14          Describe the three phones that were in your vicinity

15  near the time of arrest.

16  A.  Um-m-m, there is a Kyocera black phone.

17  Q.  Kyo--

18  A.  K-y-o-c-e-r-a.

19  Q.  K-y-o-c-e-r-a?

20  A.  Yes.

21  Q.  And that belonged to?

22  A.  Jennell.

23  Q.  The black phone?

24  A.  Yes.

25  Q.  There was a blue phone, describe that phone?

1  A.  It's a bluish silver looking phone, a flip phone, and a

2  Samsung.

3  Q.  Samsung?

4  A.  Yes.

5  Q.  Whose phone was that?

6  A.  That was mine.

7  Q.  Do you know if Mr. Rydell called you on that phone on

8  December 14th prior to your arrest?

9  A.  Yes, he did.

10  Q.  Okay.  Now, you also described a red phone.

11  A.  Yes.  The red phone is a touch screen phone I use for GPS

12  or help me find my way or what not, and that is why I called

13  Mr. Rydell on the red phone so I could use the navigation to

14  help me find the way.

15  Q.  December, about five months ago, okay.  Are you certain

16  that you called Mr. Rydell on the red phone?

17  A.  Yes.

18  Q.  Okay.  Now, why did you have a red phone and a blue phone?

19  A.  The reason I had the red phone?

20  Q.  Yes.

21  A.  I knew that the red phone -- One of the main reasons is

22  because that was the contact that I already had, area code 318

23  to contact, it was cheaper for Mackenley to call me from Krome

24  on that number.

25  Q.  I see.  So it would be -- So, Mackenley called you on that

1  phone?

2  A.  Yes, pretty much.

3  Q.  On the 318 phone?

4  A.  Yes.

5  Q.  If we were to check records, we should be able to find

6  whether or not Mr. Desir ever called you from Krome to a 318

7  area code?

8  A.  318 or 381.

9  Q.  You are not sure whether it is 381 or 318?

10  A.  I don't know numbers.

11  Q.  What model phone was that?

12  A.  I think a Huwie.

13  Q.  Do you know the number?

14  A.  No.

15  Q.  What was the phone?

16  A.  Huwie.

17  Q.  Like the state?

18  A.  No.  H-u-w-i-e.

19  Q.  Are you certain about that?

20  A.  I am not certain.  I am pretty sure that is how you spell

21  it.

22  Q.  And you said you had a specific ring tone for that phone?

23  A.  Yeah.  A specific ring tone for the phone.

24  Q.  Ashley or Jennell, her name is Ashley Kugler, you call her

25  Jennell, and she was in possession of that phone the last time

```
 1  you saw it?
 2  A.  Yes.
 3  Q.  I am about to wrap up, judge.
 4        I want to ask you about the form.
 5  A.  Uh-hum.
 6  Q.  Okay.  You indicated on direct and cross-examination that
 7  prior to you signing the form, Agent Funk-Romash said something
 8  to you?
 9  A.  Yes.
10  Q.  And what was that?
11  A.  She took the form, she slid it.
12  Q.  I need to you talk slow.
13  A.  She slid the phone to me with both her hands placed on the
14  phone.  She said I am just going to let you know before you
15  sign this, if you ask for a lawyer, most likely you are going
16  to be going to prison.  There is nothing we could do for you.
17        Basically, I am going to be messed up if I sign this
18  form and ask for a lawyer.
19        If I sign the form and I cooperate, then, I will most
20  likely go to get booked at the main jail on Monday.  They will
21  pick me up from my arraignment.  The judge will most likely
22  release me, and the reason I wasn't pretty much released right
23  then and there is because they do not hold FDC females in the
24  FBI headquarters.  They can only get booked in the Broward
25  County jail.
```

```
 1          MR. WILCOX:  No further questions.

 2          THE COURT:  Thank you, Ms. Rembert, you may step down,

 3   ma'am.

 4          Any additional witnesses or other evidence on behalf

 5   of Ms. Rembert?

 6          MR. WILCOX:  No, your Honor, but I do intend on

 7   contacting Joshua Rydell subsequent to the hearing regardless

 8   of the Court's ruling just to attempt to corroborate what she

 9   said.

10          THE COURT:  The Court is going to make the ruling on

11   the evidence presented here this morning.

12          MR. WILCOX:  I pretty much assumed that you would.

13          I am going to follow up regardless of the Court's

14   ruling.

15          THE COURT:  I understand.

16          Any rebuttal?

17          MS. VIAMONTES:  Your Honor, I want to provide defense

18   counsel with the report from the search done on Ms. Rembert's

19   phone.

20          I didn't intend on using this in my case in chief.

21   This is something given in discovery.  I actually acquired it

22   yesterday, and it doesn't show any missed calls from

23   Mr. Rydell.

24          I can submit this to the Court and defense counsel.

25          MR. WILCOX:  I don't know how she could establish the
```

```
1  predicate or authenticate Mr. Rydell's number.
2         I guess it goes to the weight.
3         I would object to that evidence being introduced.
4         I don't think a proper predicate has been laid.
5         THE COURT:  What about that, Ms. Viamentes, there has
6  been no testimony as to Mr. Rydell's telephone number.
7         MS. VIAMONTES:  Then, your Honor, at this point, I
8  will recall Agent Funk for rebuttal.
9         May I, your Honor?
10        THE COURT:  You may.
11        Special Agent Funk-Romash, let me remind you that you
12  are still under oath.
13        Ms. Viamentes, you may inquire.
14                     DIRECT EXAMINATION
15  BY MS. VIAMONTES:
16  Q.  Thank you, your Honor.
17        Agent, on December 14, 2012, did Ms. Rembert give
18  concept to search the phone she claimed was hers?
19  A.  Yes, she did.
20        MR. WILCOX:  Objection -- No, I withdraw it.
21  BY MS. VIAMONTES:
22  Q.  Did Ms. Rembert claim ownership of a particular phone?
23  A.  Yes.
24  Q.  Did you ask her for consent to search that phone?
25  A.  Yes.
```

1  Q.  How was the search of the phone conducted?

2  A.  The phone is admitted into evidence.  We put in a request

3  for our CART team to do an analysis of the phone.  They do --

4         What they do on the CART side, I am not familiar with

5  the exact procedure with it.

6         It is then returned to me on a disc with the analysis

7  of the phone, and I can print it out.

8  Q.  And what is CART?

9  A.  CART is computer analysis -- I want to say response team.

10  Q.  They are the forensic analysts?

11  A.  They are the forensic analysts.

12  Q.  Did you have an opportunity to review yesterday the report

13  given to you by the CART team in reference to Ms. Rembert's

14  cell phone?

15  A.  Yes.

16  Q.  In that report, could you identify Attorney Joshua Rydell's

17  cell phone?

18  A.  I could identify it by how Ms. Rembert put it in her

19  contact information.

20         MS. VIAMONTES:  May I approach, your Honor?

21         THE COURT:  Yes.

22  BY MS. VIAMONTES:

23  Q.  Agent, I have handed you the report to refresh your memory

24  of your review of the forensic exam of that cell phone.

25         How does Joshua Rydell's phone number appear in that

1  report?

2  A.  Law, Rydell, Joshua.

3  Q.  On December 14, 2012, do you see any phone calls to

4  Mr. Josh Rydell?

5  A.  Yes, I do.

6  Q.  At what time do you see the phone calls made to Joshua

7  Rydell's phone number?

8  A.  Ringing from beginning 8:47 in the morning on December

9  14th, to 12:53 in the afternoon.

10  Q.  After 12:53 in the afternoon, do you see any calls from

11  Josh Rydell to Ms. Rembert's phone?

12          MR. WILCOX:  Judge --

13          THE WITNESS:  No, I do not.

14          MR. WILCOX:  So that is clear, your Honor, that

15  particular phone, the witness testified she had more than one

16  phone.

17          Just so the record is clear, she is only talking about

18  one phone.

19          THE COURT:  That is what I understood her testimony to

20  be.

21          Is that correct, Special Agent?

22          THE WITNESS:  That is correct.  As to this phone, no

23  calls after 12:53.

24          THE COURT:  All right.  Okay.  Anything further?

25          MS. VIAMONTES:  Briefly, your Honor.

1  BY MS. VIAMONTES:

2  Q.  The other cell phones at the scene of Ms. Rembert's arrest,

3  where were they?

4  A.  I believe they were in the car.

5  Q.  In the car that Ms. Rembert was in prior to her arrest?

6  A.  Yes.

7  Q.  When you arrived on scene, where was Ms. Rembert?

8  A.  She was in the back, standing to the back of the vehicle.

9  Q.  Which vehicle?

10  A.  Of the vehicle that she was in at the time according to the

11  detective.

12  Q.  Not a police vehicle but the vehicle she was in?

13  A.  Right.

14  Q.  Based on where Ms. Rembert was, could she see inside the

15  vehicle and see the phones located inside the vehicle?

16  A.  I can't say --

17         MR. WILCOX:  I object, speculation -- Withdraw.

18         THE COURT:  Sustained.

19  BY MS. VIAMONTES:

20  Q.  Were the phones within her reach?

21  A.  No.

22         MS. VIAMONTES:  Nothing further, your Honor.

23         THE COURT:  All right.  Cross.

24                      CROSS EXAMINATION

25  BY MR. WILCOX:

1  Q.  Agent Funk-Romash, you, during the course of this

2  investigation, you intercepted several phone calls for -- maybe

3  intercept is not the right word -- but you recorded several

4  phone calls that Mr. Desir may have made from Krome Detention

5  Center to Ms. Rembert, is that correct?

6  A.  I personally did not record the telephone calls.

7  Q.  You collected the evidence of those calls?

8  A.  I collected them from the facility, right.

9  Q.  Records of those calls?

10  A.  Correct.

11  Q.  And those records would show to what number Mr. Desir was

12  calling, is that correct?

13  A.  To what number Mr. Desir was calling Ms. Rembert?

14  Q.  Yes.

15  A.  Those records would show that.

16  Q.  And those records -- And during the course of your

17  investigation, did you determine whether Ms. Rembert had a

18  driver's license?

19  A.  I believe she had an ID.

20        I am not sure exactly unless it is in front of me, I

21  couldn't tell whether it is a license or anything.

22  Q.  And on cross-examination --

23        Could I see the phone records, please?

24        On December 14th, the day Ms. Rembert was arrested, if

25  these records are accurate, she made 1, 2, 3, 4, 5, 6, 7, 8, 9,

1  10, 11 calls to Joshua Rydell?

2  A.  I did not count them.

3  Q.  I will give you this and ask you to count them.

4  A.  Yes, all prior to her knowledge of her arrest.

5  Q.  Understood.  All before you arrested her.

6        All these were made prior to she being arrested by

7  Hollywood Police?

8  A.  Yes, all prior to any knowledge of any arrest, as well.

9  Q.  I will give you that.  Okay.

10        But you don't think she forgot she was calling her

11  lawyer after she was arrested, you don't think that, do you?

12        MS. VIAMONTES:  Objection, this calls for speculation.

13        THE COURT:  Sustained.

14        MR. WILCOX:  No further questions.

15        THE COURT:  Redirect?  Any additional questions?

16        MS. VIAMONTES:  No, your Honor.

17        THE COURT:  Thank you, Special Agent Funk-Romash.

18        All right.  Any argument?

19        MR. WILCOX:  Your Honor, this is the Government's

20  burden, your Honor.  I will let them gone first.

21        THE COURT:  Any argument or you want to rest on the

22  testimony?

23        MS. VIAMONTES:  I am going to rest on the testimony

24  and my filed response.

25        THE COURT:  It is essentially a credibility issue

1    here.

2              MS. VIAMONTES:  Correct.

3              THE COURT:  All right.  Mr. Wilcox.

4              MR. WILCOX:  I understand that it is a credibility

5    issue, and I understand the Government has submitted a signed

6    rights waiver form, but I would submit, although not totally

7    corroborative of her testimony, somewhat corroborated by the

8    fact that she had been in contact with a lawyer on several

9    occasions prior to her being arrested, and I would suggest to

10   the Court it defies logic and common sense after she was

11   arrested she would completely forget that she had been talking

12   to a lawyer or that she would not think that maybe she ought to

13   talk to a lawyer.

14             You heard what she said.  I think the evidence had

15   been corroborated.  She said she talked about a lawyer several

16   times.  She was very specific about details surrounding the

17   arrest, your Honor, she was very specific about her response,

18   her responses as to her situation, how she reacted upon being

19   told that this was an FBI investigation, sex trafficking.

20             She was extremely credible and honest with the Court

21   and the Court should credit her testimony.

22             I don't think there was anything incredible about her

23   testimony.

24             And I would remind the Court it is the Government's

25   burden.  The Government has to prove.  It is not like you pick

1     one or the other.

2          In order to rule in our favor, all you have to do is

3     say the Government didn't carry their burden.  That is what I

4     am asking you to do.

5          This is a voluntary statement and you should suppress

6     these statements.

7          THE COURT:  All right.  The Court having considered

8     the testimony of the four witnesses presented during this

9     evidentiary hearing finds by a preponderance of the evidence

10    that subsequent to the Defendant Genet Rembert's arrest, on

11    December 14, 2012, that she was advised by Federal Bureau of

12    Investigation Special Agent Susan Funk-Romash of her Miranda

13    rights.

14         The Court further finds that Ms. Rembert read and

15    signed a Miranda rights waiver form as evidenced by

16    Government's Exhibit Number 1.

17         The Court finds that there were no threats or promises

18    made to Ms. Rembert.

19         The Court finds that there is no credible evidence

20    that Ms. Rembert invoked her right to counsel.

21         In addition, the Court finds that Ms. Rembert

22    understood her rights and knowingly, voluntarily, and

23    intelligently waived her right to counsel.

24         In addition, the Court finds that the statement given

25    by Ms. Rembert was knowing and voluntary.

1           Therefore, Ms. Rembert's motion to suppress statements

2    is hereby denied.

3           Okay.

4           Now let's move to Mr. Desir's motion to exclude

5    co-defendant Rembert's testimonial evidence.  That is docket

6    entry 148.

7           Folks, let me just say at the outset, I've read every

8    submission, so keep that in mind.

9           MR. ZACCA:  Very well judge.  I will be brief.

10          My motion sums it all up.  I don't dispute with the

11   Government, they agree the controlling case law, Crawford and

12   Bruton apply.

13          They agree that the statement given to the FBI

14   following her arrest and they agree that her testimony during

15   her bond hearing would run afoul of both those cases, and

16   should not come in in Mr. Desir's trial.

17          They propose two juries.

18          Obviously, that falls within the Court's discretion

19   what the Court wants to do, but I don't believe they disagree

20   that her statement to the FBI and her testimony at the bond

21   hearing --

22          THE COURT:  That is the way I interpret the

23   Government's response.  The question is what is the appropriate

24   remedy?

25          The Government suggests that we impanel two juries,

1  and when Ms. Rembert's post arrest statement is introduced,

2  that the Desir jury be removed from the courtroom.

3         Of course, this also necessitates separate final

4  arguments and, I don't know, it may necessitate separate

5  opening statements, depending on whether or not the Government

6  and/or Ms. Rembert wishes to allude to the statement, the post

7  arrest statement, in their opening statement.

8         Also, there is an issue of whether or not one of the

9  parties may want to address Rembert's post arrest statement in

10 the voir dire examination.

11        So, you do gain something in terms of judicial

12 economy, but I am not so sure that you gain enough.

13        Right now I am interested in your arguments or

14 position relating to the Government's request to impanel two

15 juries and hear the case in one proceeding.

16        MR. ZACCA:  Judge, I reference it in a footnote in my

17 motion.

18        I've talked about the value of having an outright

19 severance of Ms. Rembert's case from my client on numerous

20 occasions; and, in my footnote, my client, as I understand it,

21 does not want me to file a motion for an outright severance,

22 so, that being the case, I feel like the only position I can

23 argue is for the jury trial to proceed with two different

24 juries.

25        That is my position.

```
 1              THE COURT:  Mr. Wilcox, what is Ms. Rembert's
 2   position?
 3              MR. WILCOX:  On two juries?
 4              THE COURT:  Yes.
 5              MR. WILCOX:  My gut response, your Honor, and I don't
 6   have a dog in this fight, that is my initial response.
 7              So, I do not oppose two juries, okay.
 8              I don't think I am disadvantaged by having one jury --
 9   I don't think I have an advantage either way.  So, I would join
10   Mr. Desir's request for two juries.
11              THE COURT:  All right.  Government.
12              MS. VIAMONTES:  Your Honor, the Government strongly
13   urges this Court to select two juries for the following reason:
14              I know in terms of the Court's time it may not make it
15   shorter for the Court to try both defendants jointly with two
16   separate juries.
17              THE COURT:  I think it is raught with danger.
18              I've done it before but I tell you in this case in
19   particular, I see land mines along the way.
20              You don't have to convince me that this is the right
21   thing to do.
22              MS. VIAMONTES:  You see land mines if we do it
23   together.
24              THE COURT:  Yes, if we pick two juries.
25              And I assume, you correct me if I am wrong, if I deny
```

1   your request for two juries that you are going to move for

2   severance.

3           MS. VIAMONTES:  Yes, your Honor.

4           THE COURT:  Let me hear from you.

5           MS. VIAMONTES:  Your Honor, the Government is going to

6   great expense to bring witnesses here.  One of our victims,

7   C.J., is from out-of-town, she is presently here in Florida

8   from Vermont.

9           If the Court severed, the victim would have to testify

10  twice in this case, not only at additional expense to the

11  Government but, also, may cause a great impact to this victim

12  to have to testify twice about the same acts that these

13  defendants made her do.

14          Aside from that victim, your Honor, we have additional

15  witnesses that are flying in to testify as to both defendants

16  and the Government would be at a great expense, as well, for

17  that second jury trial.

18          I understand that there are concerns but I think they

19  could be addressed, your Honor.

20          THE COURT:  How do you propose that we do this in this

21  case?  Select two juries from the same venire, have two

22  separate venires?

23          What does the Government envision here?

24          MS. VIAMONTES:  I believe we can select one

25  Defendant's jury first, and with the remaining jurors, the

1  other defense attorney and I could select a second jury.

2       The Government would be willing to not address the

3  Defendant Genet Rembert's statement during opening to avoid

4  having two openings but we believe it would necessitate two

5  closing arguments.

6       THE COURT:  Talk to me a little more about the expense

7  aspect.

8       MS. VIAMONTES:  Your Honor, beginning this weekend,

9  C.J. will be at a hotel.  The Government pays for the lodging,

10 we paid for the flight, exact figures I don't have, your Honor,

11 I apologize, I don't know, but we pay for lodging, flight and

12 per diem while she is here for her meals.

13      In addition to that, two other civilian witnesses are

14 also coming for the trial that applies to her count and to the

15 conspiracy count.

16      The Government is still awaiting a response from the

17 defense as to our notice to rely on business records in this

18 case, so I am not sure how many other witnesses I may need to

19 fly in because I haven't heard from either defense counsel

20 which records they are going to object to me relying on

21 business records.

22      I do plan on having a representative from Back Page

23 dot com that will fly in.

24      I intend on having a representative from Metro PCS fly

25 in for this trial, all that expense to the Government.

1    If the Government were required to present testimony

2  twice, then, that is twice the expense, in these times, as the

3  Court knows of sequestration and all the budget cuts we are

4  facing.

5    THE COURT:  So, since we would be impaneling separate

6  juries, then each defendant would have 10 peremptory strikes,

7  correct?

8    MS. VIAMONTES:  Yes.

9    THE COURT:  And the Government would have six as to

10  each jury impaneled.

11    MS. VIAMONTES:  Correct.

12    THE COURT:  Are you able to quantify in dollars how

13  much extra money it would take to try this case a second time?

14    MS. VIAMONTES:  Your Honor, I can't do that at this

15  moment.  If we take a break, I can attempt to do that.

16    Just a ballpark figure, your Honor, I mean, the hotel

17  for each witness is $150 a night.

18    The flights are not cheap because they normally get

19  refundable flights so we could be flexible, probably $800 in

20  flights per person.

21    Aside from that, the per diem --

22    THE COURT:  All right.  We have all parties are in

23  agreement that we impanel two juries.

24    We've got the budgetary issue wherein it would be most

25  cost effective to impanel two juries, even though I think it is

1    much more cumbersome when you are selecting two -- actually, 14

2    person juries.

3          I really did not want to impanel two juries but I

4    think you've convinced me, basically, because of monetary

5    considerations that it is the appropriate decision so we will

6    impanel two juries.

7          Now, let me advise you scheduling wise, I am available

8    Monday through Friday of next week.

9          The following week, I would not be available Monday,

10   Tuesday and Wednesday.

11         Mr. Wilcox, you have a vacation or something planned?

12         MR. WILCOX:  No, the Federal Public Defenders do have

13   furlough days, that next Friday would be a furlough day, but I

14   could make arrangements to take another furlough day.

15         THE COURT:  What about next Friday?

16         MR. WILCOX:  No, next Friday.

17         THE COURT:  The following Friday you could get

18   somebody.  You could switch.

19         MR. WILCOX:  I will have to let my office know I need

20   a substitute day.

21         THE COURT:  You can swap with somebody else.

22         MR. WILCOX:  No, it is not like swap, you have to let

23   the GAO or whatever it is you can't take that furlough day.

24   That following Friday is the 24th.  I am going to be in

25   California May 24th to May 28th.  I am sorry, I didn't project

 1   that trial to take longer than two weeks.

 2          THE COURT:  If we severe, we can complete one trial

 3   next week.

 4          That is a reason to severe.

 5          Does anybody want to re-think their position?

 6          MR. ZACCA:  Judge, can I have a moment with Mr. Desir?

 7          (Pause)

 8          MR. WILCOX:  Can we go back on the record?

 9          THE COURT:  We sure can.

10          MR. WILCOX:  If the Government and Mr. Zacca re-think

11   their positions and we ended up severing the case, who would go

12   first?

13          THE COURT:  Desir.

14          Okay.  And with two separate trials, Mr. Wilcox, we

15   will work around your furlough days.

16          MR. WILCOX:  Thank you, your Honor.

17          MS. VIAMONTES:  Your Honor, if I may?

18          THE COURT:  Yes, ma'am.

19          MS. VIAMONTES:  Your Honor, if the Court is not able

20   to conduct the trials simultaneously by selecting two juries,

21   the Government would then opt to redact Ms. Rembert's statement

22   to have one trial.

23          I think it would weaken my case against Ms. Rembert,

24   however, in light of everything else, for all the reasons I

25   said, I prefer to redact her statement and go forward with one

1  trial than to conduct two separate trials in this matter.

2          So, if the Court rules that it cannot accommodate my

3  request, I would request, then, to grant me permission to

4  redact the detention hearing transcript in which she testified,

5  and I would only put before the jury statements that only

6  inculpate herself and we would only present to the jury the

7  statements that she gave to law enforcement upon arrest that

8  would inculpate herself without mentioning Mr. Desir's

9  involvement.

10         MR. ZACCA:  Judge, the problem I have with that is

11 that may solve perhaps Bruton issues, but they still have the

12 Crawford hurdle to overcome.

13         It is still testimony or evidence that I may not be

14 able to cross-examine on.  The declarant is Ms. Rembert,

15 therefore, their offer of redaction overcomes one hurdle and

16 not the second, and that is Crawford.

17         Thinking out loud, and thinking this proposal through,

18 that is what I am thinking.

19         MS. VIAMONTES:  Your Honor, in fact, Mr. Zacca is

20 right.  It does get us over the hurdle of Bruton, but it would

21 still present a Crawford issue.

22         So, I would again request that we should conduct this

23 trial simultaneously, both defendants.

24         THE COURT:  Well, the Government has made an election

25 and that is to go forward with one jury --

```
 1            MS. VIAMONTES:  Your Honor, if I may, I must retract

 2   that it would present a Crawford problem, so I would not be

 3   able to present Ms. Rembert's statements to the jury that is

 4   trying Mr. Desir because he would not have the opportunity to

 5   cross-examine Ms. Rembert about those statements, therefore,

 6   even if they don't inculpate him causing a Bruton issue, it

 7   causes confrontation and Crawford issue.

 8            THE COURT:  I understand that.  But you are

 9   nevertheless electing to go forward without the statement,

10   correct?

11            MS. VIAMONTES:  No.

12            THE COURT:  So you want separate trials?

13            MS. VIAMONTES:  Yes.

14            THE COURT:  That is what we will do.  We will go

15   forward with Desir's trial on Monday and then, following that,

16   depending on when we finish that, will in large part dictate

17   when we start Ms. Rembert's trial.

18            MR. ZACCA:  The order of trials is within your clear

19   discretion.  I only ask, since Mr. Desir is facing more counts

20   and facing the testimony of two separate victims, that we go

21   second as opposed to first.

22            THE COURT:  That will be denied.

23            MR. ZACCA:  Very well.

24            THE COURT:  Okay.

25            The next issue or motion, Desir's motion in limine to
```

1   preclude evidence of unrelated events of domestic violence,

2   docket entry 147.

3          Mr. Zacca, do you wish to offer any other argument or

4   do you stand on the motion?

5          MR. ZACCA:  I stand on the motion, by BV's own account

6   this has nothing to do with alleged crime of sex traffick or

7   commercial sex acts, for that matter.

8          It is a boyfriend/girlfriend tumulterous relationship,

9   two violations that were dismissed.  It was simply arrests.

10          One thing that she said had to do with committing

11  commercial sex acts out of coercion or force by Mr. Desir, but

12  it is not.  One had to do because she missed a turn and they

13  got into an argument, and the second one is she was working at

14  an adult nightclub.

15          Other than that, it is irrelevant; and, in a case like

16  this, there is a 403 concern.  The allegation the Government is

17  making is sensational.

18          There are serious charges.  They are trying to capture

19  the jury's attention.

20          THE COURT:  Don't the charges fall within the time

21  parameters set forth in the indictment?

22          MR. ZACCA:  Yes, sir, they do, they do.

23          THE COURT:  Doesn't this evidence relate to the

24  Desir's use of force against BV?

25          MR. ZACCA:  It is allegations of use of force against

1  BV, but not in relation what the indictment charges.  That is

2  the thrust of the argument in my motion.

3       THE COURT:  All right.  Your motion will be

4  respectfully denied as the Court finds that this evidence is

5  within the time parameters alleged in the indictment and is

6  further direct evidence of Mr. Desir's use of force against BV.

7       The Court finds that it is relevant and inextricably

8  intertwined.

9       Okay.

10      Next motion, Government's motion in limine to preclude

11 impeachment of a Government witness with juvenile criminal

12 history.

13      This is docket entry 149.

14      MS. VIAMONTES:  Your Honor, the Government believes

15 that Mr. Zacca, on behalf of Mr. Desir, will attempt to admit

16 facts that BV, victim BV while she was a juvenile, may have

17 made a false statement to law enforcement about her true name.

18      BV was a run-away and, when confronted by law

19 enforcement, she didn't want to return to DCF custody so she

20 gave a false name.

21      This is extrinsic evidence of a person's bad character

22 or character of untruthfulness.  The only way Federal rules

23 allow for a party to attack the credibility of the witness or

24 veracity is with opinion testimony, not by specific instances.

25      THE COURT:  Well, was BV adjudicated guilty, or

1  adjudicated delinquent of the false identification charge?

2          MR. ZACCA:  Yes, sir.

3          Subsequent to filing the motion, I did get records

4  from St. Lucie County and I can represent to the Court that the

5  case was dismissed.

6          THE COURT:  It was?  Okay.

7          You wish to be heard, Mr. Zacca?

8          MR. ZACCA:  Yes.  Despite this, I don't think it ends

9  the analysis.  608, witness' character for truthfulness or

10  untruthfulness and discusses the parameters when that type

11  evidence can come in.

12          Specifically, Subsection B addresses specific

13  instances of conduct, and it discusses how I can get into

14  specific instances of conduct on cross-examination.  I can't

15  introduce extrinsic evidence supporting that -- those

16  questions; and, therefore, I think, under that Rule, it clearly

17  comes in because it goes to truthfulness.

18          THE COURT:  In light of the fact the juvenile charge

19  was dismissed, I am going to grant the Government's motion in

20  limine.

21          All right.  Next motion is Mr. Desir's motion in

22  limine to exclude privileged marital communications, docket

23  entry 150.

24          MR. ZACCA:  Yes, judge.  This is our motion to

25  preclude the Government from introducing evidence of the phone

1    calls between my client when he was detained at Krome Detention

2    Center to Ms. Rembert.

3              Also, the Government intends to introduce a letter

4    that was authored -- what they say was authored by my client

5    and addressed to Ms. Rembert.

6              The privilege I am traveling under, because the

7    Government was unclear what privilege I am traveling under, not

8    testimonial privilege, but the communication privilege, I

9    thought I made that clear, clearly, communication between

10   spouses is recognized as a privilege under Federal rules.

11   These are clearly communications between spouses and,

12   therefore, I believe that the communication should be barred

13   and prohibited in this case.

14             At the time I filed the motion, I didn't know which

15   phone calls or which discussions.  There are over 120 phone

16   calls.  Since then I did get transcripts, I think this week,

17   identifying the phone calls.

18             Judge, I looked through them --

19             THE COURT:  These are all calls from Krome where

20   Mr. Desir was incarcerated, correct?

21             MR. ZACCA:  Yes, sir.

22             THE COURT:  Isn't there a warning that warns the

23   participants in the conversations that the conversations are

24   being recorded and monitored?

25             MR. ZACCA:  I understand, judge.

 1          THE COURT:  I don't see how there is any expectation

 2   of privacy there.

 3          MR. ZACCA:  You are right, however, the only point I

 4   would like to make and lodge it for the record is that, you

 5   know, there is no other way of them communicating at that

 6   point, and that was the only means of communication.

 7          Since that being the only means of communication at

 8   that stage in their marriage, I think that the marital

 9   privilege still applies despite that warning, and my client

10   reminded me to mention to the Court that these phone calls are

11   just phone calls about, you know, spouses, about their

12   marriage, and about them.

13          THE COURT:  That would go to the relevancy.

14          MR. ZACCA:  Yes.

15          THE COURT:  This relates to -- you are asserting a

16   marital -- a privileged marital communication, and I find that

17   there is no expectation of privacy, therefore, the

18   communications are not confidential.

19          MR. ZACCA:  Very well, judge.

20          THE COURT:  Insofar as the letter is concerned, any

21   argument there?

22          MR. ZACCA:  Well, judge, I think, in reviewing the

23   Government's response, their best argument is this warning,

24   when you get on the phone and callers are advised that the

25   phone call is being recorded and subject to monitoring.

1          That doesn't apply to this letter.

2          So, I think, clearly, that falls within the privilege

3   and the Government can't overcome it.

4          MS. JOHANNES:  Your Honor, would you like me to

5   respond or rely --

6          THE COURT:  You can respond.

7          MS. JOHANNES:  Briefly, judge, the letter, and I

8   didn't attach it to the motion, but I will submit it to the

9   Court, Government Ex. 2 for the record, I will hand that up.

10          Now, the letter, judge, would come in and not fall

11   under any of the marital privileges because it is not

12   communication between spouses that deal with pillow talk, if

13   you will.

14          Judge, if you read it, it is clear what that letter

15   deals with, that letter deals with how to cover up a

16   conspiracy, what you should and should not say to law

17   enforcement.

18          THE COURT:  It would be in furtherance of the

19   conspiracy?

20          MS. JOHANNES:  It would be completely in furtherance

21   of the conspiracy and it is Mr. Desir telling Ms. Rembret what

22   to do and what not to do.

23          If you are co-conspirators and you have communications

24   in furtherance of a conspiracy, that does not fall within any

25   of the privileges.

1        THE COURT:  The Court will deny Mr. Desir's motion in

2   limine with respect to the letter.  The Court finds the

3   substance of the letter reveals that the subject matter is in

4   furtherance of the conspiracy.

5        MR. WILCOX:  Your Honor, with respect to that letter,

6   I don't remember all of the assertions in the letter, but I am

7   concerned that this should not come in against Ms. Rembert.

8   She never received it.

9        THE COURT:  Should the Court -- should the Court give

10  a limiting instruction or is that necessary?

11       MS. JOHANNES:  Judge, I don't think a limiting

12  instruction would be necessary.  It would come in specifically

13  with Mr. Desir.  It was true, it was intercepted --

14       THE COURT:  We determine it is admissible against

15  Mr. Desir.  What about Ms. Rembert.

16       MS. JOHANNES:  That is the purpose of

17  cross-examination.

18       THE COURT:  What if Mr. Desir does not take the stand?

19       MS. JOHANNES:  If that is the case, in the case for

20  Ms. Rembret this letter will not be used, that solves the

21  issue.

22       THE COURT:  That is right.  We are trying two separate

23  juries.

24       MS. VIAMONTES:  Judge, if I may be heard, I don't mean

25  to complicate things.

```
 1              As I am sitting here and thinking about trying these
 2    two cases separate --
 3              THE COURT:  I know you are having a lot of anxiety.  I
 4    have looked at you and I could tell.
 5              MS. VIAMONTES:  I can barely focus on my argument.
 6              THE COURT:  You are passionate, as Mr. Zacca and
 7    Mr. Wilcox.
 8              MS. VIAMONTES:  I know we are going to be here long,
 9    many hours.
10              If I may readdress that issue.  I will not make new
11    arguments.
12              What I want to tell the Court is after sitting here
13    considering it, what I prefer to do is not present
14    Ms. Rembret's statements at all and try the cases together.
15              If she testifies, Mr. Desir has the opportunity to
16    confront her, I could --
17              THE COURT:  Cross-examine her.
18              MS. VIAMONTES:  Your Honor, taking the budgetary
19    issues into account, as well as, your Honor, to be candid with
20    the Court for me, even more important than the budgetary
21    issues, is this victim having to come in here and testify
22    twice.  I prefer --
23              THE COURT:  That resolves it.  We will pick one jury
24    and go forward with both defendants.
25              Now, with respect to the letter, as it relates to
```

1   Ms. Rembert, does the Court give a limiting instruction?

2        Ms. Johannes?

3        MS. JOHANNES:  Judge, Mr. Wilcox can, obviously,

4   cross-examine the agent and say my client never received this.

5   My client never participated in the writing of this.

6        I don't see what is in here that he is so worried

7   coming in against his client.

8        These are writings that Mr. Desir made, not his

9   client.

10        I don't understand his concern about this being used

11  against his client.

12        MR. WILCOX:  It is suggesting my client is part of a

13  conspiracy.  She had not even seen the letter.

14        Even without knowing exactly what is in the letter and

15  gleening from what has been argued here or not remembering what

16  was in the letter --

17        THE COURT:  Here is what I am going to do.

18        I am going to defer ruling on that.

19        That issue has not been briefed.

20        If either side wishes to brief that issue, you can.

21        I am not ordering that you do so but, if you would,

22  just remind me if I don't remember that I still need to rule on

23  that issue.

24        MS. JOHANNES:  Yes.  I want to make the record clear,

25  the Defendant did receive this and has a copy of it.

1        It is Bate stamped 332 to 336, so she should have

2  ample time to look at it.

3        MR. WILCOX:  I am not implying I never received the

4  letter.

5        THE COURT:  I know.  I understand.

6        Next motion is Government's motion in limine to

7  introduce climate of fear and other intrinsic evidence which is

8  docket entry 151.

9        What say -- Well, I've read the motion.  I read the

10 defendant Desir's response.

11       Mr. Zacca, anything you want to add?

12       MR. ZACCA:  I reviewed the cases they cited.

13       The law is correct, they cited the law correctly.  It

14 is allowable under the cases that I have read, this type of

15 argument, in evidence.  The concern I have, and this dates back

16 to my motion for the Bill of Particulars way back in the

17 beginning.

18       THE COURT:  You want the Government to identify the

19 prostitute that is being referred to?

20       MR. ZACCA:  Absolutely.

21       THE COURT:  Are you able to do that?

22       MS. VIAMONTES:  No, your Honor, we are not.

23       THE COURT:  They are not able to identify her.

24       MS. VIAMONTES:  Her true name, full name, no, I am

25 not.

1            THE COURT:  I am going to grant the Government's

2    motion in limine.

3            I think it is relevant and C.J. will be subject to

4    cross-examination regarding her memory, so, it is admissible.

5            MR. WILCOX:  Your Honor, I did not file a response to

6    the Government's motion in limine, however, I would imagine

7    that evidence would be coming in against Ms. Rembert, as well.

8            I would state I don't think the evidence should come

9    in until after C.J. testifies.  I presume they are going to

10   have some agent or somebody familiar with the pimp/prostitution

11   relationship.

12           THE COURT:  Yes, they noticed an expert they intend to

13   call.

14           MR. WILCOX:  I think there has to be an establishment

15   of climate of fear.

16           THE COURT:  Is the Government planning on calling C.J.

17   before the expert?

18           MS. VIAMONTES:  Yes.

19           THE COURT:  Okay, it is moot.

20           MR. WILCOX:  Okay.

21           THE COURT:  Government's motion in limine to limit

22   cross-examination of victim BV.

23           This is docket entry 156.

24           MS. JOHANNES:  Yes, your Honor, in large part I rely

25   on the briefing I filed.

1          What I will address is the Defendant's respond to our

2    motion.  Basically, in the defendant's response, page 3E says

3    he wants to talk about the details of the crime that she is

4    currently incarcerated for, she being BV, because she wants to

5    show she is violent and she is lethal, and there is a violent

6    tendency to her behavior.

7          That is precisely why it should not come in.  It is

8    highly prejudicial and has nothing to do with this case.

9          I agree the Defendant has a 6th Amendment

10   constitutional clause right.  There are limitations on the

11   right unless the Court's rulings are arbitrary or

12   disporportionate.

13         The Government is not asking for anything arbitrary or

14   disporportionate.

15         11 Circuit case law is clear, he can ask BV, are you

16   incarcerated?  Where are you incarcerated?  Is this what you

17   are incarcerated for?

18         The jury will understand she is in jail and in jail

19   for a violent crime.

20         He can ask her, do you have any bias?  Did the

21   Government promise you anything?

22         The 11th Circuit is clear on it.

23         THE COURT:  I was unclear in reading the motion and

24   the response, I was -- as I understood it, there were two males

25   and BV involved in the underlying home invasion crime, but I

1  was unclear as to the specific role of BV in this crime.

2          MS. JOHANNES:  She was knocking on the door, your

3  Honor.

4          THE COURT:  And that was it?

5          MS. JOHANNES:  She is like the bait.  She is not the

6  one --

7          MR. ZACCA:  It is not that simple.

8          If I may, she knocked on the door.  A 13 year old boy

9  answers the door and says "who is it"?  BV says, "I am your

10 mother's cousin.  I want to talk to her.  Go get your mother."

11         The boy, apparently, doesn't recognize BV, and

12 realizes something fishy, refuses to open the door.

13         The two males shoot the door, attempt to get in.  They

14 never got in, and they made an attempt and she tried to get in

15 through trick and deception.  When they didn't work, she stood

16 there with accomplices shooting and the kid on the other side.

17         THE COURT:  There is no evidence that she was the

18 shooter?

19         MR. ZACCA:  No, I haven't found any evidence, and I

20 didn't see it in any of the documents I read.

21         MS. JOHANNES:  She was not, your Honor.

22         THE COURT:  I will grant the Government's motion in

23 limine.

24         The limit will be there can be evidence of the date of

25 her conviction and/or arrest, the specific offenses to which

1  she was adjudged guilty, whether or not she stands to benefit

2  in any way from her testimony in this case, the length of her

3  sentence.  And I believe that would be it.

4         MR. ZACCA:  Judge, the only thing I would like to add

5  for the record in light of your recent ruling with regard to

6  the climate of fear, I think Rule 404(b) -- excuse me, strike

7  that.  404(a)(2) allows me to introduce evidence that is

8  pertinent to the character -- pertinent trait relating to the

9  victim.

10        What I tried to do in my response, judge, relate to

11  the Court, if the Government is going to be able to create this

12  climate of fear that BV is someone easily domineered,

13  manipulated, controlled, this evidence, this crime, violent

14  crime is in opposition of that.

15        That is the thrust of my response, especially in light

16  of your ruling of the climate of fear.  I think it is

17  important, judge, I want to put that on the record.

18        THE COURT:  Well, you will be able to get in what she

19  was adjudicated guilty of which, certainly, is a crime of

20  violence.

21        You are going to be able to argue that.

22        But when you look at the underlying facts, it gets a

23  little murky because you've got these two males who appear to

24  be perhaps dominating her.

25        I just -- I think that you are able to get in the

1 violence through evidence of what she was adjudicated guilty of

2 and the length of the sentence, an eight year sentence.

3          MR. ZACCA:  Very well, judge.

4          THE COURT:  All right.  The next matter is

5 Ms. Rembert's motion for release of Brady material, second

6 demand.

7          The Government responded and Ms. Rembert filed a reply

8 yesterday.

9          What say the Government?

10          MS. VIAMONTES:  Your Honor, I did disclose to defense

11 counsel what they may perceive to be Brady in this case.  I

12 have copies of the ads that I referenced in my response for

13 defense counsel.

14          I am providing them supplemental discovery today.

15          I did inquire of both victims about their prior,

16 possibly, previously having sex in exchange for money.

17          THE COURT:  But are seeking to exclude all that.

18          MS. VIAMONTES:  One issue is, do we have to disclose

19 it?  The other issue is, is it admissible?

20          THE COURT:  All right.  And the defendants are arguing

21 that it should be admitted, that it is relevant evidence and

22 would also come in under 404(b)(2).

23          MS. VIAMONTES:  Well, your Honor, the case law clearly

24 answers this question.  Rule 11, 412 --

25          Judge, when I don't eat lunch, I start losing my mind

1   as you see.

2          Clearly, establishes this type propensity evidence is

3   not admissible in a sex case.

4          They are trying to show the jury that these young

5   women, you know what, they were prostitutes before and,

6   therefore, they shouldn't be credible, and you should believe

7   because they consented to committing acts of prostitution in

8   the past, they must have consented with these defendants to

9   have sex in exchange for money.

10         Your Honor, I apologize, I didn't submit the cases to

11  the Court earlier, but I do have copies for the Court and for

12  defense counsel of several cases that are right on point and I

13  didn't spend hours researching it.  I spent, maybe, an hour and

14  a half researching it.  I didn't find one case in opposite of

15  supporting my position.  Every case I found did support my

16  position.

17         From the 11th Circuit, we have United States versus

18  Sarras and the citation is 575 F.3rd, 1191; and that is an

19  opinion from 2009 from the 11th Circuit.

20         I will hand that one up to the Court along with United

21  States versus Curtis.  That is right here, Broward County,

22  March 19th, 2013, and the citation is 2013 Westlaw 1196878,

23  also, from the 11th Circuit.

24         Additionally, United States versus Culver, cited at

25  598 F.3rd, 740, and that is an opinion from March 2, 2010.

1          Your Honor, in each and every one of these opinions

2     along with opinions from other Circuits, the Courts have found

3     that this type of evidence, evidence of a victim's propensity

4     to commit commercial sex acts, is squarely precluded by the

5     Federal Rule of Evidence 412 and that is, in fact, why the rape

6     shield statute was enacted to prevent this type evidence.

7          It enumerates exceptions to the rape shield statute,

8     and defense has not cited one that applies.

9          Just saying, well, my defendant won't get a fair

10    trial, my client won't get a fair trial, that is not

11    sufficient.  You have to show how he is not going to get a fair

12    trial.

13         The argument that I can't present propensity evidence,

14    that is not evidence that the Defendant will not get a fair

15    trial in this case.

16         If defense were to show, by not presenting this

17    evidence, they wouldn't be able to present to the jury who the

18    true suspect is or culprit is in the case, then it would be

19    admissible but not in this case.  Here they want to show the

20    jury that the women did it before.

21         I submit as to B.V., there is no Brady evidence to

22    turn over.  We have asked B.V. whether she has engaged in --

23    whether she engaged in commercial sex acts prior to her

24    involvement with Mr. Desir and she has said, no, on more than

25    one occasion and never said otherwise.

1          As to C.J., she said very briefly right before meeting
2   Mr. Desir she had a couple of commercial sex acts she engaged
3   in, however, Rule 412 precludes it, I rely on the case law
4   along with my written response, your Honor.
5          THE COURT:  All right.
6          Mr. Wilcox.
7          I understand why you feel that it is relevant, but
8   what about the cases that --
9          MR. WILCOX:  Those cases deal with minor victims, your
10  Honor.  It would be illegal for anyone to have them engage or
11  maintain them in a manner, them engage in commercial sex act
12  regardless of whether they were forced.
13         I think that is an important distinction here.  Here
14  we have an adult victim.  We have an adult victim that is
15  admittedly a drug addict, admittedly addicted to or trying to
16  get treatment for addiction to heroin and/or Dilaudid, and has
17  admitted on occasions she traded sexual favors in exchange for
18  drugs.
19         The issue in the case, your Honor, the central issue
20  in the case or essential to our defense are why does C.J.
21  commit acts of prostitution?
22         Did she commit acts of prostitution because
23  Ms. Rembert and Mr. Desir forced her or coerced her or did she
24  commit acts of prostitution because she needed to satisfy her
25  addiction to drugs?

1           If that is going to be an issue, and there is no way

2     that is not going to be an issue, my client would be denied a

3     fair trial if she can't say, look, she did this not only prior

4     to meeting me, but also subsequent to meeting me.  It is not me

5     that is causing her to do this.  It is her addictions or desire

6     to satisfy her addiction.

7           And I cite a general cite.  I don't have a specific

8     cite, but I do refer to Chambers v Mississippi for the general

9     proposition that a Rule of Evidence cannot deprive her of her

10    constitutional right of confrontation or constitutional right

11    to have a fair trial, to present a defense, and this evidence

12    is clearly relevant.  It is relevant under 404(b) because it

13    goes -- doesn't go just to propensity, and I suspect the

14    Government knows that, just doesn't go to propensity.  Goes to

15    her pre-disposition, intent and motive for committing these

16    acts, these acts that are essential to this case.

17          For those reasons, I think the Court must admit the

18    acts that C.J. -- commercial acts that C.J. engaged in prior to

19    the meeting Mr. Desir and Ms. Rembert and subsequent to the

20    dates in the indictment when it couldn't reasonably be argued

21    they had any influence on her.

22          In short, she did it for the drugs.  We ought to be

23    able to say she did it for the drugs.  That is her motive, and

24    we have additional evidence of her motive for doing this.

25          MR. ZACCA:  And, judge, to add to what Mr. Wilcox

 1   stated, there is one additional point.

 2        I don't know, you are probably going to say it.

 3        She lied about it, repeatedly, in the beginning, when

 4   she was interviewed by the agents and throughout the case

 5   because I would call the Government and say is there any

 6   evidence of this?  We suspected it all along, and we did our

 7   investigation.  She lied about commercial sex acts before

 8   meeting Mr. Desir and Ms. Rembert and after it.

 9        THE COURT:  What I want to do, I want to read these

10   cases that the Government has cited before I rule.

11        MR. WILCOX:  Your Honor, I would ask -- it is not

12   directly on point but I think it captures the spirit of our

13   argument, Middle District case, United States versus -- sorry,

14   Johnson versus Moore, a habeas case where they are applying

15   this analysis to Florida's rape shield statute, 472 Fd.Supp.2d,

16   1344, 2007 case, and, basically, says Florida rape shield law

17   which is a categorical and prior exclusions rape statutory

18   exception requires -- to determine the valid State policy is

19   incorporated into the general rule, exclusion must be to the

20   constitutional right of the defendant to present her defense.

21        THE COURT:  All right.

22        MR. WILCOX:  I know your Honor is going to do due

23   diligence and look at the cases, but, generally, your Honor,

24   that rape shield -- They call it the rape shield statute for a

25   reason.

```
 1            When Congress enacted this, they were talking about

 2   victims that had been raped.  I won't try to mislead the Court,

 3   there are other decisions from other jurisdictions that says --

 4   also applies -- 412 also applies to this specific crime, but,

 5   your Honor, it certainly is not -- this area of law, I do not

 6   believe, has been conclusively settled to adult victims, and

 7   whether or not we can use the prior bad act to show the adult

 8   victim has some motive for committing these acts outside the

 9   force, coercion defenses.

10            THE COURT:  She does admit to re-engaging in

11   prostitution April of this year.

12            So, I want to read these cases that the Government has

13   provided.

14            MR. WILCOX:  Finally, your Honor, she did.

15            If the Court is inclined that the Court maybe think --

16   may read these cases and conclude that the prior bad acts

17   shouldn't come in, we certainly ought to be able under 608,

18   Federal Rule of Evidence 608, ought to be able to say that she

19   was asked by an agent during investigation whether or not she

20   had done this outside of any influence of Mr. Desir and

21   Ms. Rembert and she lied about it.

22            She actually made a false statement during a Federal

23   investigation under 18 United States Code 1001 which she could

24   be prosecuted for.

25            MS. VIAMONTES:  Your Honor I have additional cases I
```

1  would like to give to the Court.  Some have adult victims where

2  the Court --

3         THE COURT:  You want to state what the cases are and I

4  will read them.

5         MS. VIAMONTES:  United States versus Graham, 321568,

6  Westlaw, out of the Western District of New York, January 28,

7  2013.

8         United States versus C-e-p-h-u-s, 684 F.3rd, 703 and

9  the opinion.

10         MR. WILCOX:  That is a 7th Circuit case.

11         MS. VIAMONTES:  Correct.  The decision was July 6,

12  2012.

13         Lastly, out of the Northern District of New York, Eric

14  Shamsud-Din, S-h-a-m-s-u-d hyphen D-i-n, 2011 Westlaw 5118840

15  and these should be persuasive to the Court, they include adult

16  victims.

17         As to the second argument counsel made they are more

18  relevant now because C.J. lied about it, your Honor, if they

19  are precluded by rape shield, doesn't matter whether she lied

20  about it.

21         If a Rule of Evidence precludes something and says,

22  you know what, it is not relevant, it doesn't matter.  If it is

23  not relevant for a defense attorney to ask my victim, did you

24  cheat in your third grade exam, if that is not relevant to the

25  case and they lied about it, it also is not relevant.

1    So, I ask the Court not to be misguided by that

2  argument.  If Federal Rule of Evidence 412 precludes this from

3  coming in because it is not relevant to the time frame of the

4  indictment and unfairly prejudicial, and that is what Congress

5  said --

6    THE COURT:  I will read the cases.  If after reading

7  the cases, I feel I need additional argument, I will let you

8  all know.

9    MS. VIAMONTES:  Thank you.

10    THE COURT:  Also, Mr. Desir filed a motion for

11  specific Brady material docket entry 183, and that has been

12  addressed by the Government.

13    Last motion, Mr. Desir's motion in limine to preclude

14  introduction of 2010 guilty plea for felon in possession of a

15  firearm.

16    That is docket entry 171.

17    MR. ZACCA:  Judge, subsequent to filing this motion, I

18  received records indicating that the possession of cocaine

19  which he originally withheld adjudication was handed out, he

20  was put on probation, violated probation --

21    Adjudication was withheld, therefore, he should have

22  been -- shouldn't have been found guilty.  Basically, it was an

23  illegal plea.

24    There was an amended judgment and the Court

25  adjudicated him on the possession of cocaine, therefore, I

1   presume that was the basis of the guilty plea, therefore, I am

2   withdrawing that motion at this time.

3          THE COURT:  All right.  Any other pending motions?

4          MR. ZACCA:  There is a motion I filed under seal with

5   regard to B.V.'s prostitution behavior.

6          It relates to a witness that I spoke to on Monday,

7   defense witness, Edwin Castily.

8          I don't know if your Honor had an opportunity to read

9   that.  I did submit a motion to the Government.  I filed it

10  under seal but the Government has a copy of the motion.

11         I take it by your look you haven't seen that motion?

12         I filed it under seal, I believe it was yesterday, and

13  I specifically told the intake clerk to take it to your

14  chambers immediately, so you would have it before the hearing.

15         I have a copy here.

16         THE COURTROOM DEPUTY:  It wasn't docketed yesterday.

17         It went on this morning.

18         Not long ago.

19         THE COURT:  I haven't seen it.

20         MR. ZACCA:  Would you like me to submit the written

21  copy?

22         THE COURT:  Please.  This is the issue we just

23  discussed.

24         MR. ZACCA:  Absolutely, judge.

25         THE COURT:  The Court will reserve ruling.

1       MS. VIAMONTES:  I haven't had an opportunity to

2   respond to that last motion, if I may, because it was filed

3   late yesterday after the deadline.

4       Rule 412 requires if a party is going to seek to admit

5   evidence under 412, they have to provide notice 14 days prior.

6       This was done yesterday, your Honor.

7       This is one of the reasons why all the evidence,

8   regarding B.V. and C.J., should not be admitted in this trial

9   regarding any alleged acts of prostitution or acts of the crime

10  in the indictment.  They do fall under 412, and Mr. Zacca by

11  filing this knows --

12      THE COURT:  Obviously, some was just discovered

13  because the Government provided the information.

14      Had the Government provided it timely, the 14 day

15  notice could have been met.

16      MS. VIAMONTES:  Not as to Edwin, that is their

17  witness.

18      THE COURT:  Edwin you are objecting, failing to comply

19  with the 14 day notification requirement.

20      MR. ZACCA:  Sorry, judge, I put in the motion a

21  footnote we weren't able to locate him until -- I think my

22  investigator found him last Friday.  I spoke to him for the

23  first time on Monday.

24      I can't represent something a witness will say until I

25  speak with the witness.

```
 1              THE COURT:  All right.  Now we will be impaneling one
 2    jury on Monday.
 3              MR. WILCOX:  Five peremtories apiece?
 4              THE COURT:  You will have 10 collectively.
 5              If you can't agree, then each defendant will have
 6    five.
 7              The Government will have six peremptories.
 8              The Government will be allotted 15 minutes for voir
 9    dire.  Each defendant will be allotted 10 minutes for voir
10    dire.
11              We will impanel a total of 14 jurors.
12              Anything else?
13              MR. WILCOX:  Starting 9, judge?
14              THE COURT:  Nine o'clock.
15              MR. ZACCA:  Could we have more than 10 minutes?
16              THE COURT:  No, sir, 10 minutes per defendant.  You
17    have a total of 20 minutes of defense questioning and 15
18    minutes of Government questioning.
19              MS. VIAMONTES:  Your Honor, in terms of scheduling, I
20    am not quite sure -- I would like a deadline for the defense to
21    respond to my 902.11 notice.  I am having difficulty scheduling
22    flights.  If we are going to have an agreement these are
23    admissible, could we adjust that?
24              MR. WILCOX:  Discovery has been flying in.  I have not
25    had an opportunity to look at everything.
```

1          If she is telling me what record custodian --

2          THE COURT:  Why don't you all discuss that after we

3     recess today and see if you can agree on some of the things.

4          Obviously, defense is not required to agree to

5     anything.

6          Burden of proof is on the Government.

7          If you can agree on things, fine.

8          MS. VIAMONTES:  Thank you.

9          MR. ZACCA:  Thank you, judge.  Have a good afternoon.

10          THE COURT:  We will stand in recess.

11          You all go about your business.  I have to clean up

12     here.

13          (Thereupon, the hearing was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

129

## A

**abbreviation** 57:9
**able** 81:5 97:12 99:19 100:14 101:3 111:21,23 115:11,18,21,25 118:17 120:23 122:17,18 126:21
**absolute** 51:2
**Absolutely** 20:17 111:20 125:24
**accommodate** 100:2
**accomplices** 114:16
**account** 102:5 109:19
**accurate** 88:25
**acquired** 83:21
**act** 35:9 119:11 122:7
**acts** 95:12 102:7,11 117:7 118:4,23 119:2,21,22,24 120:16,16,18 121:7 122:8,16 126:9,9
**actual** 8:20
**add** 111:11 115:4 120:25
**addict** 119:15
**addicted** 119:15
**addiction** 119:16,25 120:6
**addictions** 120:5
**addition** 50:20 83:4 89:15 95:10 95:14 120:24 121:1 122:25 124:7
**Additionally** 117:24
**address** 7:19 9:11,15,18 33:3 40:13 48:6 93:9 96:2 113:1
**addressed** 95:19 105:5 124:12
**addresses** 104:12
**adjudged** 115:1
**adjudicated** 103:25 104:1 115:19 116:1 124:25
**adjudication** 124:19,21
**adjust** 127:23
**admissible** 108:14 112:4 116:19 117:3 118:19 127:23
**admit** 103:15 120:17 122:10 126:4
**admitted** 85:2 116:21 119:17 126:8
**admittedly** 119:15,15
**adopt** 7:24
**adopted** 8:19
**ads** 116:12
**adult** 102:14 119:14,14 122:6,7 123:1,15
**advantage** 35:4 94:9
**adverse** 51:5
**advertise** 68:5
**advise** 26:18 33:20 37:25 98:7
**advised** 25:5,5 26:24 30:24 33:11 38:25 39:4 49:6 51:1,3 70:10,11 91:11 106:24
**affix** 42:20 43:2,6,11
**afford** 27:3 43:18
**afoul** 92:15
**afternoon** 78:8 86:9,10 128:9
**agent** 4:25 5:2,3,19,22 6:9 7:11 10:4,15,25 11:9 13:17 14:14,23 15:4,6 16:18 17:16 19:1,11,13 20:5,10 21:17,22 22:6,9 23:1 25:25 26:2,12,16,18 27:9,21,23 27:25 28:3 32:24 33:11,14,25 36:4,4 37:18,21,22,24 38:11,23 39:12 40:2 41:6,10 45:8 48:1 49:11 50:17 59:19 60:25 61:4,4 61:11 62:4 63:3,20 64:16,17 65:17 69:22 71:9 73:5,5,13,16,22 73:24 76:22 77:12 82:7 84:8,11 84:17 85:23 86:21 88:1 89:17 91:12 110:4 112:10 122:19 121:4
**agents** 4:19 39:10 74:23 77:13,21 121:4
**Aggravated** 52:14
**ago** 68:14 80:15 125:18
**agree** 92:11,13,14 113:9 127:5 128:3,4,7
**agreed** 68:14
**agreeing** 43:24
**agreement** 97:23 127:22
**Ah** 56:19
**ahead** 10:23 22:1 38:21 56:20 58:19 62:17 66:24
**alcohol** 42:14
**allegation** 102:16
**allegations** 102:25
**alleged** 102:6 103:5 126:9
**allotted** 127:8,9
**allow** 69:10 70:4 71:2,9 103:23

**allowable** 111:14
**allowed** 26:9 49:23 75:20
**allows** 115:7
**allude** 93:6
**amended** 124:24
**Amendment** 113:9
**America** 1:4 3:3
**ample** 111:2
**analysis** 85:3,6,9 104:9 121:15
**analysts** 85:10,11
**and/or** 93:6 114:25 119:16
**answer** 27:10 44:3 71:19,20 74:7
**answered** 66:11
**answering** 43:20,21 74:23
**answers** 114:9 116:24
**anticipated** 66:23
**anxiety** 109:3
**anybody** 49:1,5 99:5
**apartment** 78:16 85:25 23
**apiece** 127:3
**apologize** 96:11 117:10
**apparently** 38:21 114:11
**appear** 42:16 85:25 115:23
**APPEARANCES** 1:12
**applies** 96:14 106:9 118:8 122:4,4
**apply** 92:12 107:1
**applying** 121:14
**appoint** 43:18
**appointed** 27:4
**apprehending** 24:8
**approach** 8:14 13:7 35:20 72:3 75:16 85:20
**approached** 31:11,11
**appropriate** 41:1 92:23 98:5
**approximately** 11:8,20 14:5,6,8,9 14:11 15:14 78:3
**April** 122:11
**arbitrary** 113:11,13
**area** 12:15 18:6 39:16 80:22 81:7 122:5
**argue** 93:23 115:21
**argued** 110:15 120:20
**arguing** 55:22 116:20
**argument** 89:18,21 102:3,13 103:2 106:21,23 109:5 111:15 118:13 121:13 123:17 124:2,7
**argumentative** 20:23 35:10
**arguments** 93:4,13 96:5 109:11
**arraigned** 74:11
**arraignment** 66:6 74:8 76:23 82:21
**arrangements** 98:14
**arrest** 4:12 5:25 6:2,19 8:20,22 9:16,17 10:16,22 11:12 12:17 15:15 16:6 24:6 25:11 32:4 40:6 45:18,21 48:21 52:4,5 75:13 76:2 79:15 80:8 87:2,5 89:4,8 90:17 91:10 92:14 93:1,7,9 100:7 114:25
**arrested** 7:14 8:23 9:4,21,22 10:8 10:24 11:1,22 12:7,21 13:1,4,5 14:4 33:17 40:7 47:11 52:2 70:7 70:8 75:20 78:18 79:8 88:24 89:5 89:6,11 90:9,11
**arresting** 59:21
**arrests** 102:9
**arrival** 47:4,8
**arrive** 29:21
**arrived** 10:20,21 11:13,16,19 14:9 14:12 16:11 24:12 25:13,22,25 25:25 26:2 32:16 39:9,25 40:21 40:23 47:10 48:25 87:7
**arriving** 15:15
**ASAP** 64:7
**Ashley** 12:11 46:21 53:10,12 54:18 55:2,12,17,22 56:7,9 57:25 58:4 62:4,9,10,12 67:21,24 68:2,8 81:24,24
**Ashley's** 77:19
**Aside** 95:14 97:21
**asked** 9:5 12:16,18,19,22,24 13:2 17:20,23,24 18:1,2,21,22,24 24:24 25:1 29:2 32:25 34:4 41:21 42:2,3,9,11,13 46:15 48:3 49:15 49:17 55:23 61:6 62:21 64:12,22 64:25 65:13,15 66:11 69:17 72:25 73:3,5,15 74:6,18 77:15,17 118:22 122:19
**asking** 14:2 15:22 35:5 44:10 59:3 59:5,18 91:4 113:13
**aspect** 96:7

**asserting** 106:15
**assertions** 108:6
**assigned** 76:1
**assist** 3:9
**assisting** 3:19
**associating** 31:8
**assume** 94:25
**assumed** 83:12
**assumes** 74:17
**attach** 107:8
**attack** 103:23
**attempt** 78:20,20 83:8 97:15 103:15 114:13,14
**attempted** 34:20,21 78:18
**attempting** 39:2
**attention** 102:19
**attitude** 60:23 61:19,19
**attorney** 3:7 6:24 15:23 16:1,1 19:19,20 20:6,7,18,20 25:23 26:21 27:16 28:16,17,20,22 33:20 40:17,19 44:10 48:23 49:5 63:2,6 68:17 74:22 75:23 78:2,19 85:16 96:1 123:23
**attorneys** 4:21
**AUSA** 22:23
**authenticate** 84:1
**authored** 105:4,4
**available** 78:5 98:7,9
**avoid** 96:3
**awaiting** 96:16
**aware** 8:18 25:8,11 39:19 72:6,7,9 72:10 77:21
**awhile** 18:15
**A.F.P.D** 1:19
**A.U.S.A** 1:13,14

## B

**B** 104:12
**back** 4:5 11:13 18:3 25:2 26:5,7,10 62:19 40:1,3 56:8,12 64:17 68:5 68:12 73:25 74:1 78:25 87:8,8 96:22 99:8 111:15,16
**background** 32:25
**bad** 103:21 122:7,16
**badge** 54:25
**badges** 57:23,24
**bait** 114:5
**ballpark** 97:16
**Bar** 3:8
**barely** 109:5
**barred** 105:12
**based** 77:10 87:14
**basically** 11:2 52:6 59:23 66:2,7 82:17 98:4 113:2 121:16 124:22
**basis** 125:1
**Bate** 111:1
**bathroom** 65:14,14
**battery** 52:14
**Beach** 24:15 32:19 52:24
**Beacon** 9:8
**becoming** 35:10
**began** 44:3,3 49:1,24
**beginning** 18:17 33:8,10 34:1,3 41:6 86:8 96:8 111:17 121:3
**behalf** 4:10 50:20,23,25 83:4 103:15
**behavior** 113:6 125:5
**believe** 11:17,20 14:14,23 16:25 18:15 39:11 47:18 48:17 50:24 87:4 88:19 92:19 95:24 96:4 105:12 115:3 117:6 122:6 125:12
**believes** 103:14
**believing** 57:16
**belonged** 79:21
**belongings** 67:23
**benefit** 115:1
**best** 66:23 106:23
**beyond** 35:11
**bias** 113:20
**big** 18:3
**bike** 55:15 58:1,4,5,6,6
**Bill** 111:16
**biographical** 33:2 40:16
**birth** 48:4,6
**bit** 18:6
**black** 55:4 77:15,17,19 79:16,23
**blond** 31:18 60:14,24 71:15
**blue** 61:14 64:16 77:17,19,25 78:1 78:3 79:25 80:18

**bluish** 80:1
**bond** 65:1,2 76:25 92:15,20
**booked** 66:4,6,6 74:10 82:20,24
**booking** 40:9,9,12,24 48:5,17
**born** 50:4,6
**bottom** 33:14
**Boulevard** 1:14,20,23
**boy** 114:8,11
**boyfriend/girlfriend** 102:8
**Brady** 116:5,11 118:21 124:11
**break** 66:15,24 97:15
**brief** 66:15 92:9 110:20
**briefed** 110:19
**briefing** 112:25
**briefly** 20:2 35:19 86:25 107:7 119:1
**bring** 95:6
**bringing** 49:16 70:15
**brought** 32:24
**Broward** 1:14,20,23 66:5 82:24 117:21
**brown** 58:14 69:14,22 70:23
**Bruton** 92:12 100:11,20 101:6
**BS** 59:1 70:25,25
**budget** 97:3
**budgetary** 97:24 109:18,20
**building** 26:8
**bullshit** 7:3 12:1 28:7 44:7 69:14
**bumper** 63:11
**bunch** 57:20 60:23
**burden** 4:12 89:20 90:25 91:3 128:6
**Bureau** 41:7 91:11
**business** 69:5,5 96:17,21 128:11
**busy** 60:19
**BV** 102:24 103:1,6,16,16,18,25 112:22 113:4,15,25 114:1,9,11 115:12
**BV's** 102:5
**B.V** 118:21,22 125:5 126:8

## C

**CABRERA** 1:17
**Cain** 20:5
**California** 98:25
**call** 4:23 20:20 23:3 37:4 62:10,24 71:18,20 74:23 75:23,24 78:2,14 78:23 80:23 81:24 106:25 112:13 121:5,24
**called** 62:12 64:5 75:14 78:4,6,7,9 78:9,12,12,14,23 80:7,12,16,25 81:6
**callers** 106:24
**calling** 60:10 74:22 88:12,13 89:10 110:6
**calls** 4:24 19:22 23:4 37:6 79:1 83:22 86:3,6,10,23 88:2,4,6,7,9 89:1,12 105:1,15,16,17,19 106:10,11
**calm** 61:5 115:17,19 62:3 65:6,6,6
**candid** 109:19
**can't** 18:8,15,24 19:10,13 38:7 53:18 71:20,20 78:6,25 87:16 97:14 98:23 104:14 107:3 118:13 120:3 126:24 127:5
**capacity** 5:21 23:21 24:4 37:20
**capture** 102:18
**captures** 121:12
**car** 11:14 15:14 39:1 40:8,15 46:19 52:18 53:3,18,23 54:10 56:10,11,14,22 57:17 58:20 60:15,18 61:8 62:5,7,22 63:8,12 63:13 64:11,11,12,14,15 72:25 75:22,24 77:22 78:10 87:4,5
**card** 56:3,4
**care** 34:5
**career** 28:9
**carefully** 72:11
**carport** 62:19
**carry** 48:13 91:3
**cars** 57:19,20,21,22 58:12
**CART** 85:3,4,8,9,13
**case** 1:3 3:9,17,20 4:16,19 10:4,25 12:23 13:3 20:16 28:4 38:23,23 40:4 51:4 52:10,11,12 53:7 59:18 60:4 61:3,4 68:21 72:8 83:20 92:11 93:15,19,22 94:18 95:10 95:21 96:18 97:13 99:11,23 102:15 104:5 105:13 108:19,19

113:8,15 115:2 116:11,23 117:3
117:14,15 118:15,18,19 119:3,19
119:20 120:16 121:4,13,14,16
123:10,25
**cases** 92:15 109:2,14 111:12,14
117:10,12 119:8,9 121:10,23
122:12,16,25 123:3 124:6,7
**Cassandra** 2:6 6:11,16 17:1,3,8
23:5,8,13 39:3 41:4 54:15
**Castily** 125:7
**categorical** 121:17
**cause** 95:11
**causes** 101:7
**causing** 101:6 120:5
**cease** 28:18
**cell** 38:18 61:24 78:15,16 85:14,17
85:24 87:2
**Center** 88:5 105:2
**central** 119:19
**certain** 15:11 31:6 80:15 81:19,20
**certainly** 115:19 122:5,17
**chair** 51:13 65:20
**chambers** 120:8 125:14
**chance** 14:17 34:18
**change** 25:4
**character** 103:21,22 104:9 115:8
**charge** 39:22 104:1,18
**charged** 19:15
**charges** 10:25 11:6 15:17 16:8 40:7
48:9 49:2 73:2,3,4 102:18,20
103:1
**cheap** 97:18
**cheaper** 80:23
**cheat** 123:24
**check** 81:5
**chief** 83:20
**childhood** 34:4 49:15,18,20
**chill** 65:7
**chronicled** 9:17
**Circuit** 113:15,22 117:17,19,23
123:10
**Circuits** 118:2
**citation** 117:18,22
**citations** 29:17
**cite** 120:7,7,8
**cited** 111:12,13 117:24 118:8
121:10
**City** 23:20
**civilian** 96:13
**claim** 71:18 84:22
**claimed** 84:18
**clause** 113:10
**clean** 128:11
**clear** 86:14,17 101:18 105:9 107:14
110:24 113:15,22
**clearly** 104:16 105:9,11 107:2
116:23 117:2 120:12
**clerk** 125:13
**client** 93:19,20 105:1,4 106:9 110:4
110:5,7,9,11,12 118:10 120:2
**client's** 3:12
**climate** 111:7 112:15 115:6,12,16
**close** 51:13 63:3
**closing** 96:5
**cocaine** 124:18,25
**Coca-Cola** 65:17
**code** 80:22 81:7 122:23
**coerced** 119:23
**coercion** 102:11 122:9
**COHN** 1:11
**collected** 88:7,8
**collectively** 127:4
**com** 68:12 96:23
**come** 34:2 52:5 76:20 92:16 104:11
107:10 108:7,12 109:21 112:8
113:7 116:22 122:17
**comes** 104:17
**coming** 63:16 75:23 96:14 110:7
112:7 124:3
**comment** 63:25 64:1
**commercial** 102:7,11 118:4,23
119:2,11 120:18 121:7
**commit** 118:4 119:21,22,24
**committing** 102:10 117:7 120:15
122:8
**common** 90:10
**communicate** 74:19
**communicating** 74:16 106:5
**communication** 105:8,9,12 106:6
106:7,16 107:12

**communications** 104:22 105:11
106:18 107:23
**complete** 66:24 67:16 99:2
**completely** 15:16 90:11 107:20
**complicate** 108:25
**comply** 126:18
**computer** 85:9
**concept** 84:18
**concern** 102:16 110:10 111:15
**concerned** 106:20 108:7
**concerns** 95:18
**conclude** 122:16
**concluded** 128:13
**conclusively** 122:6
**condition** 36:8
**conduct** 99:20 100:1,22 104:13,14
**conducted** 24:12,18 29:14 85:1
**conducting** 24:10 25:7
**confidential** 106:18
**confront** 109:16
**confrontation** 101:7 120:10
**confronted** 103:18
**confuse** 73:11
**Congratulations** 45:16
**Congress** 122:1 124:4
**consent** 3:12,16 76:11 77:23 84:24
**consented** 42:4 75:12 117:7,8
**consequences** 10:5
**considerations** 98:5
**considered** 91:7
**considering** 109:13
**conspiracy** 96:15 107:16,19,21,24
108:4 110:13
**constitutional** 113:10 120:10,10
121:20
**contact** 46:4 76:21 80:22,23 85:19
90:8
**contacting** 83:7
**CONTENTS** 2:1
**contingent** 4:6
**continue** 22:17,20,22 55:11 56:6
56:18 57:11 58:10,19 59:11 60:7
67:2 76:14
**controlled** 115:13
**controlling** 92:11
**conversation** 31:21
**conversations** 35:6 39:17 105:23
105:23
**conviction** 114:25
**convince** 20:22 35:2 94:20
**convinced** 98:4
**cookies** 65:18
**cooperate** 19:14 21:10 22:18,20
33:20 74:7 82:19
**cooperated** 22:11,14 49:2 66:3
**cooperation** 28:1 44:16,19 49:6
**cooperative** 22:7,12,18,24 33:21
**copies** 116:12 117:11
**copy** 36:6 40:6 41:10 110:25
125:10,15,21
**corner** 41:22 55:13
**Corolla** 53:4,5
**correct** 3:10 9:4 16:13,14 19:18
29:15 32:22 33:5,7 36:22 47:13
49:17,19 50:5 73:17 76:11,23
86:21,22 88:5,10,12 90:2 94:25
97:7,11 101:10 105:20 111:13
123:11
**correctly** 111:13
**corroborate** 83:8
**corroborated** 90:7,15
**corroborative** 90:7
**cost** 97:25
**couldn't** 31:15 39:18 60:17 65:10
68:1 88:21 120:20
**counsel** 6:22 20:6,7 25:23 83:18,24
91:20,23 96:19 116:11,13 117:12
123:17
**count** 28:12 89:2,3 96:14,15
**counts** 101:19
**County** 66:5 82:25 104:4 117:21
**couple** 68:14 119:2
**course** 88:1,16 93:3
**Courthouse** 1:22
**courtroom** 4:20 93:2 125:16
**Courts** 118:2
**Court's** 3:11 66:20 83:8,13 92:18
94:14 113:11
**cousin** 114:10
**cover** 107:15

**covered** 21:21
**co-case** 10:15
**co-conspirators** 107:23
**co-defendant** 4:3 92:5
**Crain** 2:1 4:25 5:9,12,12,19 7:11
13:18 21:22 22:6,9 23:1 33:25
40:2 48:1 60:25 61:1 64:16 65:17
71:9,13,17 73:5,16 77:2,2
**crashed** 54:10
**Crawford** 92:11 100:12,16,21
101:2,7
**create** 115:11
**credibility** 89:25 90:4 103:23
**credible** 90:20 91:19 117:6
**credit** 90:21
**crime** 62:6 113:3,19,25 114:1
115:13,14,19 122:4 126:9
**criminal** 103:11
**cross** 7:7,9 21:24 29:4,5 45:6 67:5
87:23,24
**cross-examination** 2:3,8,12,15,19
36:20 45:5 66:16 67:2 79:6 82:6
88:22 104:14 108:17 112:4,22
**cross-examine** 100:14 101:5
109:17 110:4
**cuffs** 30:22 40:25 41:2 58:21 65:10
65:12
**culprit** 114:18
**Culver** 117:24
**cumbersome** 98:1
**curly** 60:24
**currently** 113:4
**curse** 6:20 27:23
**Curtis** 117:21
**cussing** 59:3 64:2 65:4
**custodian** 128:1
**custody** 10:14 11:18 12:20 24:13
30:17,19 45:22,25 47:3 103:19
**cut** 65:10,12,13
**cuts** 97:3
**CVS** 55:13,14 57:22 61:1
**C-a-s-s-a-n-d-r-a** 23:15
**C-e-p-h-u-s** 123:8
**C-r-a-i-n** 5:13
**C.J** 14:14 16:18,19 17:3 54:20 62:4
63:14 95:7 96:9 112:3,9,16 119:1
119:20 120:18,18 123:18 126:8

---

**D**

**danger** 94:17
**dark** 55:3
**data** 40:16
**date** 48:4,6 74:11 114:24
**dates** 111:15 120:20
**day** 39:2 52:6 76:2 88:24 98:13,14
98:20,23 126:14,19
**days** 98:13 99:15 126:5
**DCF** 103:19
**deadline** 126:3 127:20
**deal** 107:12 119:9
**deals** 107:15,15
**December** 5:23 24:4 31:13 36:9
38:25 45:18 52:2 78:18 80:8,15
84:17 86:3,8 88:24 91:11
**deception** 114:15
**decision** 98:5 123:11
**decisions** 122:3
**declarant** 100:14
**defendant** 1:16,19 3:18 27:3 37:25
53:7 91:10 96:3 97:6 110:25
111:10 113:9 118:9,14 121:20
127:5,9,16
**defendants** 1:8 20:13 94:15 95:13
95:15 100:23 109:24 116:20
117:8
**defendant's** 51:10 95:25 113:1,2
**Defenders** 98:12
**Defender's** 1:19
**defense** 83:17,24 96:1,17,19
116:10,13 117:12 118:8,16
119:20 120:11 121:20 123:23
125:7 127:17,20 128:4
**defenses** 122:9
**defer** 110:18
**defies** 90:10
**delinquent** 104:1
**demand** 116:6
**denied** 92:2 101:22 103:4 120:2

**deny** 94:25 108:1
**depart** 52:22
**Departed** 52:23
**Departed** 6:12,16 17:4 23:20,24
28:9 39:19 45:21 47:4 71:2 74:12
**depending** 93:5 101:16
**deprive** 120:9
**DEPUTY** 125:16
**Deric** 1:16 3:4
**describe** 31:17 79:10,14,25
**described** 80:10
**Description** 2:23
**Desir** 1:7 3:3,4,13,16 31:5 35:4,4
48:15,19 53:6 67:19 69:6 81:6
88:4,11,13 93:2 99:6,13 101:4,19
102:11 103:15 105:20 107:21
108:13,15,18 109:15 110:8
118:24 119:2,23 120:19 121:8
122:20 124:10
**desire** 120:5
**Desir's** 4:3 92:4,16 94:10 100:8
101:15,25 102:24 103:6 104:21
108:1 111:10 124:13
**despite** 104:8 106:9
**detail** 69:4
**details** 90:16 113:3
**detained** 105:1
**detective** 6:11 17:16,17,19 23:5,13
23:19,22,25 28:10 29:7,8 30:2,2
35:24 37:2 42:5 46:3 54:21,22
55:16 56:12,17 57:25 58:4,13
59:12 60:9,13 62:6,7 63:14,14
65:9,9 69:13,22 70:22 71:1,6
74:12 87:11
**detectives** 29:24 46:6
**detective's** 60:15
**detention** 88:4 100:4 105:1
**determine** 88:17 108:14 121:18
**device** 38:19
**Dewey** 52:23
**dialed** 78:24
**dictate** 101:16
**didn't** 13:21 14:17 16:9 19:1 21:10
27:18 29:17 47:17 50:6 59:17
60:22 64:9 69:13,24 70:14 71:6
71:14 72:11,13,15,15,16 73:16
73:19 74:1 75:8 77:18 83:20 91:3
98:25 103:19 105:14 107:8
114:15,20 117:10,13,14
**diem** 96:12 97:21
**different** 12:12,15 68:13 75:10
93:23
**difficulty** 127:21
**Dilaudid** 119:16
**diligence** 121:23
**dire** 93:10 127:9,10
**direct** 2:2,7,11,14,18 5:16 23:18
37:17 51:20 71:11 82:6 84:14
103:6
**directing** 10:15
**directions** 78:13
**directly** 59:25 121:12
**disadvantaged** 94:8
**disagree** 92:19
**disc** 85:6
**disclose** 8:2 116:10,18
**discovered** 126:12
**discovery** 83:21 116:14 127:24
**discretion** 92:18 101:19
**discuss** 3:13 4:20 128:2
**discussed** 3:14 125:23
**discusses** 104:10,13
**discussions** 105:15
**dismissed** 102:9 104:5,19
**disporportionate** 113:12,14
**disposition** 4:6
**dispute** 92:10
**distinction** 119:13
**District** 1:1,1,11 3:8 121:13 123:6
123:13
**DIVISION** 1:2
**docket** 4:4 92:5 102:2 103:13
104:22 111:8 112:23 124:11,16
**docketed** 125:16
**documents** 24:24 114:20
**Dodge** 54:25 61:14 64:16
**doesn't** 9:13,16 13:23,23 34:12,22
44:7 69:15 83:22 102:23 107:1
114:11 120:13,14 123:19,22
**dog** 94:6

**doing** 9:22 24:14 120:24
**dollars** 97:12
**domestic** 102:1
**dominating** 115:24
**domineered** 115:12
**door** 58:2,6 62:19 114:2,8,9,12,13
**dot** 68:12 96:23
**doubt** 13:13
**Dozens** 28:13
**draft** 13:21
**drafted** 13:18
**drive** 53:14,16,17,17,18 54:2,4 55:22
**driver** 31:11 54:19
**driver's** 53:20 55:16 56:2 57:25 88:18
**driving** 9:23 12:23 24:21 31:6,8,19 52:18,19 53:11,13,22 54:3,3 55:19 64:13
**drove** 53:23 64:18
**drug** 119:15
**drugs** 119:18,25 120:22,23
**due** 121:22
**duty** 5:23
**Duval** 50:4
**D-i-n** 123:14

---

**E**

**E** 1:23
**earlier** 9:5 71:16 117:11
**early** 58:16
**easier** 49:3
**easily** 115:12
**East** 1:20
**eat** 65:16 116:25
**economy** 93:12
**edge** 57:17
**Edwin** 125:7 126:16,18
**effect** 22:11
**effected** 10:22 45:21 52:4
**effective** 97:25
**effectuated** 10:12
**effort** 14:1
**eight** 116:2
**either** 73:17 94:9 96:19 110:20
**electing** 101:9
**election** 100:24
**electronic** 38:19
**employed** 10:13 23:25
**enacted** 118:6 122:1
**ended** 99:11
**ends** 104:8
**enforcement** 6:15,20 7:2 12:19 18:12 28:4,6 44:12,15,24 45:1 69:10,21,21 70:21 71:8 76:14 77:8,9 100:7 103:17,19 107:17
**engage** 119:10,11
**engaged** 35:9 118:22,23 119:2 120:18
**English** 41:21 42:1,11 67:11,13
**enroute** 25:6
**entry** 4:4 92:6 102:2 103:13 104:23 111:8 112:23 124:11,16
**enumerates** 118:7
**envision** 95:23
**Ergio** 1:16 3:7
**Eric** 123:13
**especially** 115:15
**ESQ** 1:16,16
**essential** 119:20 120:16
**essentially** 89:25
**establish** 34:10 83:25
**established** 60:3 69:17
**establishes** 117:2
**establishment** 112:14
**estimate** 18:8
**events** 102:1
**Everybody** 61:18
**evidence** 2:22 4:4,9 36:14,18 50:20 50:23 74:18,18 83:4,11 84:3 85:2 88:7 90:14 91:9,19 92:5 100:13 102:1,23 103:4,6,21 104:11,15 104:25 111:7,15 112:7,8 114:17 114:19,24 115:7,13 116:1,21 117:2 118:3,3,5,6,13,14,17,21 120:9,11,24 121:6 122:18 123:21 124:2 126:5,7
**evidenced** 91:15
**evidentiary** 91:9

---

**Ex** 35:25 107:9
**exact** 7:19 50:1 66:2 85:5 96:10
**exactly** 11:1 18:2 88:20 110:14
**exam** 85:24 123:24
**examination** 2:2,4,7,9,11,14,16,18 5:16 7:9 20:3 22:4 23:18 29:5 35:22 37:17 45:6 51:20 67:5 79:4 84:14 87:24 93:10
**exception** 121:18
**exceptions** 118:7
**exchange** 28:1 44:16,18 63:6 116:16 117:9 119:17
**exclude** 4:3,9 92:4 104:22 116:17
**exclusion** 121:19
**exclusions** 121:17
**excuse** 9:10 58:23 59:6 63:3,15 115:6
**Exhibit** 2:24 36:18 91:16
**EXHIBITS** 2:20
**exit** 4:20 25:1
**expectation** 106:1,17
**expense** 95:6,10,16 96:6,25 97:2
**expert** 112:12,17
**explain** 11:1,7 33:1 34:18 79:10
**explained** 11:9 18:24 32:2,2 33:12 40:7 68:20
**explaining** 13:25
**explains** 8:22
**expletive** 57:9
**extra** 97:13
**extremely** 58:21 90:20
**extrinsic** 103:21 104:15

---

**F**

**F** 57:6,8,8,11,12 59:20 61:4,21,22 62:1 65:4
**Face-to-face** 63:5,6
**facility** 74:10 88:8
**facing** 97:4 101:19,20
**fact** 27:6 30:4 41:10 59:17 71:18 74:17 78:21 90:8 100:19 104:18 118:5
**facts** 20:16 68:21 103:16 115:22
**failing** 126:18
**fair** 118:9,10,11,14 120:3,11
**fall** 102:20 107:10,24 126:10
**falls** 92:18 107:2
**false** 103:17,20 104:1 122:22
**familiar** 46:5 85:4 112:10
**far** 58:1 68:13
**favor** 91:2
**favors** 119:17
**FBI** 4:25 5:3,20 10:24 14:7,9,12 15:6,7,15 16:6,11 20:10 24:12 25:6,13,22,25 26:4,7,12,13 30:21 32:3,16,21,23 36:3 37:19,22,24 38:2 39:10,12 19,22,24 40:1,1,5 40:22 47:24 48:22 56:25 57:6,12 57:13 59:16,19,22 60:11 61:2 62:24 65:8 68:1 72:7,25 73:7,14 74:9 75:19 76:2 82:24 90:19 92:13,20
**FDC** 66:5 74:9 82:23
**Fd.Supp.2d** 121:15
**fear** 111:7 112:15 115:6,12,16
**Federal** 1:19,22 41:7 55:8,14 91:11 98:12 103:22 105:10 118:5 122:18,22 124:2
**feel** 59:22 119:7 124:7
**felon** 124:14
**female** 24:11,17 26:6,9 30:7 31:1 31:18 32:19
**females** 66:5 74:10 82:23
**Fernandez** 1:16 3:7,16,19,21
**fight** 94:6
**figure** 65:11 97:16
**figures** 96:10
**file** 4:11 93:21 112:5
**filed** 49:2 89:24 105:14 112:25
**filing** 104:3 124:17 126:11
**fill** 40:10
**final** 93:3
**finally** 60:23 65:8,13 122:14
**find** 41:1 65:11 80:12,14 81:5 106:16 117:14
**finds** 91:9,14,17,19,21,24 103:4,7 108:2
**fine** 50:12 61:5 65:18 128:7

---

**fingerprinted** 40:23 41:3
**finish** 101:16
**firearm** 124:15
**first** 4:22 13:18 10:13 13:13 23:12,14 42:23 46:15,17 51:16 56:22 59:10,16 70:6,21 89:20 95:25 99:12 101:21 126:23
**five** 11:8,20,21 24:1 80:15 127:3,6
**Fl** 1:15,18,20,23
**flex** 30:22 40:25 41:2
**flexible** 97:19
**flies** 58:21 65:9,12
**flight** 96:10,11
**flights** 97:18,19,20 127:22
**flip** 77:19,24 78:1 80:1
**Floor** 1:14
**Florida** 1:1,6 3:8 9:21 50:4 56:4 95:7 121:16
**Florida's** 121:15
**fluent** 67:14
**fluently** 67:11
**fly** 96:19,23,24
**flying** 95:15 127:24
**focus** 109:5
**Folks** 66:19 92:7
**follow** 83:13
**followed** 16:22 26:6 32:18,18
**following** 92:14 94:13 98:9,17,24 101:15
**followup** 48:18
**footnote** 93:16,20 126:21
**force** 102:11,24,25 103:6 122:9
**forced** 67:24,25 119:12,23
**forensic** 85:10,11,24
**forget** 90:11
**forgot** 89:10
**form** 18:19,22 19:2,11 26:16 33:12 33:14 36:3,6,11,21,21 38:2 41:7 41:11,17,19 43:24 44:1,1 49:12 49:13 71:25 73:21,24 76:3 82:4,7 82:11,18,19 90:6 91:15
**forth** 78:25 102:21
**forward** 51:7 99:25 100:25 101:9 101:15 109:24
**foster** 34:5
**found** 114:19 117:15 118:2 124:22 126:22
**four** 91:8
**frame** 124:3
**Frances** 3:23
**FRANCIS** 1:13
**Friday** 98:8 13,15,16,17,24 126:22
**friends** 53:10
**front** 7:21 63:11 88:20
**Ft** 1:2,6,15,20,23
**fucking** 58:22
**full** 111:24
**fully** 59:21 63:2
**Funk** 5:3 6:9,15 11:9 13:17,18,23 14:14,23 15:3 16:18 17:16 19:1 19:11,13 25:25 26:4,12 15,16,18 26:24 27:2,9,21,23,25 28:3 33:11 33:14 36:4,5 37:18 43:8,9 49:11 62:25 63:3 65:19 69:22 73:5,13 73:22,24 76:22 84:8
**Funk-Rohash** 15:4 61:11
**Funk-Romash** 2:10,17 5:5 37:6,8 37:12 38:11 41:6 50:18 63:20 64:17,18 77:12 82:7 84:11 88:1 89:17 91:12
**furlough** 98:13,13,14,23 99:15
**further** 7:5 19:25 21:16 29:3 35:17 37:1 45:4 50:8,14 66:13 79:2 83:1 86:24 87:22 89:14 91:14 103:6
**furtherance** 107:18,20,24 108:4
**f'in** 58:23,24 59:7 61:9 62:22
**F-u-n-k** 5:3
**F.3rd** 117:18,25 123:8

---

**G**

**gain** 93:11,12
**GAO** 98:23
**gather** 57:19
**general** 15:20 48:8 120:7,8 121:19
**generally** 121:23
**Genet** 1:7 2:13 3:3 4:11 6:14 14:25 24:6,8 26:18 27:3 33:11,13 39:2

---

**fingerprinted** (third column repeat)
**51:10,18 91:10 96:3**
**getting** 20:16 22:19 35:11 71:18
**give** 18:8 23:11 34:18 49:25 64:11 78:25 84:17 89:3,9 108:9 110:1 123:1
**given** 35:24 71:25 83:21 85:13 91:24 92:13
**giving** 27:7
**glasses** 8:10,13
**gleening** 110:15
**go** 10:23 16:9 20:15 22:1 27:9 34:12,22 38:21 41:7 43:3 56:20 58:19 62:17 66:4,6,23 74:8 82:20 99:8,11,25 100:25 101:9,14,20 106:13 109:24 114:10 120:13,14 128:11
**goes** 84:2 104:17 120:13,14
**going** 11:13 16:2 18:3 22:10 26:4 50:8 52:16 56:10,23,25 57:1 59:13 60:4,20 61:9,10,17 62:21 63:2,24 64:3 66:2 68:20,21 74:4 76:18,19,19 78:10 82:14,15,16 82:17 83:10,13 89:23 95:1,5 96:20 98:24 104:19 109:8 110:17 110:18 112:1,9 115:11,21 118:11 120:1,2 121:2,22 126:4 127:22
**good** 3:1 4:10 7:11,12 18:10 29:7 45:14,15 51:21,22 128:9
**Government** 1:13 2:24 3:22 4:12 4:23,24 8:1 21:22 23:4 35:25 36:14,18 37:6 50:21 90:5,25 91:3 92:11,25 93:5 94:11,12 95:5,11 95:16,23 96:2,9,16,25 97:1,9 99:10,21 100:24 102:16 103:11 103:14 104:25 105:3,7 107:3,9 111:18 112:16 113:13,21 115:11 116:7,9 120:14 121:5,10,12,12 124:12 125:9,10 126:13,14 127:7 127:8,18 128:6
**Government's** 5:9 23:8 36:17 37:8 89:19 90:24 91:16 92:23 93:14 103:10 104:19 106:23 111:6 112:1,6,21 114:22
**GPS** 80:11
**grade** 67:16 123:24
**Graham** 123:5
**grandfather** 76:21
**grant** 100:3 104:19 112:1 114:22
**Granted** 8:3
**gray** 54:24
**great** 95:6,11,16
**green** 58:14
**guess** 4:2 34:19 84:2
**guilty** 103:25 115:1,19 116:1 124:14,22 125:1
**gut** 94:5
**guys** 16:2
**G-e-n-e-t** 51:18

---

**H**

**habeas** 121:14
**hair** 31:18 58:14 60:14,24,24 69:22 70:23 71:15
**half** 20:11 24:3 117:14
**hand** 5:8 23:7 37:7 51:9 55:25 69:14 107:9 117:20
**handcuff** 30:12,14
**handcuffed** 11:14,16 18:14,16 30:13,20,21 39:13,14
**handcuffs** 30:23 41:2 56:15,21,23 58:20
**handed** 41:10,10 55:24 85:23 124:19
**handle** 60:11
**happen** 28:24 54:17 66:4
**happened** 10:16 31:13 32:23 33:10 52:6 59:22 68:4 74:13 79:1
**happening** 19:14
**haven't** 96:19 114:19 125:11,19 126:1
**head** 57:15
**headed** 60:3
**headquarters** 40:1 65:8 68:1 74:9 82:2
**hear** 4:1,3,8,9 6:22 7:2 21:1 28:6 38:7 39:17 51:14 93:15 95:4
**heard** 19:21 20:5 21:13 28:21 54:11 90:14 96:19 104:7 108:24

hearing 1:10 46:13 51:3 83:7 91:9
92:15,21 100:4 125:14 128:13
heart 75:6
heels 61:7
held 74:9
help 80:12,14
helped 14:2
heroin 119:16
hesitation 36:23
highly 113:8
highway 53:19
history 103:12
hold 82:23
Hollywood 6:11,16 7:17,18 9:4,21
10:21 11:14,19,22,25 12:2 15:6
16:18,20,24 17:4 23:20,23 28:9
29:20 30:5,9 31:22 32:14 39:3,10
39:12,19 45:21 46:5 47:3,4,7
53:1 54:14 60:21 62:6,7 69:13
71:1 74:12 89:7
home 113:25
honest 11:17 14:18 90:20
Honestly 13:6
Honor 3:18 5:18 7:6,8 8:1,14,24
13:7 19:22,25 20:2 22:25 23:17
27:12 34:10,12 35:14,19 36:13
36:16 37:5 45:3 50:11,12,16,22
66:14 67:4 69:16 72:3 74:17
75:16 76:9 79:2 83:6,17 84:7,9
84:16 85:20 86:14,25 87:22
89:16,19,20 90:17 94:5,12 95:3,5
95:14,19 96:8,10 97:14,16 99:16
99:17,19 100:19 101:1 103:14
107:4 108:5 109:18,19 111:22
112:5,24 114:3,21 116:10,23
117:10 118:1 119:4,10,19 121:11
121:22,23 122:6,14,25 123:18
125:8 126:6 127:19
HONORABLE 1:11
hotel 26:7 96:9 97:16
hour 69:3 117:13
hours 69:2 109:9 117:13
house 64:13
Hundreds 20:14
hungry 65:15
hurdle 102:15,20
husband 53:6
Huwie 81:12,16
hyphen 45:8 123:14
hyphenated 5:4
H-u-w-i-e 81:18

---

**I**

identification 2:22 24:24 31:9
35:25 55:23 56:3,4 104:1
identify 85:16,18 111:18,23
identifying 41:13 48:5 105:17
illegal 119:10 124:23
imagine 112:6
immediately 125:14
impact 95:11
impanel 92:25 93:14 97:23,25 98:3
98:6 127:11
impaneled 97:10
impaneling 97:5 127:1
impanelment 69:17 70:17 103:11
imply 40:16
implying 111:3
importance 72:16
important 70:3,14 72:15 109:20
115:17 119:13
inappropriately 25:4
incarcerated 105:20 113:4,16,16
113:17
inclined 122:15
include 123:15
incorporated 121:19
incredible 90:22
incriminating 25:19
inculpate 100:6,8 101:6
indicate 79:6
indicated 9:3 82:6
indicating 65:22 124:18
indictment 102:21 103:1,5 120:20
124:4 126:10
individual 9:25 34:18 46:19
induce 44:21,25
INES 1:13
inextricably 103:7

---

influence 42:2,13,16 120:21
122:20
inform 25:3
information 24:25 32:25 33:2
40:10,12,13 48:5,8 49:20 85:19
126:13
informed 5:4 38:4
infraction 25:9
initial 17:15 27:6 36:11 42:4,20
43:22 45:21 94:6
initialed 33:13 36:4 42:23 66:10
initially 45:22,23,24
initials 42:20 43:2,6,11,15 72:19
inquire 5:15 23:16 37:15 51:19
84:13 116:15
inside 60:18 87:14,15
Insofar 106:20
instances 103:24 104:13,14
instruction 108:10,12 110:1
insurance 24:25
intavailable 122:13
Intelligence 23:22 30:1
intelligently 34:13 91:23
intend 83:6,20 96:24 112:12
intends 105:3
intent 35:5 120:15
intention 66:20
interaction 6:18
intercept 88:3
intercepted 88:2 108:13
interested 93:13
interpret 92:22
interrogating 39:23
interrogation 6:19,25 17:20 18:4
26:13 38:14
interrogations 28:10
intertwined 103:8
interview 6:3 16:2,15,17 17:9,11,14
17:15,22,25 18:17 20:8,20 21:2,4
21:7,13 22:10,15,16 28:23,24
33:6,8,10,25 34:3 41:5,6 49:1,7
69:9 70:9 76:13
interviewed 8:21 41:4 70:8 121:4
interviews 20:12
intrinsic 111:7
introduce 104:15 105:3 111:7
115:7
introduced 84:3 93:1
introducing 104:25
introduction 124:14
invasion 113:25
investigation 5:25 25:7 26:3 28:18
28:19 32:24 39:20,22 41:7 88:2
88:17 90:19 91:12 121:7 122:19
122:23
investigator 126:22
invoke 4:16,17 6:22 25:22
invoked 29:2 91:20
involved 5:25 20:12 24:6 26:15
28:11 30:9 113:25
involvement 6:18 100:9 118:24
irrelevant 102:15
isn't 68:3,14,18 69:1,6,11 70:6
71:11 72:19 73:3,7 75:13 76:3,13
77:12,12 78:19,24 105:22
issue 89:25 90:5 93:8 97:24 100:21
101:6,7,25 108:21 109:10 110:19
110:20,23 116:18,19 119:19,19
120:1,2 125:22
issues 35:11 100:11 109:19,21
It's 80:1
I'd 18:6
I'm 18:18 22:8 57:8
I've 92:7 93:18 94:18 111:9

---

**J**

jail 56:23 66:3 74:11 82:20,25
113:18,18
JAMES 1:11
January 123:6
Jennell 54:18 55:17 62:8,10,11,14
62:18,18 64:5 68:2,8 75:22,24
79:22 81:24,25
jewelry 64:10
Johannes 1:14 3:23,24 5:1,3 107:4
107:7,20 108:11,16,19 110:2,3
110:24 112:24 114:5,21
Johnson 29:7 55:14 121:14
join 26:12 94:9

---

jointly 94:15
joke 94:15
Jones 2:6 6:11,16 17:1,3,8,16,17
39:3 41:4 42:5,6 46:3 54:15,21,22
55:16 56:12,17 57:25 58:4 59:12
60:9 62:4,7 69:22 71:1,6 74:12
Josh 67:18 71:19 74:16,19,22 75:5
78:2 86:4,11
Joshua 52:17 59:25 60:9 74:16
78:19 83:7 85:16,25 86:2,6 89:1
judge 1:11 3:11 8:5 34:22 35:10
46:15 50:8 57:1 82:3,21 86:12
92:9 93:16 99:6 100:10 104:24
105:18,25 106:19,22 107:7,10,14
108:11,24 110:3 115:4,10,17
116:3,25 120:25 124:17 125:24
126:20 127:13 128:9
judgment 124:24
judicial 93:11
July 123:11
juries 92:17,25 93:15,24 94:3,7,10
94:13,16,24 95:1,21 97:6,23,25
98:2,3,6 99:20 108:23
jurisdictions 122:3
jurors 95:25 127:11
jury 93:2,23 94:8 95:17,25 96:1
97:10 100:5,6,25 101:3 109:23
113:18 117:4 118:17,20 127:2
jury's 102:19
juvenile 103:11,16 104:18
J-o-n-e-s 23:13

---

**K**

Kastigar 68:18,19
keep 22:19,19 75:20 92:8
keys 64:11
kicked 61:7,7
kid 114:16
kind 31:2 33:3 40:12 51:25
knew 22:7,10,13 31:9,9 60:13
70:13 80:21
knocked 114:8
knocking 114:2
know 8:7 9:17 10:10 11:18,21,23
11:25 12:2,16 13:16 16:8 17:12
17:19 19:16 24:16 32:7,9,9,12
34:18 46:2,3,19 47:2,6 53:14,17
55:3,7,12,21,22 56:11,24 57:1,4
57:19 58:11,22 59:17,20 60:20
62:24 63:1,24 65:7,24 66:8 68:6
68:11,13 72:16,17 74:3 75:6,7,8
78:16 80:7 81:10,13 82:14 83:25
93:4 94:14 96:11 98:19 105:14
106:5,11 109:3,8 111:5 117:5
121:2,22 123:22 124:8 125:8
knowing 91:25 110:14
knowingly 34:13 91:22
knowledge 89:4,8
knows 22:23 97:3 120:14 126:11
Krome 80:23 81:6 88:4 105:1,19
Kruger 46:21 53:10,12,13 62:11
Kugler 81:24
Kyo 79:17
Kyocera 79:16
K-y-o-c-e-r-a 79:18,19

---

**L**

lady 18:6 55:3 60:14,23 61:16
71:15
laid 84:4
land 94:19,22
lanes 23:4
language 67:13
large 101:16 112:24
lastly 71:25 123:13
late 22:20,21 58:16 78:11 126:3
Lauderdale 1:2 6,15,20,23
laughing 55:5
law 6:15,20 7:2 12:19 18:12 28:3,6
44:12,15,24,25 69:10,21,21
70:21 71:8 76:14 77:8,8 86:2
92:11 100:7 103:17,18 107:16
111:13,13 113:15 116:23 119:16
lawyer 11:23 27:3,10 29:2 33:17
38:4 43:9,14,18 44:5 47:20 48:23
52:8,9,15 58:22,24 59:7 60:3,9
62:24 63:1,22 64:5,6 65:24,24

---

66:1,1,9 69:11 70:4,24 71:3,9,12
71:12,14,21 72:23 73:22,25 74:4
77:9 82:15,18 89:11 90:8,12,13
90:15
leading 25:9 27:12
lean 56:21 60:20
leaned 55:17
leaning 60:19
leave 24:11 64:9,13 67:21,23,24
68:1
left 58:8 62:5,7 78:7,9
length 115:2 116:2
lethal 113:5
letter 68:18,20,22 105:3 106:20
107:1,7,10,14,15 108:2,3,5,6,20
109:25 110:13,14,16 111:4
let's 4:8 92:4
license 53:20 56:2 88:18,21
lied 121:3,7 122:21 123:18,19,25
life 35:7 49:25
light 99:24 104:18 115:5,15
limine 101:25 103:10 104:20,22
108:2 111:6 112:2,6,21 114:23
124:13
limit 112:21 114:24
limitations 113:10
limiting 108:10,11 110:1
line 2:23,23 25:5 78:15
lines 55:19
lips 60:17
listened 47:15
little 18:6 37:23 40:25 66:22 78:10
96:6 115:25
lived 24:10
locate 39:2 126:21
located 39:4 87:15
location 32:3
locking 61:24
lodge 106:4
lodging 96:9,11
logic 90:10
long 11:18 20:10 23:23 24:2 37:22
47:2 69:1 75:8 109:8 125:18
longer 99:1
look 10:10 19:14 33:19 57:18 60:16
63:13 111:2 115:22 120:3 121:23
125:11 127:25
looked 7:25 54:19 55:2 65:25
105:18 109:4
looking 55:21 64:25 65:2 80:1
Looks 9:20
losing 116:25
lot 55:14 57:21,22,24 61:1 69:4
109:3
loud 100:17
Lucie 104:4
lunch 66:21,22 116:25
L.L.P 1:17

---

**M**

Mackenley 1:7,16 3:3 31:5 53:6
54:1 67:19 80:23,25
Mackenley's 60:3
Magnum 61:14
main 74:10 80:21 82:20
maintain 119:11
majority 21:12
making 78:2 102:17
male 29:20 30:2,3,6,12 32:7 58:13
58:13 60:14 63:14 65:9 70:22
males 113:24 114:13 115:23
manipulated 35:3 115:13
manner 119:11
March 117:22,25
marital 104:22 106:8,16,16 107:11
marked 2:21 35:24
markings 48:7
marriage 48:18 106:8,12
married 48:16
material 116:5 124:11
matter 3:2,13 100:1 102:7 108:3
116:4 123:19,22
maximum 77:6
ma'am 5:7 6:17,23 7:4 9:3 18:5
23:6 36:1,7,10 38:7 83:3 99:18
meals 96:12
mean 11:6 41:25 54:21 55:17 57:6
57:8,11,12 59:16 61:21 62:23
65:5 78:20 97:16 108:24

---

**means** 13:22 55:21 57:2 106:6,7
**measurements** 18:10
**mechanism** 41:1
**meet** 32:3 59:25 68:14,21
**meeting** 68:17 69:9 119:1 120:4,4 120:19 121:8
**member** 3:7
**memory** 85:23 112:4
**mention** 19:19,20 20:5 25:23 48:12 48:15 69:10,13 77:18 106:10
**mentioned** 48:22 67:18 71:12
**mentioning** 33:16 100:8
**mentions** 28:16
**mess** 57:7,13
**messed** 82:17
**met** 69:1,2 126:15
**metal** 56:15,21 58:20
**Metro** 96:24
**Miami** 14:12 15:7 26:5,13 40:1,4,22 48:22
**microphone** 46:14 51:13
**middle** 45:9 121:13
**mile** 53:24
**mind** 92:8 116:25
**mine** 77:20 80:6
**mines** 94:19,22
**minor** 119:9
**minutes** 11:8,8,20,21 15:14 16:6 65:11 66:17 127:8,9,15,16,17,18
**Miramar** 1:17,18
**Miranda** 6:4 16:9 18:21 19:1 20:15 26:16 34:13,14,23 36:21 37:25 41:11 47:22 49:9 50:9 70:11 71:25 72:16 91:12,15
**misguided** 124:1
**mislead** 122:2
**missed** 75:23 83:22 102:12
**Mississippi** 120:8
**model** 81:11
**moment** 8:24 50:2 97:15 99:6
**moments** 78:23
**mom's** 64:23
**Monday** 74:8 76:20,23 82:20 98:8,9 101:15 125:6 126:23 127:2
**monetary** 98:4
**money** 97:13 116:16 117:9
**monitored** 105:24
**monitoring** 106:25
**month** 53:25
**months** 80:15
**Moore** 121:14
**moot** 112:19
**morning** 3:1,15 4:1,10 7:11 29:7 45:14,15 51:21,22 83:11 86:8 125:17
**Motel** 9:8 24:15 52:24
**mother** 114:10
**mother's** 114:10
**motion** 1:10 4:2,3,7,8,9,11 35:12 92:1,4,10 93:17,21 101:25,25 102:4,5 103:2,3,10,10 104:3,19 104:21,21,24 105:14 107:8 108:1 111:6,6,9,16 112:2,6,21 113:2,23 114:22 116:5 124:10,13,13,17 125:2,4,9,10,11 126:2,22
**motions** 3:25 66:21 125:3
**motive** 120:15,23,24 122:8
**motor** 54:7
**move** 36:13 92:4 95:1
**moved** 63:12
**moves** 57:17
**murky** 115:23

**N**

**name** 5:1,4,11,11 10:4,5,7,11 12:11 13:21 23:11,12,14 24:17 33:2 37:10,10,12 40:13 45:9,9 46:19 46:21 48:6,17 51:16,17 52:15 58:17 62:10 64:23,23 68:2,3,5,6 68:8,10,11,13 81:24 103:17,20 111:24,24
**names** 46:5
**narcotic** 42:13
**Narcotics** 30:1
**nature** 40:14
**navigation** 80:13
**near** 9:8 39:16 52:24 79:15
**necessary** 51:4 67:25 108:10,12
**necessitate** 93:4 96:4

**necessitates** 93:3
**need** 8:10 38:7,20 63:17,20,23 66:9 66:15 82:12 96:18 98:19 110:22 124:7
**needed** 119:24
**negative** 69:16 70:16
**Neither** 73:5
**never** 21:13 29:2,2 34:20,20 48:22 62:12 70:8,9,11,12 108:8 110:4,5 111:3 114:14 118:25
**nevertheless** 101:9
**new** 21:20 109:10 123:6,13
**nickname** 68:9
**night** 22:17 97:17
**nightclub** 102:14
**nine** 23:25 127:14
**noise** 63:16
**normally** 40:8 97:18
**north** 55:9,10
**Northern** 123:13
**notations** 41:22,23
**notice** 96:17 126:5,15 127:21
**noticed** 112:12
**noticing** 58:11
**notification** 126:19
**November** 54:9
**number** 3:25 33:2 48:7 75:1,4,6,7 75:11 76:1,5,7 78:16,24 80:24 81:13 84:1,6 85:25 86:7 88:11,13 91:16
**numbers** 81:10
**numerous** 93:19

**O**

**oath** 67:1 84:12
**object** 34:22 50:8 69:16 84:3 87:17 96:20
**objecting** 126:18
**objection** 19:5 20:23 25:9 27:12 34:8 36:15 70:16,16 74:17 84:20 89:12
**observe** 6:14 32:14
**observed** 24:11
**obviously** 60:22 92:18 110:3 126:12 128:4
**occasion** 118:25
**occasions** 90:9 93:20 119:17
**occurred** 45:18
**offense** 47:12 48:12
**offenses** 114:25
**offer** 100:15 102:3
**office** 1:19 14:7,9,13 15:7,15 16:7 16:11 26:4,13 32:21,23 40:1,4,22 40:23 47:24 48:22 72:7,25 73:7 73:14 78:15,16 98:19
**officer** 6:15,20 7:2 10:21 11:22,25 12:2,19 16:18,19,24 24:18 28:4,6 29:18,20 30:3,3 31:22 32:7,14 39:3,12 44:12,15,24 54:14 56:7 60:21,21 63:13 69:10,22 70:21 71:8
**officers** 12:12 16:17 18:12 30:5,7,9 32:11 47:3,7 69:21,23 77:9
**Official** 1:22
**Oh** 63:17
**okay** 3:4 23:4:23 8:16,24 9:14 12:5 16:14,22 30:14 31:24 35:15 38:21 52:4,15 53:22 54:14,23 58:7,10 59:11,12 61:6 62:13,14 64:25 65:18 66:9 71:7,17 79:10 80:10,15,18 82:6 86:24 89:9 92:3 94:7 99:14 101:24 103:9 104:6 112:19,20
**old** 51:23 58:15 69:14 70:22 114:8
**older** 31:3
**once** 24:12 25:25 26:2 40:21,23 44:1 65:4 66:6
**open** 114:12
**opening** 93:5,7 96:3
**openings** 96:4
**operated** 54:7
**opinion** 103:24 117:19,25 123:9
**opinions** 35:6 118:1,2
**opportunity** 12:14 28:19 85:12 101:4 109:15 125:8 126:1 127:25
**oppose** 94:7
**opposed** 101:21
**opposite** 117:14
**opposition** 115:14

**opt** 99:21
**order** 91:2 101:18
**ordering** 110:21
**original** 36:6 41:11
**originally** 124:19
**ought** 90:12 120:22 122:17,18
**outright** 93:18,21
**outset** 92:7
**outside** 4:21 63:9 122:8,20
**outstanding** 3:25
**out-of-town** 95:7
**overcome** 102:10 107:3
**overcomes** 100:15
**Overruled** 34:15,24
**owned** 31:4
**ownership** 84:22
**owns** 53:5
**o'clock** 60:1 127:14

**P**

**page** 2:23,23 68:5,12 96:22 113:2
**paid** 96:10
**paper** 65:25 66:10 74:3,4,6
**paperwork** 40:9 48:17
**parameters** 102:21 103:5 104:10
**park** 53:18
**parking** 55:14 57:21,22,24 61:1
**Parkway** 1:17
**part** 17:24 36:23 63:11 101:16 110:12 112:24
**partially** 6:2 18:16
**participants** 105:23
**participated** 6:2 17:20,25 32:18 110:5
**particular** 24:2 84:22 86:15 94:19
**Particulars** 111:16
**parties** 4:19 93:9 97:22
**party** 103:23 126:4
**passed** 56:7
**passenger** 31:20 54:18 56:13
**passionate** 109:6
**PAULINE** 1:21
**Pause** 9:1 35:16 99:7
**pay** 52:8 96:11
**payment** 52:8 60:5 64:6
**pays** 96:9
**PCS** 96:24
**PD** 39:3,10,12
**pending** 125:3
**people** 11:10 30:4 57:18,21,23 61:24
**perceive** 116:11
**peremptories** 127:7
**peremptory** 97:6
**peremtories** 127:3
**permission** 3:11 26:11 64:12 76:2 100:3
**permit** 21:19
**permitted** 3:8
**person** 10:1,18 12:6,8,9,11 18:11 28:19 30:16,24 31:15,17 46:3,7 46:11 75:24 97:20 98:2
**personally** 88:6
**personnel** 40:24
**person's** 10:7 103:21
**persuasive** 123:15
**pertaining** 24:25 28:18
**pertinent** 115:8,8
**phones** 75:10,20 79:7,11,11,14 87:2,15,20
**phonetic** 5:5
**photographed** 40:24 41:4
**pick** 82:21 90:25 94:24 109:23
**pictures** 31:10
**pillow** 107:12
**pimp/prostitution** 112:10
**pissed** 59:22
**place** 11:10 12:21 52:23 63:6 66:5 placed 10:13 11:14 24:13 30:16,19 45:22,24 76:3 82:13
**Plaintiff** 1:5
**plan** 96:22
**planned** 98:11
**planning** 112:16
**play** 7:3 12:1 28:7 59:1 69:15 70:25
**plea** 124:14,23 125:1
**please** 5:7,10,10 14:15 23:6,9,11 24:8 37:7,9,10 39:8 40:21 41:19 46:14 51:7,11 55:11 56:6,18

58:10 59:11 66:19 74:15 88:23 125:22
**plenty** 78:4
**point** 22:15 26:12 34:2 40:19 44:4 84:7 106:3,6 117:12 121:1,12
**pointing** 55:1
**police** 6:11,16 10:21 11:14,19,22 11:25 12:2 17:4 23:20,23 28:9 29:20 30:4,5,7,9 39:19 45:21 47:3,4,7 54:14 62:6,7 63:8,12,12 71:2 74:12 87:12 89:7
**policy** 121:18
**portion** 17:13,22
**portions** 17:15
**position** 93:14,22,25 94:2 99:5 117:15,16
**positions** 99:11
**possession** 75:2,13,15,21 81:25 124:14,18,25
**possible** 64:6
**possibly** 29:20 116:16
**post** 93:1,6,9
**power** 38:20
**precisely** 113:7
**preclude** 102:1 103:10 104:25 124:13
**precluded** 118:4 123:19
**precludes** 119:3 123:21 124:2
**predicate** 84:1,4
**prefer** 99:25 109:13,22
**preferred** 16:10
**pregnant** 31:18 32:19
**prejudicial** 113:8 124:4
**preliminary** 64:19,20
**prepare** 29:10,16
**prepared** 13:15
**preponderance** 91:9
**presence** 4:21 33:23
**present** 3:4,5 6:4,8,9,24 7:13 25:23 26:15,21 27:2,10 33:8 40:17 44:5 45:24 74:13 97:1 100:6,21 101:2 101:3 109:13 118:13,17 120:11 121:20
**presented** 83:11 91:8
**presenting** 118:16
**presently** 95:7
**presume** 112:9 125:1
**pretty** 38:11 59:3 64:2 69:1 70:3 72:6 74:4,7 78:12 81:2,20 82:22 83:12
**prevent** 118:6
**prevented** 74:23 77:9
**previously** 116:16
**pre-disposition** 120:15
**print** 85:7
**prior** 19:11 47:2,4,7 49:8 80:8 82:7 87:5 89:4,6,8 90:9 116:15 118:23 120:3,18 121:17 122:7,16 126:5
**prison** 82:16
**privacy** 106:2,17
**private** 11:9
**privilege** 105:6,7,8,8,10 106:9 107:2
**privileged** 104:22 106:16
**privileges** 107:11,25
**probably** 4:2 7:25 19:15 28:14 53:18,25 54:24 66:6 97:19 121:2
**probation** 124:20,20
**problem** 46:13 100:10 101:2
**procedure** 16:10 20:15 85:5
**procedures** 10:13
**proceed** 93:23
**proceeded** 32:21 56:14
**proceeding** 93:15
**process** 13:25 76:18
**processed** 32:25
**processing** 48:5,8
**prohibited** 105:13
**project** 98:25
**promise** 113:21
**promises** 27:25 44:16,18 91:17
**proof** 128:6
**propensity** 117:2 118:3,13 120:13 120:14
**proper** 84:4
**proposal** 100:17
**propose** 92:17 95:20
**proposition** 120:9
**prosecuted** 122:24
**prosecutor** 22:7,10,13

prostitute 111:19
prostitutes 117:5
prostitution 25:16,20 52:1 69:4,5,7 73:1,6,14,17 117:7 119:21,22,24 122:11 125:5 126:9
prove 4:13 90:25
provide 83:17 126:5
provided 122:13 126:13,14
providing 116:14
public 1:19 11:10 98:12
pull 51:13 55:1,1,2,12
pulled 10:22 11:11 12:13 24:18 55:13 56:13 57:21,22,25 61:10 61:14,15 65:20
pulling 32:2 55:6,18
punishment 77:3
purpose 34:7,17 35:2 79:11 108:16
purse 55:23
put 30:22 43:15 56:13,14,21,22 58:21,21 60:4,5 64:11 65:9 72:19 85:2,18 100:5 115:17 124:20 126:20

**Q**

quantify 97:12
question 9:5 12:20 14:19 21:18 25:13 28:21 48:16,19 49:21,24 50:1 75:3 92:23 116:24
questioned 15:9 47:23
questioning 26:22 34:20 38:5 44:4 77:10 127:17,18
questions 7:5 12:16,18,19,22 13:2 17:6,9,10,21,23,24 19:25 25:16 27:10 28:18 34:4,7,17 35:2,5,7 35:17 37:1 40:15 42:24 43:10,14 43:20 44:3 45:4 48:3,5,10,18 49:11,15,17,18,22 50:9,14,16 53:22 64:19,20,22 66:11,13 73:1 73:6,13,16,22 74:7 79:12 83:1 89:14,15 104:16
quite 127:20

**R**

rain 62:8,20
raining 62:18
raise 5:7 23:6 27:21 37:7 38:16 51:8
raised 34:5 35:12
ram 64:16
rape 118:5,7 121:15,16,17,24,24 123:19
raped 122:2
raught 94:17
reach 65:22 75:2,5 78:19 87:20
reached 55:23 65:23
reacted 90:18
read 6:4 8:11,12 33:11 34:14 41:21 42:1,3,4,6,18 47:22 60:16 67:7 70:12 72:10,13,15,17 73:21 91:14 92:7 107:14 111:9,9,14 114:20 121:9 122:12,16 123:4 124:6 125:8
readdress 109:10
reading 19:1 113:23 124:6
realizes 114:12
really 12:14 15:19,21 22:21 61:5 63:23,24 71:6 72:12 78:25 98:3
reason 13:13 32:11,12 80:19 82:22 94:13 99:4 121:25
reasonably 120:20
reasons 80:21 99:24 120:17 126:7
rebuttal 83:16 84:8
recall 9:3 10:4,4,11 11:17 13:6 14:21 15:19,21,22,25 18:15 24:17 30:13,15,16,19,22 31:3 33:16,19 34:3 47:15 50:7 54:12 54:14 58:17 63:25 64:2 78:2 84:8
receive 110:25
received 2:21 36:17,18 108:8 110:4 111:3 124:18
recess 66:18 128:3,10
recognize 35:25 41:13 114:11
recognized 105:10
recollecting 14:16
recollection 15:3
record 5:11 23:12 37:11 51:1,17 86:17 88:6 99:8 106:4 107:9 110:24 115:5,17 128:1
recorded 88:3 105:24 106:25

records 81:5 88:9,11,15,16,23,25 96:17,20,21 104:3 124:18
recross 21:18 22:4
Recross-Examination 2:5
red 75:22 77:16,18,22 80:10,11,13 80:16,18,19,21
redact 99:21,25 100:4
redaction 100:15
redirect 2:4,9,16 20:1,3 21:21,23 35:18,22 50:15 79:3,4 89:15
refer 120:8
reference 25:6 44:10 85:13 93:16
referenced 116:12
referred 111:19
referring 8:4,6,8 16:19
refresh 85:23
refundable 97:19
refused 69:10 71:8
refuses 71:2 114:12
regard 115:5 125:5
regarding 13:2 112:4 126:8,9
regardless 87:3 113 119:12
registration 24:25
regular 57:20
relate 102:23 115:10
related 48:8
relates 106:15 109:25 125:6
relating 25:16 93:14 115:8
relation 47:11 103:1
relationship 102:8 112:11
relax 65:7
release 76:18 82:22 116:5
released 66:7 74:11 82:22
relevance 19:5 34:8,9
relevancy 106:13
relevant 35:8 103:7 112:3 116:21 119:7 120:12,12 123:18,22,23,24 123:25 124:3
rely 96:17 107:5 112:24 119:3
relying 96:20
remain 5:7 23:6 26:19 43:1 51:8
remaining 95:25
Rembert's 4:3,7 35:12 36:23 83:18 85:13 86:11 87:2 91:10 92:1,5 93:1,9,19 94:1 96:3 99:21 101:3 101:17 116:5
Rembret 10:8 107:21 108:20
Rembret's 4:8 109:14
remedy 92:24
remember 7:19 9:6 10:1 11:4 12:5 12:6,24 14:16,19 16:2,5 18:1,2 21:11,19 22:6,9 24:14 28:12 30:20,20 31:4 39:13 50:1 52:2,15 64:4,22 66:2 68:24 75:11 108:6 110:22
remembering 110:15
remind 66:25 84:11 90:24 110:22
reminded 106:10
remove 41:1
removed 41:3 93:2
repeatedly 121:3
rephrase 73:11
reply 116:7
report 7:20,22,23 8:2,4,18,20,20,21 8:22 9:11,15,17 10:7,9 13:9,11 13:13,15,21 14:15,17,20 29:10 29:16 32:24 83:18 85:12,16,23 86:1
REPORTED 1:21
Reporter 1:22
reports 9:20
represent 10:4 126:24
representative 96:22,24
represented 3:4,5
representing 3:22
represents 67:19
request 6:24 27:16 65:24 66:1 85:2 93:14 94:10 95:1 100:3,3,22
requested 4:20
requesting 3:7
requests 28:16
required 97:1 128:4
requirement 126:19
requires 121:18 126:4
researching 117:13,14
reserve 125:25
residence 24:11,12 26:6,10
resolves 109:23
respect 108:2,5 109:25
respectfully 103:4

respond 25:1 39:6 58:25 63:25 107:5,6 113:1 126:2 127:21
responded 26:7 116:7
responding 63:25
response 47:14,15 49:21,22 85:9 89:24 90:17 92:23 94:5,6 96:16 106:23 111:10 112:5 113:2,24 115:10,15 116:12 119:4
responses 90:18
rest 89:21,22
restroom 66:15
retract 101:1
return 103:19
returned 78:23 85:6
reveals 108:3
review 14:17 85:12,24
reviewed 13:22,24 14:1,3 111:12
reviewing 106:22
re-engaging 122:10
re-think 99:5,10
ride 15:9 40:3,8,15 48:21 72:25 73:14
riding 16:6
right 5:6,8,14 6:22 8:3 14:4,7,10 16:12 17:10 18:7 19:17,17 21:17 22:1 23:1,7 25:22 26:19,21 27:7 27:9 29:2 33:13 35:18 37:2,7,14 40:19 41:20 42:18,21,23 43:1,4,8 43:9,14,20,22 45:19 50:17 51:2,6 51:9 54:11,19 55:13 56:8 58:3 63:24 66:19 69:2,15 70:3,6,15 72:7,17,19,23 73:19 82:22 86:24 87:13,23 88:3,8 89:18 90:3 91:7 91:20,23 93:13 94:11,20 97:22 100:20 103:3 104:21 106:3 108:22 113:10,11 116:4,20 117:12,21 119:1,5 120:10,10 121:20,21 125:3 127:1
rights 6:14 16:9 19:2 20:15 26:16 27:15,19 33:11,12 36:3,21 37:25 38:2 41:7,11 42:3,25 43:17 47:22 49:9,12,13 69:23 70:10,11,14,20 70:22 71:25 72:11,16 90:6 91:13 91:15,22
ring 60:8 75:25 81:22,23
ringing 59:24 60:8 86:8
road 33:5 57:61:15
roadside 25:13,19
rodeo 70:6
Rohash 45:8,10
role 24:9 39:23 69:5,7,7 114:1
Romash 51:5 41:10 45:9,11 61:12 61:13
Ronnalyn 2:1 5:9,12 13:18
room 16:15,17 18:3,3,4,11 19:8,17 33:4,6,8,10 34:1 40:9 41:5
RPR-CM 1:21
rule 4:16,17 91:2 104:16 110:22 115:6 116:24 118:5 119:3 120:9 121:10,19 122:18 123:21 124:2 124:4
rules 100:2 103:22 105:10
ruling 83:8,10,14 110:18 115:5,16 125:25
rulings 113:11
run 65:2 92:15
running 78:10
run-away 103:18
RWUE 41:24
Rydell 52:17 59:25 60:9 67:18 71:19 74:16,16,19,22 75:2,5,14 75:24,25 78:2,3,14 79:1,20 80:7,13 80:16 83:7,23 86:2,4,11 89:1
Rydell's 84:1,6 85:16,25 86:7
R-e-m-b-e-r-t 51:18
R-o-m-a-s-h 5:5 37:13 45:12
R-o-n-n-a-l-y-n 5:12

**S**

s 1:14 125:5
Samsung 80:2,3
sandy 58:14 69:13,22 70:23
Sarras 117:18
sat 64:16 65:15,19,23
satisfy 119:24 120:6
saw 30:4 31:10 36:9 38:9 64:13 82:1
saying 12:5,6 15:22,25 16:2 22:6,9 33:19 53:15 60:16,17 118:9

says 13:9,11,15 71:19 73:25 113:2 114:9,9 121:16 122:3 123:21
scared 53:19 72:9,10
scars 48:7
scene 7:13 10:18,20,21 11:13 12:17 26:5 30:21 31:10,24 32:15 39:6,9,10,25 46:22 47:10,22,23 48:21 87:2,7
scheduled 59:25
scheduling 66:20 98:7 127:19,21
school 67:16
screen 80:11
seal 125:4,10,12
search 56:14 75:12 76:2,11 77:23 83:18 84:18,24 85:1
seat 31:20 54:18,19 64:17
seated 5:10 23:9 37:9 51:11 66:19
second 4:5 63:15 76:9 95:17 96:1 97:13 100:16 101:21 102:13 116:5 123:17
Security 48:7
see 5:13 10:20 14:15 19:20 27:6 28:19 33:17 39:8 46:22 47:19 52:16 59:2 60:15,20 63:22 67:18 68:6 75:23 76:5,15,16 80:25 86:3 86:6,10 87:14,15 88:23 94:19,22 106:1 110:6 114:20 117:1 128:3
seek 126:4
seeking 116:17
seen 10:13 125:11,19
select 94:13 95:21,24 96:1
selecting 98:1 99:20
sensational 102:17
sense 90:10
sentence 115:3 116:2,2
sentencing 51:4
separate 93:3,4 94:16 95:22 97:5 99:14 100:1 101:12,20 108:22 109:2
separated 46:25
sequestration 4:18 97:3
series 49:11,15
serious 72:6,8 102:18
set 120:21
settled 122:6
severance 93:19,21 95:2
severe 99:2,4
severed 95:9
severing 99:11
sex 10:25 11:6 13:1,2 15:20 25:17 25:20 35:9 47:12 48:10,12 61:20 61:21,22,23 62:1,22,23 65:1 73:6 73:13,17 90:19 102:6,7,11 116:16 117:3,9 118:4,23 119:2 119:11 121:7
sexual 119:17
shade 62:20
shaking 57:15
Shamsud-Din 123:14
sheet 48:6 65:20,21
shield 118:6,7 121:15,16,24,24 123:19
shirt 55:4 58:14
shocked 59:16
shoes 61:16
shoot 114:13
shooter 114:18
shooting 114:16
shop 55:15 58:1,4,5,6,6
short 60:14 66:18 120:22
shorter 94:15
shortly 1:11 39:25
shouldn't 73:25 117:6 122:17 124:22
show 14:20 34:20 83:22 88:11,15 113:5 117:4 118:11,16,19 122:17
showed 11:9 40:6
showing 11:11 61:18,19
side 11:11 31:11 55:16 56:13,22 57:23 58:1,1,6 59:12 60:14 61:15 62:19 85:4 110:20 114:16
sign 36:11 41:17 42:4 43:24 73:21 74:3,3,6 82:15,17,19
signature 41:15
signed 7:25 14:3 18:19,21 33:13,14 33:14 36:5,5,6 42:5,5 44:1,1 49:12,12 65:21 66:10 76:11 90:5 91:15
signing 19:11 36:24 49:8 82:7
silent 15:16 26:19 43:1

silver 80:1
similar 44:13
simple 114:7
simply 35:6 102:9
simultaneously 99:20 100:23
sir 13:8 33:24 47:15 48:2,11,14,20
48:24 49:4,10,20 50:1 51:12,15
52:3 54:13,16 102:22 104:2
105:21 127:16
sit 40:9
site 12:13 15:15 16:6
sitting 18:7 57:18 109:1,12
situation 72:6 90:18
six 97:9 127:7
slid 74:2 82:11,13
slide 65:21
slow 82:12
smaller 18:6
Social 48:6
soft 38:11 61:18
soften 34:11
solid 25:4
solve 100:11
solves 108:20
somebody 35:8 38:18 61:9,22
98:18,21 112:10
somewhat 90:7
soon 64:6
sorry 8:10 10:23 18:18 22:8 31:16
34:25 45:14 49:8 56:20 57:8
62:10 63:18 79:12 98:25 121:13
126:20
sort 76:16
south 55:9
Southern 1:1 3:8
speak 25:2,6 32:14 38:7,15 42:4
43:24 44:25 46:14,24,25 67:11
69:11 71:2,9,14,20 78:21 126:25
speaking 39:12,15 44:22 70:23
Special 5:22 21:17 23:1 37:21,22
50:17 84:11 86:21 89:17 91:12
specific 57:2 60:8 73:5 75:25 81:22
81:23 90:16,17 103:24 104:12,14
114:1,25 120:7 122:4 124:11
specifically 12:25 25:25 41:23 78:6
104:12 108:12 125:13
speculation 19:23 87:17 89:12
spell 5:11 23:11 37:10 51:16 81:20
spend 117:13
spent 117:13
spirit 121:12
spoke 26:3 32:11,13 42:11 47:10
125:6 126:22
spoken 38:11 61:18
spot 24:2
spouses 105:10,11 106:11 107:12
squarely 118:4
St 104:4
stage 68:2,9,11 106:8
stamped 111:1
stand 62:20 102:4,5 108:18 128:10
standard 20:5 126:2
standing 5:7 23:6 39:11,16 51:8
60:18 63:9,11 87:8
stands 115:1
start 43:20 52:10 79:13 101:17
116:25
started 11:6 34:2 58:11 60:15 62:8
62:18 65:4
starting 57:18 127:13
state 5:10,19 37:10 51:1,16 52:12
56:4 73:4 81:17 112:8 121:18
123:3
stated 48:17 121:1
statement 4:7,8 44:18 91:5,24
92:13,20 93:1,6,7,7,9 96:3 99:21
99:25 101:9 103:17 122:22
statements 4:11 21:13 25:19 35:12
68:23 91:6 92:1 93:5 100:5,7
101:3,5 109:14
states 1:1,4,11,22 3:2 49:5 68:22
117:17,21,24 121:13 122:23
123:5,8
statute 118:6,7 121:15,24
statutory 121:17
stay 64:23
stayed 26:5
stemming 4:12
step 23:2 37:3 50:19 51:6 58:2 83:2
STIPES 1:21

stood 114:15
stop 10:12 20:8,20 24:12,19 25:1
28:23 29:14,19,21 30:10 39:9
43:21 54:12 58:3 59:6 63:17
stopped 25:3 28:24 39:6
stopping 54:15
storage 61:24
story 35:7 49:23,25
straight 70:20
street 52:23 53:18
strike 115:6
strikes 97:6
strongly 94:12
stuff 12:23 33:3 62:2 65:1
subject 106:25 108:3 112:3
submission 92:8
submit 83:24 90:6 107:8 117:10
118:21 125:9,20
submitted 90:5
Subsection 104:12
subsequent 83:7 91:10 104:3
120:4,19 124:17
substance 108:3
substances 42:3
substantially 36:8
substitute 98:20
sufficient 118:11
suggest 34:21 40:16 49:2 90:9
suggesting 110:12
suggests 92:25
Suite 1:17,20
sums 92:10
sunglasses 55:3
supplemental 116:14
support 117:15
supporting 104:15 117:15
supposed 61:17
suppress 4:7,8,11 35:12 91:5 92:1
suppression 51:3
sure 8:15 22:3,7,10,13,23 26:5 30:3
35:15 53:13 63:1 64:5 77:21
78:17 81:9,20 88:20 93:12 96:18
99:9 127:20
surrounding 90:16
surveillance 24:10,14
Susan 2:10,17 5:3 6:15 13:18 27:2
37:6,8,12 61:10,11 62:25 64:17
64:17 65:19 91:12
suspect 20:18 28:16 37:25 38:4
118:18 120:13
suspected 121:6
suspects 39:23
Sustained 19:6,24 20:24 27:13
50:10 69:19 70:18 74:20 87:18
89:13
SUV 54:24
swap 98:21,22
sway 35:5
switch 98:18
SWORN 5:9 23:8 37:8 51:10
S-h-a-m-s-u-d 123:14


T

table 2:1 5:2
take 8:3,10 64:6,9,10,12,14,15
66:15,17 68:1 74:1 97:13,15
98:14,23 99:1 108:18 125:11,13
taken 33:6 35:4 39:25 66:18
takes 39:22 73:25
talk 12:14 15:13,18,20 20:22 22:18
22:22 31:24 35:14 40:4 60:10
62:25 63:22 68:21 70:4 71:6
82:12 90:13 96:6 107:12 113:3
talked 16:5,8 90:15 93:18
talking 12:8,12 17:1,3 22:19,19
60:15,19 61:24 62:4 63:14 73:4
76:14 86:17 90:11 122:1
tatoos 48:7
taught 37:24 38:2
teaching 54:2
team 85:3,9,13
telephone 84:6 88:6
tell 7:2 10:12 19:14 24:8 27:2 28:6
35:7 39:8 40:21 41:19 44:7 47:11
49:5,23 52:4 59:18,19,22 61:10
61:17,23 63:20 66:7 74:15 78:6
88:21 94:18 109:4,12
telling 59:19 107:21 128:1

tells 20:18 70:23
tendency 113:6
terminate 38:5
terms 18:9 93:11 94:14 127:19
testified 59:7 71:11,16 74:22 86:15
100:4
testifies 109:15 112:9
testify 18:24 19:10,13 50:24 51:2
68:22 95:9,12,15 109:21
testifying 62:15
testimonial 4:4,9 92:5 105:8
testimony 4:20 48:22 54:11 73:24
75:19 76:22 77:10 84:6 86:19
89:22,23 90:7,21,23 91:8 92:14
92:20 97:1 100:13 101:20 103:24
115:2
Thank 3:21 5:18 7:8 8:9 22:25 23:1
23:10,17 37:2,5,16 45:3,17 50:12
50:16,17 66:12 67:4 83:2 84:16
89:17 99:16 124:9 128:8,9
That's 16:11
thing 12:5 56:22 64:4 66:3 70:3
94:21 102:10 115:4
things 34:19 40:10,13 49:3 64:24
76:16,20,21 108:25 128:3,7
think 4:6 12:8,11,13 21:24 57:8
61:14,23 62:8 63:23 66:23 70:14
72:15 77:2 81:12 84:4 89:10,11
97:25 98:4 99:23 104:8,16
105:16 106:8,22 107:2 108:11
112:3,8,14 115:6,16,25 119:13
120:17 121:12 122:15 126:21
thinking 100:17,17,18 109:1
third 123:24
thought 57:19 105:9
threaten 28:4
threats 21:1,4,7,10,23,25 44:21,25
91:17
three 37:23 77:8 79:7,10,11,14
thrust 103:2 115:15
ticket 56:10
tight 40:25 55:4 58:21 65:10
time 4:24 6:7,14,19,24 8:2 11:5
13:4,6 17:10 19:4 20:5 21:4,7
22:21,22 23:4 27:15,18,25 28:3,6
29:19 32:16 36:13 37:6 39:13
43:21 44:7 46:15 47:23 48:12
49:1 53:23 54:7 59:9,10,24 60:13
61:7 62:4 64:2,25 66:13 69:1,9
78:5,6 79:7,15 81:25 86:6 87:10
94:14 97:13 102:20 103:5 105:14
111:2 124:3 125:2 126:23
timely 126:14
times 78:4 90:16 97:2
today 14:17 17:17 71:16 116:14
128:3
told 10:24 11:11,22,25 12:2 13:1
22:20 50:4 56:13,21 60:9,21,21
61:3,20 62:3,24,25 63:22 65:17
66:9 69:14 73:23,23 75:25 76:22
76:25,25 77:1,3,5,6,12,19 78:10
78:22 90:19 125:13
tone 38:13,13 60:8 75:25 81:22,23
total 127:11,17
totally 90:6
touch 80:11
tow 56:10
Tower 9:8
Town 24:15 32:19 52:24
Toyota 53:4,5 63:12
traded 119:17
traffic 10:12 24:12,19,25 25:5
29:14,19,21 30:10 39:9 53:17,19
54:11 62:1
traffick 61:22 102:6
trafficking 10:25 11:6 13:1,3 15:20
25:17,20 47:12 48:10,12 61:21
61:21,23 62:22,23 65:1 73:6,13
73:17 90:19
training 37:24
trait 115:8
transcript 1:10 100:4
transcripts 105:16
transport 14:13,14 26:4
transportation 40:3
transported 82:8 14:6,23,24 15:6
40:2 47:24 48:3
travel 53:9 61:24
traveling 52:20 53:3 55:9,10 105:6

105:7
treatment 119:16
trial 92:16 93:23 95:17 96:14,25
99:1,2,22 100:1,23 101:15,17
118:10,10,12,15 120:3,11 126:8
trials 99:14,20 100:1 101:12,18
trick 114:15
tried 60:16 114:14 115:10
trouble 14:16
truck 54:25
true 67:19 68:15,18 69:1,6,11 71:3
71:23 72:1,20 73:3,7,9 74:24
75:13 76:3,13 77:10,12,12 78:19
78:24 103:17 108:13 111:24
118:18
truthfulness 104:9,17
try 20:22 94:15 97:13 109:14 122:2
trying 3:9,17 34:10,11 60:19,20
65:11 73:11 75:2,5 101:4 102:18
108:22 109:1 117:4 119:15
Tuesday 98:10
tumulterous 102:8
turn 60:22,22 63:13 102:12 118:22
twelve 57:20 62:25
twice 95:10,12 97:2,2 109:22
two 9:20 24:3 30:6,9 60:1,1 75:20
77:8 92:17,25 93:14,23 94:3,7,10
94:13,15,24 95:1,21,21 96:4,4,13
97:23,25 98:1,3,6 99:1,14,20
100:1 101:20 102:9 108:22 109:2
113:24 114:13 115:23
type 64:25 104:10 111:14 117:2
118:3,6


U

Uh-huh 52:7 76:6
Uh-hum 82:5
Um-m-m 52:8 79:16
unclear 105:7 113:23 114:1
underlying 113:25 115:22
understand 16:10 27:18 42:1,24
59:21 60:17 83:15 90:4,5 93:20
95:18 101:8 105:25 110:10 111:5
113:18 119:7
understanding 3:6
understands 57:2
understood 22:13 72:22,23 86:19
89:5 91:22 113:24
unfairly 124:4
unhandcuffed 18:15
uniform 60:21
unit 23:22 29:24,25 30:1
United 1:1,4,11,22 3:2 49:5 117:17
117:20,24 121:13 122:23 123:5,8
unmarked 57:21
unrelated 102:1
untruthfulness 103:22 104:10
upset 1:5,7 61:5 69:24 70:1,13
upstairs 63:16
upwards 28:14
urges 94:13
use 38:2 65:13 68:2,8,13 75:10
80:11,13 102:24,25 103:6 122:7
uses 36:3 68:5,9,11
usually 48:6 54:6
U.S 33:20


V

v 120:8
vacation 98:11
valid 126:13
value 93:18
Vanessa 1:14 3:23
vehicle 9:23 12:22 24:21,24 25:1,2
26:5,10 30:24 31:2,3,4,12 46:7
46:12 52:20 54:7 77:13 79:7 87:8
87:9,10,12,12,15,15
venire 95:21
venires 95:22
veracity 13:13 103:24
Vermont 95:8
versus 3:17 117:21,24 121:13,14
123:5,8
Viamentes 5:14 23:16 37:4,14 67:3
84:5,13
Vice 23:22 30:1
vicinity 79:14
victim 34:21 35:3 95:9,11,14
103:16 109:21 112:22 115:9

119:14,14 122:8 123:23
**victims** 95:6 101:20 116:15 119:9
122:2,6 123:1,16
**victim's** 118:3
**VIN** 29:24
**violated** 69:23 70:14,22 124:20
**violations** 102:9
**violence** 102:1 115:20 116:1
**violent** 113:5,5,19 115:13
**voice** 27:21 38:16
**voir** 93:10 127:8,9
**VOLUME** 1:9
**voluntarily** 34:23 91:22
**voluntary** 91:5,25
**vs** 1:6

---

**W**

**waived** 34:13,14,23 91:23
**waiver** 18:22 20:15 36:3 41:11
49:12 71:25 90:6 91:15
**waiving** 27:7 33:14
**walked** 62:8
**wallet** 60:5 64:10
**want** 8:10,12 20:18 32:12 51:6 57:2
58:22,24 59:7 61:8 62:25 71:12
82:4 83:17 85:9 89:21 93:9,21
98:3 99:5 101:12 103:19 109:12
110:24 111:11,18 114:10 115:17
118:19 121:9,9 122:12 123:3
**wanted** 11:23 19:20 22:17,19 25:23
40:16 44:5 59:16 60:15 61:6
63:13,22 65:16 76:13,15
**wants** 38:4 50:24 92:19 113:3,4
**warning** 49:9 105:22 106:9,23
**warns** 105:22
**warrant** 25:8,11 32:4 40:6 49:8,9
**warrants** 56:10
**wasn't** 6:6 13:2 17:11 19:9 30:21
34:1 35:2 52:19 56:11 67:25
82:22 125:16
**way** 25:14 32:3 33:17 35:6 47:19
65:12 67:18 73:6 78:22 80:12,14
92:22 94:9,19 103:22 106:5
111:16 115:2 120:1
**weaken** 99:23
**wearing** 55:3 58:13 61:7
**Wednesday** 98:10
**week** 98:8,9 99:3 105:16
**weekend** 96:8
**weeks** 68:14 99:1
**weight** 84:2
**went** 26:16 41:11,19 54:1 59:12
60:14 64:15 65:11 68:17 69:4
125:17
**weren't** 6:4 19:8 21:12 41:2 45:24
72:25 126:21
**Western** 123:6
**Westlaw** 117:22 123:6,14
**We've** 97:24
**whatnot** 55:20 56:10
**what's** 61:17
**wheel** 31:12
**white** 24:17 25:4 26:6,9 31:1,18
32:19 55:19 58:13
**wig** 64:10
**willing** 96:2
**window** 60:16,19
**wise** 66:20 98:7
**wish** 43:19 102:3 104:7
**wished** 27:10
**wishes** 93:6 110:20
**withdraw** 84:20 87:17
**withdrawing** 125:2
**withheld** 124:19,21
**witness** 4:22,23 5:9,12 6:19 7:5 8:8
8:10,16 10:17,19 13:9 19:1 23:3
23:8,10,13,15 26:18 27:2,9,21,23
28:3 31:21 34:11,25 36:5,11,23
37:4,8,12 38:9 42:18 44:12,15,24
46:11 51:10,12,15,18 63:18
86:13,15,22 97:17 103:11,23
104:9 125:6,7 126:17,24,25
**witnessed** 28:21 33:15 36:20
**witnesses** 4:16,19 50:20 83:4 91:8
95:6,15 96:13,18
**women** 117:5 118:20
**wondering** 56:9
**won't** 19:15 118:9,10 122:2
**word** 48:23 88:3

**words** 22:11 66:2
**work** 5:19 23:19 37:18 44:8 51:25
66:20 99:15 114:15
**working** 23:23 24:4 38:25 102:13
**worried** 110:6
**worry** 82:7
**wouldn't** 11:21,23 12:2 16:8
118:17
**wrap** 82:3
**wrapping** 22:17
**write** 7:22,23 14:2 29:17 41:21 42:1
42:9 67:9
**writing** 33:13 110:5
**writings** 110:8
**written** 119:4 125:20
**wrong** 94:25
**wrote** 13:22,24,25 14:3

---

**Y**

**yeah** 78:12,22 81:23
**year** 31:13,16 45:18 114:8 116:2
122:11
**years** 11:21 23:25 24:3 28:10 37:23
65:2 69:14 70:22 77:4,6
**yelled** 62:21 64:5
**yesterday** 83:22 85:12 116:8
125:12,16 126:3,6
**York** 123:6,13
**young** 117:4
**you've** 98:4 115:23

---

**Z**

**Zacca** 1:16,17 3:5,6,11,14,17,20
92:9 93:16 99:6,10 100:10,19
101:18,23 102:3,5,22,25 103:15
104:2,7,8,24 105:21,25 106:3,14
106:19,22 109:6 111:11,12,20
114:7,19 115:4 116:3 120:25
124:17 125:4,20,24 126:10,20
127:15 128:9

---

**$**

**$150** 97:17
**$250,000** 65:3,5 76:25
**$800** 60:5 97:19

---

**1**

**1** 1:9 2:24 35:25 36:14,17,18 88:25
91:16
**1:30** 13:5,9,11,15 14:4,6,12
**10** 18:9 66:17 89:1 97:6 127:4,9,15
**10th** 67:17
**1001** 122:23
**11** 89:1 113:15 116:24
**11th** 113:22 117:17,19,23
**1100** 1:20
**1191** 117:18
**1196878** 117:22
**12** 18:9
**12-60312-CR-COHN** 1:3
**12:53** 78:3 86:9,10,23
**120** 105:15
**12781** 1:17
**13** 114:8
**1344** 121:16
**14** 5:23 24:4 38:25 78:18 84:17
86:3 91:11 98:1 126:5,14,19
127:11
**14th** 45:18 52:2 80:8 86:9 88:24
**147** 102:2
**148** 4:4 92:6
**149** 103:13
**15** 65:2 77:4,6 127:8,17
**150** 104:23
**151** 111:8
**156** 112:23
**16** 18:9
**17** 20:11
**171** 124:16
**18** 122:23
**1820** 52:23
**183** 124:11
**19** 2:24
**19th** 117:22

---

**2**

**2** 88:25 107:9 117:25
**2:02** 14:6
**2:25** 14:9,12 16:11
**20** 65:11 127:17
**2007** 121:16
**2008** 53:4
**2009** 117:19
**2010** 117:25 124:14
**2011** 123:14
**2012** 5:23 24:4 36:9 38:25 52:2
78:18 84:17 86:3 91:11 123:12
**2013** 1:7 117:22,22 123:7
**21** 2:4 51:24
**23** 2:5
**24** 2:6,7
**24th** 98:24,25
**25** 15:14 16:5
**28** 123:6
**28th** 98:25
**299** 1:23

---

**3**

**3** 88:25
**3E** 113:2
**30** 2:8 65:11
**303** 1:17
**318** 80:22 81:3,6,8,9
**321568** 123:5
**33021** 1:18
**33132** 1:15
**332** 111:1
**33301** 1:20,23
**336** 111:1
**36** 2:9
**37** 2:24
**38** 2:10,11
**381** 81:8,9

---

**4**

**4** 88:25
**40** 69:14 70:22
**40's** 58:16
**403** 102:16
**404(a)(2)** 115:7
**404(b)** 115:6 120:12
**404(b)(2)** 116:22
**412** 116:24 118:5 119:3 122:4
124:2 126:4,5,10
**46** 2:12
**472** 121:15

---

**5**

**5** 88:25
**50** 28:14 69:14 70:22
**50's** 58:16
**500** 1:14
**5118840** 123:14
**52** 2:13,14
**575** 117:18
**598** 117:25

---

**6**

**6** 2:1,2 88:25 123:11
**6th** 113:9
**60** 28:14
**608** 104:9 122:17,18
**68** 2:15
**684** 123:8

---

**7**

**7** 88:25
**7th** 1:14 123:10
**703** 123:8
**740** 117:25
**754** 76:8
**754-245-7323** 76:8

---

**8**

**8** 2:3 18:9 88:25
**8:47** 86:8
**80** 2:16
**85** 2:17,18
**89** 2:19

---

**9**

**9** 1:7 88:25 127:13
**902.11** 127:21

---

**954-769-5496** 1:24